STATE OF ILLINOIS      )
                       )  SS:
COUNTY OF C O O K      )

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT – LAW DIVISION

RAMIRO BAHENA,                    )
                                  )
            Plaintiff,            )
                                  )
            vs.                   )   No. 15 L 3260
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
            Defendants.           )


          The deposition of NANCY GALASSINI ADDUCI,
called as a witness herein, pursuant to the
applicable provisions of the Code of Civil Procedure
of the State of Illinois and the Rules of the Supreme
Court thereof, taken before THERESA M. LAZZARO,
CSR No. 84-004629, on March 13, 2017 at 11:07 a.m. at
33 North LaSalle Street, Suite 1950, Chicago,
Illinois.

1  PRESENT:
2      SECOND CITY LAW, P.C., by
       MR. JAMES BARANYK
3      30 North Dearborn Street, Suite 1950
       Chicago, Illinois 60602
4      312-517-2904
5         and
6      LAW OFFICE OF AMEE ALONSO, by
       MS. AMEE E. ALONSO
7      33 North Dearborn Street, Suite 1950
       Chicago, Illinois 60602
8      773-412-5228
       amee.alonso@comcast.net
9
          Appeared on behalf of Plaintiff;
10
11     QUERREY & HARROW, by
       MR. MATTHEW P. DIXON
12     175 West Jackson Boulevard, Suite 1600
       Chicago, Illinois 60604-2827
13     312-540-7606
       mdixon@querrey.com
14
          Appeared on behalf of Defendants;
15
16     COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
       MR. ALVIN PORTIS and
17     MS. SUYON FLOWERS
       50 West Washington Street, Room 500
18     Chicago, Illinois 60602
       312-603-5339
19     alvin.portisjr@cookcountyil.gov
20        Appeared on behalf of the Deponent.
21
22
23
24

1              I N D E X
2
3  WITNESS:
4  NANCY GALASSINI ADDUCI
5
6  EXAMINATION BY:                PAGE
7    MR. BARANYK           4
8    MR. DIXON        65
9    MR. BARANYK            73
10   MR. DIXON       80
11
12 EXHIBITS:    DESCRIPTION          PAGE
13 Exhibit A   Eye exam record, one page      82
14 Exhibit B   Case Supplementary Report      82
15
16
17
18
19
20
21
22
23
24

1          (WHEREUPON, the witness was
2          duly sworn.)
3          NANCY GALASSINI ADDUCI,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6          EXAMINATION
7  BY MR. BARANYK:
8      Q.  And is it Ms. Adduci?
9      A.  Yes.
10     Q.  If you wouldn't mind just stating and
11 spelling your name --
12     A.  Sure.
13     Q.  -- for the record.
14     A.  I practice under Nancy Galassini,
15 G-a-l-a-s-s-i-n-i, Adduci, A-d-d-u-c-i.  It's not
16 hyphenated.
17     Q.  And during the time frame of Mr. Bahena's
18 criminal case was your last name Galassini?
19     A.  It was.
20     Q.  And what was the spelling of that last
21 name?
22     A.  G-a-l-a-s-s, like Sam, i-n-i.
23     MR. BARANYK:  This is the deposition of Nancy
24 Adduci --

1          Is it Adduci or Adduci?
2      THE WITNESS:  Adduci.
3      MR. BARANYK:  Okay.  Adduci.
4          -- taken pursuant to notice and the
5  Illinois Rules of Civil Procedure.
6  BY MR. BARANYK:
7      Q.  Have you ever had a deposition taken
8  before?
9      A.  Once.
10     Q.  Okay.  You probably kind of get what the
11 ground rules are -- you're an attorney -- so I'll
12 spare you the gory details, but I'm going to be
13 asking a bunch of questions.  If at any point I ask a
14 question that doesn't make sense --
15         A lot of times a question, when it
16 comes out of my mouth, it will be like what is he
17 saying.
18         -- make sure you let me know, and
19 I'll do my best to rephrase the question in a clear
20 way.
21         And the only other thing, obviously,
22 as you know, is the court reporter is taking down
23 everything we say, so if we do what we do in normal
24 conversation, start to answer questions before the

1  question is finished, it won't translate to a clean
2  record.
3       Also if at any time you need to get
4  up, need to use the washroom, take a break for any
5  reason, even need to check your cell phone, all of
6  that is totally fine. The only thing I'd ask is if
7  there's a question pending answer the question and
8  then you can take whatever break or breaks that you
9  need.
10       I don't anticipate this going all
11  that long, but I just want to let you know, so don't
12  feel like you can't say, hey, I need to answer a call
13  or something because that's totally fine.
14       So also just another kind of basic
15  thing: Is there any reason why you wouldn't be able
16  to answer truthfully and accurately --
17       A.  No.
18       Q.  -- today?
19       Okay.  Good.
20       Ms. Adduci, what is your current
21  assignment with the Cook County State's Attorney's
22  Office?
23       A.  I'm a deputy supervisor.
24       Q.  And where are you a supervisor?

1       A.  In the Conviction Integrity Unit.
2       Q.  And just if you wouldn't mind giving a
3  thumbnail of what your responsibilities are there.
4       A.  The Conviction Integrity Unit
5  investigates old cases, old convictions, people
6  convicted in Cook County, to see if we have the right
7  person for lack of a better term.
8       In reviewing the cases, as a deputy
9  supervisor I intake all the cases into the unit, I
10  assign all the cases in the unit, and I participate
11  in my own investigations as well as contemporaneously
12  with the people I supervise to supervise their
13  investigations, and I report to -- currently I report
14  to the deputy chief of the State's Attorney's Office.
15       Q.  And who is the deputy?
16       A.  It's April Perry.
17       Q.  How long has that unit been around?
18       A.  It's been around since 2012, and I've
19  been there since May of 2014.
20       Q.  And where were you before that?
21       A.  I was in the Domestic Violence Unit.
22       Q.  How long were you in the Domestic
23  Violence Unit?
24       A.  I believe a year, and I'm not sure of the

1  exact date.  Sometime after January of 2013 I think I
2  went in there.  I think it was January, but I'm not
3  sure of the exact date, so approximately a year I was
4  in the Domestic Violence Unit.  Prior to that I was
5  in the Felony Trial Division.
6       Q.  And the Felony Trial Division, were you
7  part of the special -- a special prosecution team
8  or --
9       A.  No.  I was just a line first chair
10  assistant.  At the time I was in Judge Wadas'
11  courtroom, so I went from Judge Wadas to domestic to
12  CIU.
13       Q.  And at the time when this criminal case
14  happened, were you assigned to Judge Wadas'
15  courtroom?
16       A.  When the crime actually occurred?
17       Q.  Your involvement with the case.
18       A.  What happened is I got transferred from
19  Judge Wadas to domestic violence.  This case had
20  already been pending on the calendar and the call of
21  the person I took over from.  That person was
22  transferred out.  I got transferred in.  This was one
23  of the cases that was pretty much in a trial posture
24  when I came into the Domestic Violence Unit.

1       Q.  And over the course -- and when did you
2  start at the Cook County State's Attorney's Office?
3       A.  1996.
4       Q.  And in your time there I imagine you've
5  prosecuted numerous felonies?
6       A.  Yes.
7       Q.  And have you prosecuted numerous
8  homicides?
9       A.  Yes.
10       Q.  Roughly how many?
11       A.  Juries or benches?
12       Q.  Let's just say both.
13       A.  Probably a hundred.
14       Q.  That's quite a few.
15       And how many homicides have you
16  recommended withdrawing charges or dismissing a case,
17  roughly?
18       A.  Have I recommended or have they
19  actually -- has it actually happened?
20       Q.  Have you recommended for starters.
21       A.  Well, are we talking about up until CIU?
22  Because CIU incorporates a lot.
23       Q.  Let's say up until then.
24       A.  So before I entered CIU?

1     **Q. Yeah.**
2     A. Because that's part of -- I mean, CIU was
3  recommending nolles.
4     **Q. Right.**
5     A. I mean, that's pretty much what I do.
6     So I'm going to take those out of
7  the equation, and then the answer would be one. It
8  would be this one.
9     **Q. And how many homicides have you**
10  **investigated not including the CIU?**
11     A. Oh, investigated?
12     **Q. Or, sorry, have you been on.**
13     A. That's a hard number to give. I mean, in
14  the Felony Trial Division, and I was there from
15  approximately 2003 to 2013, so approximately ten
16  years, I mean, I was never assigned to a drug room.
17  I was always in a major role, so it was -- I
18  really -- that would be so hard to say because you
19  work on -- maybe you don't try it, but you work on
20  it. You're doing discovery. You're opening a file.
21     So if you're talking about just
22  working on homicides, basically from 2003 to 2013 I
23  was working homicides.
24     **Q. Which is -- that's --**

1     A. Yeah.
2     **Q. -- a plenty good answer.**
3     **When did you first become involved**
4  **in the Bahena case, if you recall?**
5     A. When I got assigned to domestic violence.
6     **Q. And that was quite some time after Bahena**
7  **was originally arrested, charged, and/or rearrested;**
8  **is that correct?**
9     A. I don't know the timing of the --
10     **Q. Okay.**
11     A. I don't know when the crime occurred. I
12  don't recall the dates.
13     **Q. He had already been charged before you**
14  **were on the case though; is that correct?**
15     A. Yeah. My recollection is when I came
16  into DV, it was a case that I took over from the
17  previous assistant and it was in a trial posture.
18     **Q. And do you recall who the previous**
19  **assistant was?**
20     A. Ruth Guidino.
21     **Q. And who was on the case with you when you**
22  **took over from Ruth?**
23     A. It was just me.
24     **Q. And what were your responsibilities with**

1  **regards to the Bahena case being in a trial posture?**
2     A. So I started to -- I think -- I mean, I
3  don't remember if it had a trial date set, so let's
4  assume, you know, it did or didn't. It was getting
5  it ready for trial, which meant reviewing the file,
6  interviewing the officers, interviewing witnesses,
7  reviewing all the physical evidence.
8     **Q. And reviewing like the case incident**
9  **reports and--**
10     A. Exactly. Any motions, looking at
11  transcripts of any previous motions that were
12  litigated, looking at the procedural history.
13     **Q. GPRs?**
14     A. Correct.
15     **Q. Supplemental reports?**
16     A. Yes.
17     **Q. Now, what are GPRs?**
18     A. General progress reports?
19     **Q. Yeah.**
20     A. They're notes taken by detectives
21  usually -- any officer can take them, but it's
22  usually detectives -- during the course of their
23  investigation.
24     **Q. To your knowledge are those done**

1  **contemporaneously when they're out in the field?**
2     A. When I was on felony review, that's what
3  I observed.
4     **Q. Now, did you review any of the GPRs from**
5  **the detectives in this case regarding their witness**
6  **interviews?**
7     A. I have no independent recollection of
8  reviewing the GPRs, but I'm certain I did.
9     **Q. And do you recall whether you requested**
10  **all of the GPRs?**
11     A. It is my recollection that that file was
12  complete at the time.
13     **Q. Based on your recollection do you believe**
14  **that any GPRs that should have been in the file were**
15  **missing?**
16     A. I have no recollection of that. I have
17  no recollection of -- I have no recollection of
18  sending additional subpoenas, talking to officers,
19  asking for additional information, or feeling
20  something was missing. I don't have a recollection
21  of that.
22     MR. BARANYK: One second. Can we take just a
23  five-minute break?
24     (WHEREUPON, a recess was had.)

BY MR. BARANYK:

1    Q.  Do you remember one way or another
2  whether you requested additional materials from the
3  officers once you were assigned to the case?
4    A.  I don't recall.
5    Q.  Would that have been documented in a --
6  if you did, would that have been done in -- would
7  that have been a request that would have been done in
8  writing?
9    A.  It might have been.  I might have issued
10  another subpoena and then compared the result of that
11  subpoena to what I had.  It might have been a phone
12  call asking someone to bring in the file so I could
13  look at it.  I don't remember.
14    Q.  So if you did, there's a chance that
15  there might be a subpoena and then that would be in
16  the case file?
17    A.  It should be.
18    Q.  Do you recall speaking to any of the
19  detectives on the case?
20    A.  I recall speaking to detectives.  I don't
21  remember which ones.
22    Q.  Does the name Detective Moreth sound
23  familiar to you?

1    A.  No.
2    Q.  Does the name Detective M. Kennedy sound
3  familiar to you?
4    A.  It sounds familiar to me.
5    Q.  Do you have any recollection of who that
6  individual is as you sit here today?
7    A.  No.
8    Q.  How about a Detective W. Fielder -- or
9  Fiedler?
10    A.  No, it doesn't sound familiar to me.
11    Q.  How about a Detective Haniacek?
12    A.  Haniacek?
13    Q.  Yeah.
14    A.  I know who Haniacek is.  I don't recall
15  him being on this case.
16    Q.  How about a Detective R. Rodriguez, Jr.?
17    A.  No, I don't recall.
18    Q.  A Detective Takaki?
19    A.  I don't recall.
20    Q.  A Detective D. Jensen?
21    A.  I don't recall.
22    Q.  A Detective Velazquez?
23    A.  I don't recall.
24    Q.  A Detective V. Alonso?

1    A.  I know who that is.  I don't recall
2  talking to him on the case.
3    Q.  A Detective T. Dusenbery?
4    A.  I don't recall.
5    Q.  A Detective J. Morales?
6    A.  I don't recall.
7    Q.  A Detective D. Healey?
8    A.  I don't recall.
9    Q.  A Detective J. Hillman?
10    A.  I don't recall.
11    Q.  How about a Detective Alvarez?
12    A.  I know some -- I know a couple Detective
13  Alvarezes.  I don't remember talking to any of them
14  that I know on this case.
15    Q.  Do you recall specifically any detective
16  by name that you talked to with regards --
17    A.  No.  I can remember a description of one
18  of the detectives.  That's the best I can give you.
19    Q.  And what did that detective look like?
20    A.  He was a tall Caucasian gentleman, older
21  than me, so forties, so he's maybe in his fifties.
22    Q.  And do you recall what the nature of your
23  conversation or conversations was?
24    A.  When I explained that we were dismissing

1  the case.  I remember that conversation.
2    Q.  Do you know what his role was in the
3  case?
4    A.  I remember he was a detective on the
5  case.
6    Q.  Okay.  And what did you tell him as to
7  why you were dismissing the case?
8    A.  That we were exercising our discretion
9  and we were dismissing the case.
10    Q.  Did you give him any more details than
11  that?
12    A.  I don't recall.
13    Q.  Now, do you know if you spoke to an
14  Officer Rene Duran in connection with this case?
15    Q.  Do you know if you spoke with a -- I
16  don't remember if it's an officer or a detective, but
17  an individual by the name of Steve Gilmour?
18    A.  I don't remember.
19    Q.  Now, did you review the original
20  scene -- or the original incident case report?
21    A.  Yes.
22    Q.  And --
23    MR. PORTIS:  I'm sorry.  Can you clarify?

1  When she reviewed things --
2      MR. BARANYK:  Sure.
3      MR. PORTIS:  -- do you mean today or back
4  then?
5      MR. BARANYK:  Actually, yeah, I can do that.
6      MR. PORTIS:  Okay.  Thank you.
7  BY MR. BARANYK:
8      Q.  So have you reviewed anything in
9  preparation for your deposition today?
10     A.  No.
11     Q.  So when would you have reviewed the
12 original case report?
13     A.  Sometime when I first entered the unit,
14 so sometime around 2013 is when I would have started
15 looking at it.
16     Q.  Do you know -- so was that -- and you
17 entered the unit in January of 2013?
18     A.  I don't know the date I entered the unit,
19 and I'm basing that on -- I don't remember.  I just
20 don't remember when I started.  My husband passed
21 away in 2012 in November, and I know it was after he
22 died because -- and that's my way -- the way I'm
23 basing it on my dates, so I just don't remember.
24     Q.  Sure.  I understand.  Were you assigned

1  to the case right away when you were --
2      A.  Yes.  It was one of mine for sure.  I got
3  that, inherited that, with the assignment.
4      Q.  Do you recall there being a witness in
5  the case by the name of Arturo De la Cruz?
6      A.  I remember the name Arturo.  I remember
7  he was the eyewitness.  I can't recall his last name
8  at this point.
9      Q.  Do you recall whether in the original
10 case report whether Arturo De la Cruz identified the
11 shooter by name?
12     A.  I don't recall what the case report says.
13     Q.  Would taking a look at the narrative in
14 the original case incident report refresh your
15 recollection?
16     A.  As to what it says in the case report?
17     Q.  Yeah.
18     A.  Yeah.
19     MR. BARANYK:  Okay.  I've got another -- I
20 should have another two copies.
21     MR. PORTIS:  We can share one.
22     MS. FLOWERS:  Yeah.  I have one.  It's just
23 marked up.
24     MR. BARANYK:  Here you go.

1  BY MR. BARANYK:
2      Q.  What does that document appear to be to
3  you?
4      A.  It's the original RD, the paper.  It's
5  the first paper of the original RD case report.
6      Q.  And if you take a look, I believe it's
7  Page --
8      A.  Four.
9      Q.  Is that -- the page that has the --
10     A.  Page 4, yeah.
11     Q.  Page 4 with the narrative, does that
12 indicate that the assailant who Arturo saw was an
13 unknown male Hispanic?
14     A.  Yes, it does.
15     Q.  Okay.  Thank you.  I don't have any
16 further questions on that document.
17         As you sit here today do you know
18 whether Arturo ever identified Mr. Bahena by name?
19     A.  I believe he did.
20     Q.  And did that -- well, strike that.
21         Now, if you had meetings with any of
22 the detectives throughout the case, would you have
23 created a record indicating which detectives you met
24 with?

1      A.  The only record you'd see is a
2  notification.
3      Q.  So you would send a notification to the
4  department?
5      A.  Correct.
6      Q.  And do you know whether or not you sent
7  out any notifications as you sit here today?
8      A.  I don't have any independent
9  recollection, but I'd be shocked if I didn't.
10     Q.  And is a copy of -- is a copy of those
11 notifications contained in the State's Attorney's
12 case file?
13     A.  They should be.
14     Q.  Okay.  Now, do you recall whether you did
15 anything to verify what the detectives told you?
16     A.  I don't recall, but I'm -- I -- I mean,
17 that's assuming what they told me, so I don't recall
18 having a conversation with the detectives prior to me
19 reviewing all the evidence and all the records and
20 all the transcripts.
21     Q.  And that's just your recollection?
22     A.  Yeah.  I don't remember calling them in
23 first --
24     Q.  Okay.

1    A. -- which would have -- I don't remember
2  it, but that would be a map that I wouldn't have -- I
3  usually wouldn't have done it that way.
4    Q. Do you have any recollection of any
5  conversations other than the one we spoke about where
6  you informed them that --
7    A. I -- I don't. I'm sure I had other
8  conversations, but I don't remember.
9    Q. Do you recall reviewing -- or did you
10 review the lineup evidence?
11   A. I did.
12   Q. Do you have any recollection of reviewing
13 that?
14   A. No.
15   Q. And did you review the security on the
16 security video?
17   A. The next-door neighbor's? Yes.
18   Q. Yeah. And what, if anything, do you
19 recall about the security video?
20   A. I remember I wanted it to be enhanced and
21 I could not get it enhanced.
22   Q. Did you send it anywhere to have it
23 enhanced?
24   A. I don't recall if I sent it or I -- I

1  know I talked to someone. My recollection is that I
2  don't know if it was the FBI or if it was the RCFL,
3  but someone told me -- what I was looking for was the
4  height on the shooter, and I distinctly remember this
5  because I thought it was ridiculous because they said
6  they could give me the height within six inches, plus
7  or minus. Well, that doesn't do me any good.
8         And I recall some other aspects.
9  That I specifically recall. The rest of it just
10 recall them saying it couldn't be done. Whatever I
11 was asking for couldn't be done. But the height, I
12 remember thinking within that --
13        So I was trying to get more
14 identification based on height, weight, whatever I
15 could on the image in the surveillance, and it was
16 impossible based on the quality of the surveillance,
17 et cetera.
18   Q. Do you recall whether, in fact, you sent
19 it out or just had conversations about sending it
20 out?
21   A. I had to have sent it out because then it
22 had to be looked at for that point of reference to be
23 told to me. Do I recall sending it out? No. Do I
24 remember who I sent it to? No. Do I remember that

1  actual part of that conversation? Yes.
2    Q. And would that -- would the details of
3  where it was sent out to or any -- would that be part
4  of the State's Attorney's file?
5    A. It should be, yes.
6    Q. Now, after reviewing the video yourself
7  did you have any misgivings about the case?
8    MS. FLOWERS: Objection. Form. Relevance.
9  BY THE WITNESS:
10   A. It wasn't just the video. It was
11 everything. It was the combination of all of the
12 work I had done up to that point.
13 BY MR. BARANYK:
14   Q. And what things -- what evidence or what
15 things led to that combination?
16   A. I interviewed Arturo. Arturo was not
17 identifying Mr. Bahena. He wasn't unidentifying him,
18 but he wasn't identifying him. He was saying he
19 couldn't see the face of the shooter. He could see
20 the shooter, he saw the shooting, but as to whether
21 or not it was Mr. Bahena he was unsure.
22   Q. And how about any other evidence or
23 things?
24   A. There was the video. I'm guessing there

1  was the original case report --
2    Q. And what --
3    A. -- which --
4    Q. Sorry. Go ahead.
5    A. Well, I mean, I just read it now. I
6  don't remember this. So it's a domestic. Sometimes
7  they don't name someone they know right away. That's
8  not unusual, but taking that maybe in conjunction
9  with everything.
10        I don't remember, though, exactly
11 what I thought at the time. I just remember the
12 combination of all my investigation and the video was
13 what led to my thinking or my decisions regarding the
14 case.
15   Q. And what specifically about the video, if
16 you recall?
17   A. You can see Mr. Bahena, and he's well
18 identified prior in the video. He's identified by
19 the police. He was identified by the living
20 witnesses, including the injured witness.
21        You then later see on the same
22 surveillance video in the same -- similar location
23 but across the street you see the shooting. The
24 person is not dressed the same. The person appears

1  to perhaps not be the same age, weight, or height;
2  however, that could be a distortion of the video, so
3  it's unclear because it's across the street, because
4  it's raining, because it's a different perspective,
5  but the person isn't dressed the same is my
6  recollection.
7      Q.  And when you looked at the video, did you
8  believe it to be Mr. Bahena?
9      A.  I didn't form an opinion.
10     Q.  Did you ask anyone else if that appeared
11 to be Mr. Bahena?
12     A.  I did.  I asked people to watch the
13 video.
14     Q.  And do you remember who you asked?
15     A.  Probably anyone who was in the room at
16 the time that I partnered with.  I might have asked
17 them after looking through everything to look at it,
18 and I definitely remember I asked my supervisor to
19 look at it.
20     Q.  And what happened when your supervisor
21 looked at it?
22     MS. FLOWERS:  Objection.  Form.
23 BY THE WITNESS:
24     A.  I don't recall what he said to me.

1  BY MR. BARANYK:
2      Q.  Do you recall any of the people you
3  showing the video to having misgivings about the
4  shooter potentially being Mr. Bahena?
5      A.  I believe --
6      MS. FLOWERS:  Objection.  Hearsay.
7  Speculation.  Form.
8          Go ahead.
9  BY THE WITNESS:
10     A.  They didn't know Mr. Bahena.  They had no
11 idea.  I was asking them to look at that video in a
12 vacuum just in and of itself.
13 BY MR. BARANYK:
14     Q.  And when you looked at the video,
15 understanding that there could have been possible
16 distortion of the video and the video wasn't of the
17 highest quality, it appeared to you that the shooter
18 may have been a different age than Mr. Bahena?
19     A.  I wasn't sure, but it was possible.
20     Q.  Was it enough to raise doubts in your
21 mind?
22     A.  It was.
23     Q.  And how about the height?
24     A.  That was really hard to tell.

1      Q.  So I assume that didn't form any basis?
2      A.  No.
3      Q.  Okay.  And how about the weight of the
4  individual?
5      A.  I don't recall, but I think that -- I
6  just don't recall if that was -- it was global.  It
7  was -- just there was questions about whether this
8  was the same person that I had seen earlier in the
9  video based on the way they walked, the way they
10 moved, based on probably the fact that I believe
11 there was indication he may have been inebriated, and
12 this wasn't long after that first video was shot, if
13 you will, captured.
14         So I think it was very global, but I
15 do recall height can get skewed in videos, so I think
16 I had to take that out in my mind because I was told
17 that I just can't factor that in, but it was a
18 global.  Just globally looking at the first images of
19 Mr. Bahena and the second images there was a question
20 mark.
21     Q.  And so do you believe that the
22 individual -- that the shooter was moving or walking
23 in a different way than the individual that was
24 identified as Mr. Bahena was in the video?

1      A.  I remember watching Mr. Bahena, who I
2  knew was Mr. Bahena in the earlier video, and then
3  watching the shooter and not necessarily seeing
4  anything characteristically similar.
5      Q.  Now, besides -- well, strike that.
6          You mentioned that you did have at
7  least one conversation with Arturo?
8      A.  I had more than one.
9      Q.  And where did these conversations take
10 place?
11     A.  I don't recall all the conversations, but
12 I specifically remember one conversation took place
13 in the victim witness office.
14     Q.  And is that the conversation you were
15 relating earlier where he indicated that he wasn't
16 able to see the shooter's face?
17     A.  I can't remember which conversation I had
18 with him, where he said that.  I believe we were in
19 the victim witness office because I was using my
20 victim witness coordinator who spoke Spanish to make
21 sure we were having a clear conversation.  That's all
22 I recall about that.
23     Q.  Do you recall whether or not Arturo had
24 any vision impairment?

1    A.  I was told that by his attorney.  They
2   were given -- they gave us reports regarding that,
3   and he relayed that to me.
4    **Q.  And just to be -- would seeing -- I'm**
5   **going to show this to you.  Does this appear to be**
6   **the information that you were given?**
7    A.  I remember I was given a doctor's report
8   regarding his eyes, and this looks like a doctor's
9   report regarding the eyes.
10    **Q.  And does it appear to be a doctor's**
11   **report relating to Arturo De la Cruz?**
12    A.  Correct.
13    **Q.  And do you know if you were given this**
14   **by -- or given a report by an individual named Robert**
15   **Johnson?**
16    A.  I don't remember who gave it to me.
17    **Q.  Okay.**
18    A.  I remember the defense gave it to me, but
19   I don't remember who.
20    **Q.  Okay.  Do you know if you ever followed**
21   **up with the eye doctor?**
22    A.  I did.
23    **Q.  And what --**
24    A.  It was a female.  That's all I recall.  I

1   remember speaking to a female eye doctor.  Whether
2   she was an ophthalmologist or optometrist I don't
3   recall.  I don't know why I remember just talking to
4   a female doctor.
5    **Q.  And did she confirm whether -- did she**
6   **confirm that Arturo had vision difficulties.**
7    A.  She did, and I think I must have already
8   talked to him once because he wasn't wearing glasses
9   or contacts, and so I remember talking to her about
10   that, like if he needs correction, why isn't he
11   getting it.  I don't remember what her answer was,
12   but she said he has -- I don't know if it was
13   nearsighted or farsighted, but, yes, he should be
14   wearing corrective lenses.
15    **Q.  Do you remember if she gave any**
16   **indication as to the severity of his vision**
17   **difficulties?**
18    A.  No, just that it needed to be corrected;
19   it was wasn't 20/20.
20    **Q.  Do you recall whether Arturo ever told**
21   **you if he had vision difficulties?**
22    A.  He did.
23    **Q.  And what did he tell you?**
24    A.  I specifically recall asking him why he

1   said that he saw Ramiro if he didn't, and he said I
2   saw the shooting, but I can't see -- I can't say now
3   the face.  It was -- that was his issue, I could
4   see -- like he could see well enough to see outside,
5   he could see where someone was standing, he could
6   hear clearly, but he couldn't see like something
7   detailed.  That was his way of explaining to me his
8   vision.
9    **Q.  Did he ever indicate to you why he**
10   **identified Ramiro?**
11    A.  He did.
12    **Q.  And what did he tell you?**
13    A.  My recollection is that he was putting
14   two and two together.  He knew Ramiro had threatened
15   his mother earlier, he was angry about the shooting,
16   and that he saw the shooting and that he thought the
17   person was Ramiro.
18    **Q.  And did he say -- did he ever indicate**
19   **whether or not he had been pressured by the**
20   **detectives to identify Ramiro?**
21    A.  No.  He told me that --
22    MS. FLOWERS:  Objection as to form, just the
23   word pressured.
24    Go ahead.  Sorry.

1   BY THE WITNESS:
2    A.  He told me that he wasn't sure but that
3   they needed an answer as, you know, what did you see,
4   and so when he thought about it, he became sure
5   basically that --
6   BY MR. BARANYK:
7    **Q.  And do you recall him telling that to**
8   **you?**
9    A.  I recall him telling that to me.
10    **Q.  Did he tell you anything else?  Do you**
11   **recall him telling you anything else about the lineup**
12   **or anything like that?**
13    A.  No.  He was trying to -- he says that he
14   was trying to be like a -- give it a percentage, if I
15   recall, and that -- but then later he said it wasn't
16   a percentage.  He just -- it could have been; it
17   could not have been; he couldn't say for sure what it
18   was.  That's what I recall him telling me when I was
19   prepping him, when I was interviewing him.
20    **Q.  And to give you -- and to be clear, was**
21   **he -- was it your understanding that he was trying to**
22   **tell the detectives that there was a percentage?**
23    A.  And this is where I can't recall
24   independently what I said to him, but in domestic

1    situations -- and this is where you have to
2    understand we see people flip. They said -- they
3    identify someone to the grand jury. They say I saw
4    so-and-so do A, and then the time of trial comes and
5    they say I didn't see it, and you see that very often
6    in domestics because they don't want to name a loved
7    one or someone that they know. They flip.
8            And I was trying to find out from
9    Arturo is this your classic flip or really did you
10   not -- did you put the pieces together because Arturo
11   had heard about the threats or knew about the threats
12   and that he put two and two together and decided to
13   say it was Ramiro because he was angry or because he
14   believed that, at the time he believed it was Ramiro,
15   and that's kind of where I was going with that.
16       Q.   So do you believe that it was a classic
17   flip or that it was not?
18       A.   I don't think it was.
19       Q.   And in your experience as a prosecutor in
20   situations where an eyewitness flips, have you
21   proceeded to trial anyway?
22       A.   Yes.
23       Q.   And was this the -- strike that.
24           And is that because you have things

1    you could impeach them with among other things?
2        A.   Correct.
3        Q.   And in this case you're aware that Arturo
4    testified in front of the grand jury?
5        A.   Correct. So we have substantive -- we
6    could have put his statement in substantively. We
7    still had an eyewitness in this case legally.
8        Q.   And Arturo's explanation to you was not
9    the only reason that you decided not to go forward;
10   is that also correct?
11       A.   That's correct. There was many factors.
12       Q.   And we spoke about the video. Do you
13   recall what any of the other factors would have been?
14       A.   No. Do I recall independently? No, I
15   don't.
16       Q.   Did you document what those factors were?
17       A.   I don't think so. I don't recall.
18       Q.   Did you create any sort of report or
19   memorandum where you sought to have the case
20   dismissed?
21       A.   I don't think I did in this case.
22       Q.   Do you know if you reviewed Mr. Bahena's
23   phone records from the date of the shooting?
24       A.   I don't remember.

1        Q.   I have it somewhere and I apologize.
2            I only have one copy. Take a look
3    at that.
4        MS. FLOWERS: Do you need this back?
5        MR. BARANYK: Sure.
6    BY MR. BARANYK:
7        Q.   Looking at that document, do you know
8    what that is?
9        A.   It's a GPR.
10       Q.   Does it appear to be a GPR for the
11   criminal case against Mr. Bahena?
12       A.   It is.
13       Q.   And what does that GPR -- what
14   information does that GPR purport to contain?
15       A.   It has a bunch of different phone numbers
16   on it, and so it appears to be the times of calls,
17   one minute twelve seconds, zero seconds. It also
18   appears that the officer or the detective who made
19   this was watching the video and logging that, the
20   correlation between the person we knew was Ramiro
21   Bahena on the video, what he was physically doing,
22   which was you could see him and like he appeared to
23   be making a phone call in the video, and then the
24   timing of that reflected on the -- on his actual

1    phone record, so it would appear that it was a fake
2    call perhaps.
3        Q.   So based on that document it doesn't look
4    like there's any substantive call that was made
5    during the time period of the shooting?
6        A.   I don't know the time of the shooting.
7        MS. FLOWERS: Objection. Foundation.
8    BY THE WITNESS:
9        A.   So I don't remember the timing of the
10   incident.
11   BY MR. BARANYK:
12       Q.   Did you ever do anything to determine --
13   to rule out whether he made any calls during that
14   time yourself?
15       A.   I believe I did, but I don't have an
16   independent recollection of what I did.
17       Q.   Do you recall determining that he hadn't
18   made any substantive calls during the time?
19       A.   I don't recall that.
20       Q.   Did Arturo to your recollection other
21   than what we've already discussed tell you anything
22   else about his interactions or conversations with the
23   detectives?
24       A.   No, not that I recall.

www.veritext.com                Veritext Legal Solutions                888-391-3376

1    Q.   Would it surprise you if the detectives
2  documented in a supplementary report Arturo making a
3  specific statement and there being no corresponding
4  GPR to the typed supplementary report?
5    MS. FLOWERS:  Objection.  Form.
6  BY THE WITNESS:
7    A.  I don't understand the question.
8  BY MR. BARANYK:
9    Q.  Okay.  Let me --
10    A.  Okay.
11    Q.  Let me try to rephrase that.
12        So what is a supplementary report?
13    A.  Typically they're -- well, they're
14  supplemental to the initial report and they're --
15  typically as the investigation continues they're
16  supplementing the investigation.  Lots of times you
17  see them -- basically the GPR is a handwritten.
18  They're a typed form or a formal form of what the
19  information is in the GPRs.
20    Q.  And so maybe this will be more clear now.
21        If there's a supplement -- or strike
22  that.
23        Would you expect there to be GPRs
24  written by detectives for every statement that Arturo

1  made in their presence?
2    A.  Verbatim; no; in general, yes.
3    Q.  And would it surprise you if you learned
4  that there were statements that were documented in
5  supplementary reports that didn't have a
6  corresponding GPR?
7    A.  No, it would not surprise me.
8    Q.  And why not?
9    A.  Sometimes detectives are there at the
10  station and they just throw it on there.  They don't
11  have to write a GPR because they're going to put it
12  in the sup right away.  So a sup is like -- a GPR is
13  like a first step, if you will.  Usually those are
14  used in the field.  So I've seen -- in my experience
15  I've seen no GPR.  I've seen no GPR that corresponds
16  to something in the sup.
17    Q.  And is that typically because the sup is
18  actually typed contemporaneously with the statement?
19    A.  It can be or it could just be they didn't
20  do a GPR.  They might have written it down in another
21  fashion or didn't write it down or they did it
22  contemporaneously or they went back and wrote it
23  right away or they were already going to write it
24  right away, they knew they were going back to the

1  station to write it right away.
2    A.  So I don't know.  I mean, I just
3  know that I've seen -- you don't always have a
4  lockstep what's in a GPR, what's in a sup.  What
5  you're looking for is to make sure there's nothing in
6  a GPR that's not in a sup.
7    Q.  And as a prosecutor -- actually,
8  strike --
9        Well, as a prosecutor would you
10  prefer to have GPRs that document statements that
11  were made in the field?
12    MR. PORTIS:  I'm going to object as to form.
13  Foundation.  That's more of a policy question on
14  behalf of the office that you should ask a policy
15  person.
16        But you can answer now.
17  BY THE WITNESS:
18    A.  I don't -- would I prefer -- I mean, I
19  can't read the GPRs half the time, so I just want to
20  make sure it's in the sup.  I mean, I don't care how
21  they do the job as long as I end up getting it so I
22  can disclose it somehow.
23  BY MR. BARANYK:
24    Q.  Do you recall having any conversations

1  with a woman Maria Rabadan in regards to this case?
2    A.  I don't recall if she spoke English, and
3  if I'm using a translator, I really have very little
4  recollection of those conversations.
5    Q.  So as you sit here today, you don't have
6  any independent recollection of that?
7    A.  No, I don't, and I'm sure I talked to
8  her.  I just don't remember talking to her.
9    Q.  We discussed some of the reasons that you
10  gave for seeking to have the case dismissed.  Those
11  were concerns about the video; is that correct?
12    A.  Correct.
13    Q.  And those were also concerns with
14  Arturo's testimony; is that also correct?
15    A.  Correct.
16    Q.  And you mentioned that there were
17  probably other concerns that you had?
18    A.  I'm sure there were.
19    Q.  As you sit here today you don't remember
20  what those were?
21    A.  My concerns were the identity of the
22  shooter.  That was what I was trying to prove.  That
23  was my concern.
24    Q.  Do you recall whether or not you had any

1  concerns with how the police or detectives conducted
2  the investigation?
3      A.  No, that wasn't an issue.
4      Q.  Now, what is the process like for having
5  a homicide dismissed?
6      A.  It's case by case.
7      Q.  And what was the process like in this
8  case?
9      A.  The way I recall is I formed an opinion.
10 I basically just went and talked to my boss.  He
11 asked me what my opinion was based on.  I told him.
12 He then -- it was Joe Magats.  He then have viewed
13 the video.  I don't remember if I went to Fabio, if
14 we went to Fabio.  I remember talking to Fabio about
15 it once, but I don't know -- it was in passing.  It
16 was Joe that watched the video.  We reviewed all the
17 evidence.  We reviewed the options.  We discussed
18 what each of us thought.  I don't remember if anyone
19 else was there.
20     Q.  So what you remember is -- sorry.
21          Was that Joe Magats?
22     A.  It was Joe Magats, yeah.  But I don't
23 remember where I got the permission from or how high
24 it went.  I don't know if Joe talked to Fabio or

1  Fabio talked to someone above him.  I'm guessing --
2  it's a double homicide, and I'm guessing that -- so
3  it went above Fabio.
4      Q.  And do you know whether or not it would
5  have gone all the way to the --
6      A.  It would have gone to the chief deputy in
7  my opinion.  I don't know if this one did.  I just --
8  I would just suspect it did.
9      Q.  Do you know if it would have gone all the
10 way up to Anita's office at the time?
11     A.  It could have, yes.
12     Q.  But you don't know one way or the other?
13     A.  I don't remember.  I'm just guessing if
14 I'm nolleing a double homicide, I'm checking to make
15 sure my bosses are good with that, and all the
16 bosses, so I'm sure I asked some questions.
17     Q.  And to your recollection you didn't
18 document your reasoning for dismissal?
19     A.  The reasons, no.
20     Q.  Well, what, if anything, did you
21 document?
22     A.  I don't know.  I don't remember.  I mean,
23 I'm sure I documented who I got the nolle permission
24 from.  I hope I did.

1      Q.  To your recollection there wasn't like an
2  internal memorandum that you had to submit or that
3  you did submit or anything like that?
4      A.  I don't recall doing a memo on this.  I
5  recall speaking with my supervisors, discussing the
6  case with them.
7      Q.  And roughly how long did that process
8  take?
9      A.  There was an -- I remember there was an
10 initial conversation because whenever you have an
11 initial conversation, they tell you to do A, B, and C
12 or to check A, B, and C, so I know that happened in
13 this case.
14          I don't remember what A, B, and C
15 were or even if there was an A or a B or a C, but I
16 know there was, okay, now let's do this, and then so
17 that was -- it was a continuing process of then
18 filling in, okay, we've done this, this is what we
19 have, this is where we stand, and then a final
20 determination.
21     Q.  Was that done according to some sort of
22 like department protocol?
23     A.  No.
24     Q.  Okay.  And --

1      A.  Just running it out.
2      Q.  And with regards to Mr. Bahena, are you
3  aware that he was released for a month after Arturo
4  gave his signed statement?
5      A.  You mean he wasn't charged right away?
6      Q.  Yeah.
7      A.  No, I don't remember that.
8      Q.  Would that surprise you?
9      A.  No.  I just don't remember that.
10     Q.  And why wouldn't that surprise you?
11     A.  Many times we don't indict murders until
12 we've finished our investigation or the -- sorry --
13 the grand jury or the CPD, so, I mean, there's no
14 statute of limitations.
15     Q.  Would it surprise you if he was
16 rearrested if no additional substantive evidence had
17 been found?
18     A.  No, I would not be surprised.
19     Q.  And why not?
20     A.  Because sometimes you don't find anything
21 else.  If I recall, in this case there was some red
22 light cameras maybe that were being looked at.  I
23 remember trying to look at them.
24     Q.  Do you know whether or not red light

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

1  cameras had any -- played any part of the decision to
2  ultimately --
3      A.  No, they didn't.  I remember that.
4      So I can run things out and they
5  don't run out.  You don't get it, whatever.  You
6  still have what you have and charge.  So no.
7  Surprised?  No, I would not be surprised.
8      Q.  As you sit here today are you aware of
9  any evidence that was gathered after Arturo gave his
10  handwritten statement that led to the decision to
11  charge Mr. Bahena?
12      A.  Well, I know that in this case the
13  handwritten and then the grand jury came, but as far
14  as like the timing of when we got the surveillance,
15  when we got all the stuff that we had that made up
16  the entire case, no, I have no idea.
17      Q.  Is it your understanding that Arturo's
18  grand jury testimony was substantively similar to his
19  signed statement?
20      A.  That's my recollection.
21      MR. BARANYK:  If we could just have one
22  minute.
23      (WHEREUPON, a recess was had.)
24

1  BY MR. BARANYK:
2      Q.  Now, you mentioned a name Fabio.  What is
3  Fabio's full name?
4      A.  Fabio Valentini, V-a -- so it's F-a-b-i-o
5  and it's V-a-l-e-n-t-i-n-i.
6      Q.  And do you recall where the conversation
7  that -- you don't recall whether he was present; is
8  that correct?
9      A.  I recall one time speaking to him and it
10  was just me and him because I had mentioned -- we
11  were talking about something else, and I asked him if
12  he had talked to Joe about this case and he hadn't
13  and so I filled him in.
14      Q.  Do you know where that conversation --
15      A.  It was in his office.
16      Q.  Was that at 26th Street?
17      A.  Correct.
18      Q.  And the conversations with Joe, were
19  those at Joe's office or --
20      A.  Most of them were.  I think one of them
21  was in my office because I think he came up to watch
22  the video, but I also know we watched it in his
23  office as well.  We watched it more than once.
24      Q.  Okay.  And do you know an approximate

1  date for those conversations?
2      A.  No, I have no idea.  Sorry.
3      Q.  No worries.
4      And I assume both of your offices
5  were located in 26th Street at the time?
6      A.  They were at the time, yes.
7      Q.  And as far as Arturo, you know, did you
8  talk to him in some sort of a victim room?
9      A.  I remember speaking in -- I distinctly
10  remember the victim witness room, speaking with him
11  with my victim witness coordinator assisting me.  I
12  think then my other conversations with him typically
13  would have been in the like library on the 12th
14  floor.  My office is right next to that.
15      Q.  So the law library --
16      A.  Yes.
17      Q.  -- on the --
18      A.  I don't recall, but that would have
19  probably been where I spoke to him.
20      Q.  And that's on the south side of the south
21  building at 26th --
22      A.  It was in the administration building,
23  yeah.
24      Q.  And where is the victim witness room?

1      A.  It's on the first floor, so in between
2  the courthouse and the administration building is
3  like a concourse, if you will for lack of a better
4  term, and they sort of have carved out in the south
5  end of the building.  They have an office there.
6      Q.  And you said -- sorry.  What was the
7  title of the person that helped you?
8      A.  My victim witness coordinator.
9      Q.  And do you recall what that individual's
10  name was?
11      A.  Maria Godinez, G-o-d-i-n-e-z, Godinez.
12  Maria Godinez I think, yeah.  It was Maria.  I'm
13  pretty sure her last name was Godinez.
14      Q.  Did she provide any -- was she there to
15  provide translation services, if necessary?
16      A.  I think it was, yes, if I wanted
17  clarification, plus she had spoken to his mother who
18  was a victim and as well as his sister who was a
19  victim and then there was the friend who was a
20  victim, so she had spoken -- she had been interacting
21  with all these people, so she was there to help and
22  assist me because she had already spoken to them.
23      Q.  And do you recall any conversations you
24  had with her about the conversations she had with

1    those folks?
2        A.  With Maria?
3        **Q.  Yeah.**
4        A.  No.  Sorry.
5        **Q.  How about any other witnesses?**
6        A.  I don't recall.
7        **Q.  And, now, you spoke with Arturo you said**
8    **on like several occasions?**
9        A.  It was more than one.  I can't say
10   several, but I know it was more than one.
11       **Q.  And was he consistent -- or strike that.**
12           **Both times that you met with him was**
13   **he unclear about whether or not he had been able to**
14   **see the shooter's face?**
15       A.  Correct.
16       **Q.  So his story didn't change through your**
17   **conversations?**
18       A.  No.
19       **Q.  Do you know when those conversations took**
20   **place?**
21       A.  No.
22       **Q.  And do you know who would have been**
23   **present for those conversations, if anyone?**
24       A.  It would have been Maria.

1        **Q.  For the one on the first floor concourse?**
2        A.  It probably would have been all of them.
3        **Q.  Okay.  Anybody else you can think of?**
4        A.  I remember for some reason that one in
5    the victim witness office Arturo had someone with
6    him.  It was a female, and that's all I remember.  I
7    don't remember who it was.
8        **Q.  And was she actually present for the**
9    **conversation?**
10       A.  I don't think she was.  She came with
11   him.
12       **Q.  Okay.**
13       A.  But I don't remember.
14       **Q.  And the law library where you may have**
15   **met with Arturo, does that law library have like**
16   **private rooms or --**
17       A.  No, and that's why I'm not sure if I met
18   with him there.  I could have used a conference room.
19   My recollection is that I spoke with him a
20   second time or the subsequent time.  The victim
21   witness conversation was a subsequent conversation to
22   an initial conversation.  Where that initial
23   conversation happened, I don't remember.  When it
24   happened, I don't recall.

1        **Q.  Do you know if you ever spoke --**
2        A.  I don't know if I just even talked to him
3    on the phone, but I don't remember that, the initial
4    conversation.
5        **Q.  Do you know if you spoke with Arturo like**
6    **outside the courtroom when the case was up?**
7        A.  I don't recall that.
8        **Q.  Did you show Arturo the video?**
9        A.  I don't remember.
10       **Q.  Are you aware of whether the detectives**
11   **showed Arturo the video?**
12       A.  I don't remember.
13           And you're talking about during the
14   investigation.
15       **Q.  Yeah, during the investigation.**
16       A.  Yeah, I don't know.
17       **Q.  Do you recall showing anyone the video**
18   **besides your boss Joe?**
19       A.  I showed my partners in the office with
20   me.  At one point we discussed it.  I don't remember
21   who was there or who it was exactly.
22       **Q.  Who do you think it was?**
23       A.  Well, I know Krista Peterson,
24   P-e-t-e-r-s-o-n.  It's K-r-i-s-t-a.  She sat across

1    from me, so if she was there, if she wasn't on
2    vacation or maternity leave or something, I would
3    have talked to her about it, but I don't recall if I
4    did.
5        **Q.  Do you recall what the nature of the**
6    **conversations were?**
7        A.  Look at this and tell me what you think.
8        **Q.  And what, if anything, do you recall --**
9    **what, if anything, did they think that was related**
10   **to?**
11       A.  I think everyone was just like, well, it
12   is what it is.
13       **Q.  And what do you mean by that?**
14       MS. FLOWERS:  Objection.  Form.
15   BY THE WITNESS:
16       A.  When you look at the video, you see
17   someone we definitely can tell is -- we know
18   definitively is Ramiro Bahena.  Then you look at the
19   shooter and there are some differences.
20   BY MR. BARANYK:
21       **Q.  And did the folks in the office that you**
22   **showed it to agree that there were some differences?**
23       A.  When you -- when I pointed them out, yes,
24   and that was part of the reason I kept showing it to

1  people because a lot of people were just like, well,
2  could be, could not be. It's -- that's what it is
3  what it is kind of. It's what's the other evidence.
4      Q. Now, do you recall Arturo's -- in the
5  statement Arturo gave that he said that Mr. Bahena
6  had come back at around 7:00 o'clock?
7      A. I recall that when I spoke with Arturo,
8  he related stuff that was inconsistent or
9  misunderstood at the initial investigation. There
10  was an issue about who had what phone, and I remember
11  that was very confusing to me when I first spoke to
12  him, and I thought maybe we were having a language
13  problem or I misunderstood something, and I think
14  what it turned out is that the syntax of whose phone
15  or who had what or where someone was got messed up by
16  who modified what because I think that my
17  recollection is he had his mother's phone at some
18  point and that Mr. Bahena was calling the mother's
19  phone, but Mr. -- so Arturo was aware of that.
20      Q. Okay. Do you recall Arturo saying that
21  Mr. Bahena came back after the initial argument that
22  you see on the video?
23      A. So I can't recall because I remember
24  there was a confusion about what was in the

1  handwritten and the grand jury and what he
2  states -- was stating to me at that point about what
3  happened, and so I don't remember the timing. I just
4  remember there was an inconsistency and a confusion.
5      Q. And I'm going to -- would seeing his
6  statement help refresh your recollection?
7      A. It might. I mean, I don't know. I just
8  remember something was different that he was telling
9  me than was in the initial documents I had and it had
10  to do with where he was because I remember he went to
11  some party or a cousin's or something like that. He
12  left the -- he left where the shooting occurs at some
13  point, and that timing, who he was with, what phone
14  he had, or something to do with something was off.
15          (WHEREUPON, there was a
16          conference between Mr. Baranyk
17          and Ms. Alonso.)
18  BY MR. BARANYK:
19      Q. I'm just going to show you so you can
20  take a look at it --
21      MR. DIXON: I've got a copy. Are you looking
22  at this?
23      MS. ALONSO: Yeah, the handwritten.
24

1  BY MR. BARANYK:
2      Q. Yeah, just take a minute to look at it.
3  The part that I'm going to ask a few questions on
4  starts with the second full paragraph on Page 2 --
5      A. Okay.
6      Q. -- and then the last full paragraph on
7  Page 3.
8      A. I remember, yeah.
9      Q. And does this document that I've given
10  you appear to be an accurate copy of Arturo
11  De la Cruz's signed statement?
12      A. Yes, it does.
13      MS. FLOWERS: Objection. Foundation.
14  BY MR. BARANYK:
15      Q. And does that document indicate that he
16  saw Mr. Bahena at the Laramie house twice before the
17  shooting occurred, once at around 7:30 --
18          (WHEREUPON, there was a
19          conference between Mr. Baranyk
20          and Ms. Alonso.)
21  BY MR. BARANYK:
22      Q. Sorry. Strike that.
23          So he saw him there once --
24      A. Right.

1      Q. -- at around 7:30?
2      A. Right.
3      Q. And was that conversation -- or was
4  that -- was Mr. Bahena at the house at the
5  7:00 o'clock hour as --
6      A. Well, I don't know whether he was, but I
7  know what he told me. He told me that he didn't see
8  Ramiro. He knew about the threats. He didn't
9  observe the threats. He knew about them because he
10  had the phone --
11      Q. Okay.
12      A. -- his mom's.
13      Q. And that would have been the later time
14  when the police came to intervene?
15      A. Yeah, I don't remember the timing, but
16  when I talked to him, that was -- because that was
17  one of the issues, was the clothing in the video, and
18  if you saw him, what was he wearing.
19      Q. Right.
20      A. He didn't see him. What do you mean you
21  didn't see him?
22      Q. But he related that he saw him at 7:30
23  but not later at 10:00, is that correct --
24      A. No.

1      Q.  -- based on your --
2      A.  My recollection is when I asked him about
3   seeing him at 7:30, he said he hadn't seen the
4   initial confrontation, that that was -- he heard
5   about -- he knew about it because he had the phone.
6      Q.  So that was inconsistent with the
7   statement he gave?
8      A.  Exactly.
9          And there were a couple other
10  things.  That was one of the things that I recall.
11  He couldn't say he saw what he was wearing.  Well,
12  you saw him.  No, I didn't.  What do you mean you
13  didn't?  No, I heard -- I knew all about this.
14         All this was -- you know, he's
15  saying this was not accurate which made me question
16  his credibility.
17     Q.  And based on your review of the video
18  when you were on the case, did you ever see
19  Mr. Bahena outside of the house around the
20  7:00 o'clock hour?
21     A.  I don't remember the timing.
22     Q.  Did you only -- well, let me put it this
23  way:  Was there only one argument where you could see
24  Mr. Bahena arguing captured on the video?

1      A.  There was one time he's there and then
2   the police come and he leaves.  That's what I recall.
3   I remember seeing one constant time.  He goes back
4   and forth across the street, he comes back over, he
5   pretends to be on his phone, allegedly pretends, and
6   then the police come and he leaves.  That's what I
7   recall.
8      Q.  And there wasn't a time earlier in the
9   evening where Mr. Bahena was on that video?
10     A.  That I -- I don't remember when the video
11  starts.  I don't remember when it starts to capture.
12  I don't remember how much we -- the police retained.
13  I just remember that.  I remember seeing him one
14  fluid time in that beginning part, if you will.
15     Q.  And the time where he's seen on the video
16  and the police intervene, was that around 9:00,
17  9:00 o'clock or later that evening?
18     A.  I have no idea.  I'm sorry.  I don't
19  recall the times.
20     Q.  Would you defer to the arrest report on
21  that?
22     MR. PORTIS:  Objection as to form.
23  BY MR. BARANYK:
24     Q.  Strike that.

1          Would looking at the case -- the
2   initial case incident report refresh your
3   recollection on that?
4      A.  No, actually that wouldn't because the
5   only thing that would probably -- you're talking
6   about the video, like what time he's on the video?
7      Q.  Yeah, what time he was -- the police
8   intervene and then he was arrested, what time that --
9      A.  If their reports states when they
10  arrived, yes, that would reflect the -- I remember
11  seeing them arrive on the video, so, yes, that would.
12     MS. ALONSO:  You're going to ask me for that?
13     MR. BARANYK:  Yeah.
14     MS. ALONSO:  I should have that in here
15  somewhere.  That's an earlier arrest report.
16         Sorry, guys.  Give me a second.
17         (WHEREUPON, there was a
18         conference between Ms. Alonso
19         and Mr. Baranyk.)
20  BY MR. BARANYK:
21     Q.  Maybe I can ask it this way:  Did you
22  ever see -- well, strike that.
23         One final thing.  Did you advocate
24  to have the case dismissed because you didn't believe

1   the State would be able to meet its burden?
2      A.  That's not correct.
3      Q.  What was the reason or reasons that you
4   advocated to have the case dismissed?
5      A.  I recommended the case be nolled in
6   exercising our discretion in prosecuting cases.
7      Q.  Did you believe that you would have been
8   able to prove Mr. Bahena guilty beyond a reasonable
9   doubt based on the evidence that you had?
10     A.  I had evidence that would be sufficient
11  to go to trial, to meet a burden, correct.
12     Q.  And were you uncomfortable going to trial
13  with that evidence?
14     MS. FLOWERS:  Objection.  Form.
15         Go ahead.
16  BY THE WITNESS:
17     A.  I don't think uncomfortable is the right
18  word.  I had questions about the identity of the
19  shooter after looking at all the evidence.
20  BY MR. BARANYK:
21     Q.  After looking at all the evidence did you
22  believe that Mr. Bahena was the shooter?
23     A.  I had other evidence that was not
24  admissible in court that I developed during my

1  investigation regarding Mr. Bahena's possible
2  involvement in the ordering of the shooting but not
3  being the actual shooter.
4      Q.  Well, could you expand on that?  So you
5  didn't -- just maybe to state the question again, did
6  you believe that Mr. Bahena was the shooter at the
7  time that you advocated the dismissal of the case?
8      A.  I didn't know if he was or he wasn't.
9      Q.  What was this other evidence that you
10 were referring to about him maybe ordering the
11 shooting?
12     A.  There's a -- he gives a -- he's on video
13 in police custody and talked to.  He's pretty cool
14 for someone who you think would be falsely accused of
15 a double homicide.  I recall that I had to speak to
16 family members of the two victims, and I don't
17 remember which family members it was.  I don't
18 remember when I talked to them.  I just remember it
19 was a young female Hispanic and an older female
20 Hispanic.  I don't know if it was a mother of one of
21 the victims, a sister.  I don't know the
22 relationship.
23         But I remember speaking with them
24 obviously explaining to them the People's decision,

1  and I expected them to be more shocked and horrified
2  than they were, and one of the reasons was they
3  weren't surprised because they had heard Mr. Bahena
4  had ordered his son, who went to Mexico the day after
5  the murder and has never been seen from since, to do
6  the shooting.
7      Q.  Mr. Bahena's son?
8      A.  Correct.  I don't know if any of that's
9  true.  I never followed up on it.  I gave the
10 information to the detectives, and that was the end
11 of it.
12     Q.  And Mr. Bahena has never been charged
13 with that; is that correct?
14     A.  Correct.  And this was after our decision
15 was made to nolle, so that wasn't a factor, but you
16 were asking me what I thought.
17     Q.  Yeah.
18     A.  So when I heard that, perhaps he wasn't
19 the shooter, but at the time we made the decision to
20 nolle, it was a question mark as to the identity of
21 the shooter.
22     Q.  And just to be clear there's no statute
23 of limitations on a double homicide?
24     A.  On any homicide.

1      Q.  So if you would have had evidence or
2  encounter evidence that would prove that, he could
3  have been recharged or could be recharged?
4      A.  Yeah.  He could be charged with
5  accountability, with conspiracy, with -- he could be
6  charged as an accountable person, not as the shooter,
7  but our theory as we charged it was that he was the
8  shooter, so --
9      Q.  And you advocated the dismissal because
10 you had questions about the identity of the shooter;
11 is that correct?
12     A.  Correct.
13     Q.  Do you know the name of the son?
14     A.  No.  I know I spoke to one son.  He has
15 more than one apparently.  There was one that was a
16 witness, if you will.  He saw Mr. Bahena come home.
17 He's in the police reports.
18     Q.  Was that David Bahena?
19     A.  I believe that is David.
20     Q.  Do you believe this was a different son?
21     A.  I believe -- and that's my recollection
22 because I'm like David is still around.  We talked to
23 him.
24         No, a different son.  And again

1  not -- never verified, nothing.  This is after the
2  fact, after the decision.  It was just --
3      MR. BARANYK:  I've got nothing further.
4      MR. DIXON:  Okay.  Just a few.  I won't keep
5  us here much longer.
6              EXAMINATION
7  BY MR. DIXON:
8      Q.  To your knowledge had Arturo,
9  Mr. De La Cruz, wavered on this identification of
10 Mr. Bahena prior to the conversation with you?
11     A.  No.  In fact, he said he hadn't, that he
12 did say what he said.
13     Q.  And when you say he did say what he said,
14 was that to you confirming that he had, in fact,
15 given the statements to the detective and to the
16 prior State's Attorney?
17     A.  Yeah.
18     Q.  And are you aware that in the statement
19 of Mr. De la Cruz to the State's Attorney he
20 indicates that he was treated well and that outside
21 of the presence of the detectives indicated to
22 ASA Kwilos -- I may not be pronouncing that right --
23 that there was no issue with how he had been treated
24 by the detectives?

1      A.  Correct.
2      Q.  Are you aware that in the grand jury he
3  also testified that he had been treated well and had
4  not been promised anything or threatened in any way?
5      A.  Correct.
6      Q.  During your interviews with Arturo do you
7  remember having any discussion about Arturo's
8  relationship or potential relationship with
9  Mr. Bahena's daughter?
10      A.  He dated her is my recollection but was
11  not dating her at the time I spoke with him.
12      Q.  Okay.  Was there any conversation as to
13  whether that factored into Mr. De la Cruz's current
14  at that time reluctance to now identify Mr. Bahena?
15      A.  Did I question it or did he tell me that?
16      Q.  Either.
17      A.  Yes, certainly I questioned it because
18  again you're looking at is someone flipping.  It's a
19  domestic.  Are they flipping because they don't want
20  to testify against someone that they know or someone
21  that they may -- a loved one of another, someone they
22  may love.  It's a classic thing you see.  You
23  question it absolutely.  You question it.
24      Q.  Okay.  Are aware that Mr. De la Cruz's

1  grand jury statement was done through an official
2  interpreter?
3      A.  I don't remember that, but I remember
4  that I had language issues with him sometimes.
5      Q.  And so you used someone to interpret into
6  Spanish?
7      A.  I did when I really wanted to make sure I
8  understood, yes.
9      Q.  And are you aware that a Detective
10  Alvarez, I believe, translated the photo spread
11  advisory form for Arturo into Spanish?
12      A.  I don't recall.  I mean, I don't remember
13  that.
14      Q.  Okay.  Are you aware of the use of a --
15  it's called a lineup photo spread advisory form?
16      A.  I know what they are.
17      Q.  And are you aware that they tell the
18  individual who is viewing the lineup or agreeing to
19  view a lineup or a photo spread that they are not
20  required to make any identification?
21      A.  Correct.
22      Q.  And that they also agree that they
23  understand that the person whom the police may
24  suspect as being the offender may not be even present

1  in that lineup?
2      A.  Correct, and that they are not required
3  to make an identification.
4      Q.  Correct.  Thank you.  Are you aware that
5  Mr. De la Cruz was given and signed one of those
6  prior to viewing the lineup?
7      A.  Independently I don't recall that.
8      Q.  Okay.  Would seeing that particular form
9  signed by Mr. De la Cruz refresh your recollection as
10  to whether that happened?
11      A.  I don't know what his signature is, but,
12  I mean, I can tell you what the form is and I can see
13  if it's signed.
14      MS. FLOWERS:  Objection.  Foundation.
15      MR. DIXON:  Sure.
16  BY THE WITNESS:
17      A.  So this is a classic lineup advisory form
18  by the Chicago Police Department.  It's filled out
19  and signed with the person viewing the lineup as
20  Arturo De la Cruz.
21  BY MR. DIXON:
22      Q.  Okay.  Thank you.
23      As to the eye doctor document, I
24  don't know if you still have that in front of you --

1      MR. BARANYK:  Yeah, I have it somewhere.
2      MS. FLOWERS:  I gave it back to you.
3      MR. BARANYK:  I think we should probably mark
4  that as an exhibit, so Joint Exhibit A?  We'll have
5  it marked.
6      MR. DIXON:  We don't have to mark it.  That's
7  fine.  I just wanted to ask two questions about it.
8  Well, maybe more than two.
9  BY MR. DIXON:
10      Q.  You stated that this was provided to you
11  by Mr. Bahena's defense counsel; is that right?
12      A.  Yes.
13      Q.  Okay.  Was it your understanding to your
14  knowledge that the eye exam was done at the behest of
15  his defense counsel in that case?
16      A.  Yeah, and it was a year after the
17  occurrence or more, yes.
18      Q.  That the eye exam --
19      A.  That is my understanding.
20      Q.  -- took place long after the occurrence
21  took place?
22      A.  Yes.
23      Q.  And you see also on there that it
24  indicates the date of his last eye exam was

1 apparently two to three years prior?

2    A. Yes.

3    Q. In your interviews with Arturo did you

4 ever discuss whether he had told anyone that he had

5 eyesight problems?

6    A. The only thing I remember talking to him

7 about is that he still wasn't wearing glasses or

8 contacts when I was talking to him then and there and

9 why wasn't he, and I don't remember what his reason

10 was, if it was monetary or whatever. He just squints

11 a lot, has trouble seeing. That was all I recall.

12 He told me that he's always had bad eyes.

13    Q. But to your knowledge in your interviews

14 with him, your discussions with him, did he ever say

15 that he had told any detective that he had vision

16 problems?

17    A. No, he never told anybody.

18    Q. And that would include the State's

19 Attorney as well?

20    A. Yeah, because I asked him about that

21 because this was recent. Yeah, he had never -- it

22 was just something he lived with.

23    Q. You said that you had other evidence in

24 this case besides Arturo's statements that would have

1 allowed you in your mind to go to trial. Did that

2 include other individuals stating that Mr. Bahena had

3 made death threats toward the decedents earlier that

4 day?

5    A. Yes.

6    Q. And did that also include individuals

7 that would confirm that Mr. Bahena was there earlier

8 that day and had an argument with at least one person

9 there, including one of the decedents, Mr. O'Campo?

10    A. As well as that, yes, and the police that

11 asked him to leave, he was interviewed by them and

12 they said he was hot and just angry, didn't want to

13 leave. He was very angry. So it was the police as

14 well as the other surviving witnesses and victims.

15    Q. The video that we've had some discussion

16 about here, that is, the one that shows the shooting,

17 that's taken from across the street; is that right?

18    A. Well, the video is on the house next door

19 and the shooter is across the street.

20    Q. Okay.

21    A. Is that what you meant?

22    Q. Yes.

23    A. Okay.

24    Q. Thank you. And the shooter as far as you

1 can see on that video never comes across the street

2 to come closer into view?

3    A. No. He stays across the street, walks

4 into view, shoots, walks out of view, stays on that

5 sidewalk which is across the street.

6    Q. And to your knowledge Arturo, when he

7 made his identifications, stated to the detectives

8 that he had personally seen this; is that correct?

9    A. Yes.

10    MR. BARANYK: I'm just going to object on

11 foundation grounds.

12 BY THE WITNESS:

13    A. Yes, he said he identified Arturo [sic].

14 He admits that, the grand jury and the handwritten,

15 he said it, but he was angry and he was putting two

16 and two together, and he did see the shooting, but he

17 can't say for sure it was him.

18 BY MR. DIXON:

19    Q. Okay. So am I correct in what you're

20 saying about your impression of Arturo and his

21 reasons for doing that were personal reasons of

22 Arturo, not because of any pressure or threat from

23 the police?

24    MR. BARANYK: I'm just going to object as to

1 foundation once again.

2 BY THE WITNESS:

3    A. It was that and he was asked to make an

4 identification, and he did.

5 BY MR. DIXON:

6    Q. But to your knowledge he was not

7 threatened or promised anything in order to make that

8 identification?

9    A. No.

10    MR. DIXON: That's all I have.

11    MR. BARANYK: Based on that just a couple

12 things.

13      FURTHER EXAMINATION

14 BY MR. BARANYK:

15    Q. When you spoke to Arturo about having

16 dated Mr. Bahena's daughter in the past, did you

17 determine that that played any role in his decision?

18    A. You know, I don't remember. I remember

19 asking him, but I didn't dwell on it. It wasn't a

20 big deal, if I recall, at all. He had a very sort of

21 gentle affect to him. He was very sort of even

22 keeled, so I didn't -- he didn't -- he wasn't

23 dramatic, so it wasn't like that was something we

24 really dwelled on or talked about. I don't remember

1  really dwelling on that a lot.  It was just something
2  maybe in my mind thinking where someone may be coming
3  from, an agenda to change testimony.
4      Q.  And an agenda to change the testimony,
5  would that comprise what you were talking about when
6  you were talking about a classic flip?
7      A.  Sometimes people don't want -- nobody
8  wants to be a murderer eyewitness.  It's not like you
9  raise your hand and say pick me.  So you have that.
10  They're afraid to come to court.  Their loyalties
11  change.
12          Anger subsides.  If they made
13  a -- in this case perhaps a false claim that was
14  based on anger, then the anger subsides and they see
15  a more calm perspective.
16          So you have to vet all that, and
17  that's -- in talking to him all the aspects went into
18  it:  His relationship with his mother, his mother's
19  relationship with Ramiro, Ramiro's relationship with
20  his family, his wife, the dynamics between the
21  parties, the dynamics between the victims that died
22  and the victim that was shot and then the two victims
23  that were shot at.  So all that comes into play.
24      Q.  Sure.  And did you believe that his

1  loyalties had changed and that was the basis of
2  his --
3      A.  I don't think I ever came to a conclusion
4  on that.
5      Q.  And if you had believed that his
6  loyalties had changed and that was the basis for his
7  change in testimony, would it have been possible to
8  charge him with perjury?
9      MS. FLOWERS:  Objection.  Form.  Foundation.
10  BY THE WITNESS:
11      A.  I think when he said the things he said
12  to the grand jury and the State's Attorney, I think
13  he believed them.  I think in his mind he really
14  thought he saw what he saw or he -- I think he did.
15          And then he came to a come-to-Jesus
16  moment, if you will, when I'm asking him to get on
17  the stand, take an oath, and say tell me 100 percent
18  this person you saw do the shooting from across the
19  way is the person sitting here today, and I think
20  when he -- I don't know what he thought, but I just
21  think that perhaps he couldn't say it.  He couldn't
22  say for certain the person he saw was the person of
23  Ramiro Bahena.
24

1  BY MR. BARANYK:
2      Q.  Right.  And just to reiterate that it
3  wasn't, his situation you didn't believe was that
4  classic type of witness flip?
5      A.  I didn't -- I didn't think it was -- I
6  didn't think it was a classic just I don't feel like
7  testifying against my mom's boyfriend, I see him all
8  the time, I know his daughter, I don't want to put
9  this man in jail, no, I didn't, but I didn't know.  I
10  don't know.
11      Q.  Right, absolutely.
12      A.  Could have been.  Who knows?
13      Q.  Yeah.  And just going back a little bit,
14  we talked about the argument that he was in with the
15  individuals outside of the house?
16      A.  When you say he, you mean Ramiro?
17      Q.  Ramiro, yeah.  And to your knowledge that
18  argument led to the police coming onto the scene?
19      A.  That's my understanding.
20      Q.  And that was captured on the surveillance
21  video; is that correct?
22      A.  Not the audio, just the actual people.
23  You can see the police cars, yes.  You can't hear
24  anything, so I can't hear threats.  I can only see

1  the people being involved and police and people
2  walking around.
3      Q.  Just the video and no audio?
4      A.  Right.  So I don't know.  That's not
5  captured.  The threats come from the statements by
6  witnesses.
7      Q.  And I'm going to show you a supplemental
8  report.
9      MR. BARANYK:  I actually don't have copies of
10  that.  We can make a --
11      MR. DIXON:  I was just going to say I might
12  have a copy of it with me before you actually make a
13  copy of it.
14      MS. ALONSO:  Regarding the initial when the
15  police arrived at the scene.
16      MR. DIXON:  I don't think I have that one.
17      MR. BARANYK:  You might have just passed it.
18      MS. ALONSO:  Do you want me to make a copy?
19  Yeah, I can do that.
20      MR. DIXON:  I can just look at it.
21      MS. ALONSO:  I'll make a copy afterwards.
22      MR. DIXON:  Okay.  I know which one this is.
23      MR. BARANYK:  I don't have any -- it's not a
24  particularly probative question, but, here, if you

1  want to look at it.
2      MS. FLOWERS:  Yeah.
3          Okay.  Case supplement.  Okay.
4      MR. BARANYK:  Sure.
5  BY MR. BARANYK:
6      Q.  I'm going to show you a case
7  supplementary report and if you can take a look at
8  that, and we'll attach that as an exhibit just so
9  that we're clear about that.
10         What does that -- do you know what
11  that document purports to be?
12     A.  It's a progress report.  It's a
13  supplemental progress report.
14     Q.  Does it involve the criminal case against
15  Mr. Bahena?
16     A.  It does.
17     Q.  And if you look to the page that has the
18  pink tab on it --
19     A.  Okay.
20     Q.  -- what page number does that say on the
21  bottom?
22     A.  Six of eight.
23     Q.  Does that indicate what time the police
24  arrived on the scene outside of the Laramie house?

1      A.  It says a time for the call, so a call, a
2  service call, came in for a battery in progress at
3  2142 hours.
4      Q.  Okay.  So that's the time the service
5  call came in?
6      A.  That's what it says.  People fighting in
7  front of above address and a male went to a car and
8  got something but isn't sure what it was, and that's
9  actually captured in the video.
10     Q.  And what's described there, it's your
11  understanding that that's what's captured on the
12  video?
13     A.  Well, it would be a huge coincidence,
14  but, yeah, you do see what's described in there on
15  the video.
16     Q.  And do you have any reason to doubt the
17  time, the 2142?
18     A.  No, because I have no memory, so, no, I
19  have no reason to doubt that.
20         (WHEREUPON, there was a
21          conference between Mr. Baranyk
22          and Ms. Alonso.)
23  BY MR. BARANYK:
24     Q.  Actually just to clear up one area, do

1  you know where the conversation took place where
2  Arturo indicated that he had bad eyes?  Was that --
3      A.  No, I don't know.
4      Q.  Do you know if that was discussed at all
5  in the conference that you had in like the area
6  between the two buildings at 26th Street?
7      A.  You're talking about the victim
8  witness --
9      Q.  Right.
10     A.  I'm sure it came up because that was a
11  very comprehensive conversation.
12     Q.  Okay.  And we talked about whether or not
13  Arturo was promised anything or threatened in any
14  way.  A pretty obvious question, but you weren't
15  there when the detectives interviewed him; correct?
16     A.  No.  And what people relate after the
17  fact, you know, I don't know, so I wasn't there.
18     MR. BARANYK:  Okay.  I don't have anything
19  else.
20     MR. DIXON:  Just one final question.
21          FURTHER EXAMINATION
22  BY MR. DIXON:
23     Q.  If you can look at the statement of
24  Arturo De la Cruz one more time and look at

1  the second page, first full paragraph.
2      A.  "Arturo states that he can read, write,
3  and speak and understand Spanish"?
4      Q.  Correct.
5          So in reading that paragraph does
6  that indicate to you that Arturo told the State's
7  Attorney that he could read, write, and understand
8  Spanish and also read, write, and understand some
9  English?
10     A.  Correct.  And I recall speaking to him in
11  English.  I do not speak Spanish, and I recall having
12  one-on-one conversations with him, if you will, that
13  there wasn't a translator and then also using a
14  translator for accuracy.  So, yeah, he did speak
15  English.  I don't know about the reading and the
16  writing part.  I just know he spoke it.  But it is in
17  there that he says can understand, read, and write
18  some English.
19     Q.  It's also noted in there that a Detective
20  Alvarez assisted translating things into Spanish and
21  English and vice versa?
22     A.  It does say that in the paragraph.
23     Q.  Okay.  And that was done for the benefit
24  of ASA Kwilos?

1    A.  Correct.
2    MS. FLOWERS:  Objection.  Form.
3    MR. DIXON:  Nothing else.
4    MR. BARANYK:  Based on that nothing else.
5    THE REPORTER:  How would you like to handle
6  signature?
7    MS. FLOWERS:  Waive.
8             (WHEREUPON, Plaintiff's
9             Exhibit A and Exhibit B were marked
10            for identification as of
11            March 13, 2017.)
12            (WHEREUPON, the deposition was
13            concluded at 12:52 p.m.)
14
15
16
17
18
19
20
21
22
23
24

1  this action.
2       IN WITNESS WHEREOF, I do hereunto set my
3  hand at Chicago, Illinois, this 18th day of July
4  2017.
5
6
7             <%Signature%>
8             THERESA M. LAZZARO, CSR
9             CSR License No. 84-004629
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1             CERTIFICATE
2                 OF
3       CERTIFIED SHORTHAND REPORTER
4
5       I, THERESA M. LAZZARO, a Certified
6  Shorthand Reporter of the State of Illinois, CSR
7  License No. 84-004629, do hereby certify:
8       That previous to the commencement of the
9  examination of the aforesaid witness, the witness was
10  duly sworn by me to testify the whole truth
11  concerning the matters herein;
12       That the foregoing deposition transcript
13  was stenographically reported by me and was
14  thereafter reduced to typewriting under my personal
15  direction and constitutes a true and accurate record
16  of the testimony given and the proceedings had at the
17  aforesaid deposition;
18       That the said deposition was taken before
19  me at the time and place specified;
20       That I am not a relative or employee or
21  attorney or counsel for any of the parties herein,
22  nor a relative or employee of such attorney or
23  counsel for any of the parties hereto, nor am I
24  interested directly or indirectly in the outcome of

Veritext Legal Solutions
www.veritext.com                                    888-391-3376