56167-LSK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RAMIRO BAHENA,

Plaintiff,

v.

CITY OF CHICAGO, et. al.,

Defendants.

Case No. 17 CV 8532

Judge Lefkow

# EXHIBIT M

**DEPOSITION TRANSCRIPT OF A.S.A. JACQUELINE GRIFFIN**
**f/k/a JACQUELINE KWILOS**

**TAKEN ON SEPTEMBER 28, 2018**

**( Felony Review A.S.A.)**

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAMIRO BAHENA,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) No. 17 CV 8532
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
          Defendants.             )

     The deposition of JACQUELINE GRIFFIN,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil Procedure
of the United States District Courts pertaining
to the taking of depositions, taken before
MARGARET R. BEDDARD, a Notary Public within and
for the County of Kane, State of Illinois, and a
Certified Shorthand Reporter of said state, at
Suite 3710, 20 North Wacker Drive, Chicago,
Illinois, on September 18, 2018, at 10:10 a.m.

2

1   PRESENT:
2     ROBERTSON DURIC
      One North LaSalle Street, Suite 300
3     Chicago, Illinois  60602
      (312) 223-8600
4     BY:  MR. ROB ROBERTSON
           rob@robertsonduric.com
5
           --- and ---
6
      LAW OFFICES OF JEFFREY J. NESLUND
7     20 North Wacker Drive, Suite 3710
      Chicago, Illinois  60606
8     (312) 223-1100
      BY:  MR. JEFFREY J. NESLUND
9          neslundlaw@yahoo.com
10         --- and ---
11    LAW OFFICE OF AMEE ALONSO
      33 North Dearborn Street, Suite 1950
12    Chicago, Illinois  60602
      (773) 412-5228
13    BY:  MS. AMEE E. ALONSO
           amee.alonso@comcast.net
14
           appeared on behalf of the Plaintiff;
15
      QUERREY & HARROW, LTD.
16    175 West Jackson Boulevard, Suite 1600
      Chicago, Illinois  60604
17    (312) 540-7616
      BY:  MR. LARRY S. KOWALCZYK
18         lkowalczyk@querrey.com
19         appeared on behalf of the Defendants;
20    STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
      500 Richard J. Daley Center
21    Chicago, Illinois  60602
      (312) 603-5475
22    BY:  MR. STEPHEN L. GARCIA
           Assistant State's Attorney
23         stephen.garcia@cookcountyil.gov
24         appeared on behalf of the Deponent.

3

1              I N D E X
2   WITNESS               EXAMINATION
3   JACQUELINE GRIFFIN
4     By Mr. Robertson          4
5     By Mr. Neslund          237
6     By Mr. Kowalczyk        241
7     By Mr. Robertson        254
8
9          E X H I B I T S
10  NUMBER              MARKED FOR ID
11  Griffin Deposition Exhibit
12    No. 1                    49
13    No. 2                   121
14    No. 3                   158
15    No. 4                   175
16    No. 5                   176
17    No. 6                   179
18    No. 7                   182
19    No. 8                   183
20    No. 9                   192
21
22
23
24

4

1       MR. ROBERTSON:  Would you, please, swear in
2   Ms. Griffin.
3              (WHEREUPON, the witness was
4               duly sworn.)
5           JACQUELINE GRIFFIN,
6   called as a witness herein, having been first
7   duly sworn, was examined and testified as
8   follows:
9              EXAMINATION
10  BY MR. ROBERTSON:
11      Q.  Ma'am, could you, please, state your
12  name for the record?
13      A.  Jacqueline Griffin.
14      Q.  And formerly you were -- your maiden
15  name was?
16      A.  Jacqueline Kwilos.
17      Q.  I know you're an attorney licensed to
18  practice law in the State of Illinois, correct?
19      A.  Yes.
20      Q.  And how long have you been so?
21      A.  Since 2005.
22      Q.  And have you ever given a deposition
23  before?
24      A.  No.

ASA Jacqueline Griffin
September 18, 2018

5

1    Q.   Okay.  If you have any questions, I
2  know you're represented here by Mr. Garcia.  I'm
3  sure he's prepped you and given you a general
4  overlay.
5        You feel fine today?  Nothing that
6  would prevent you from giving a complete and
7  honest deposition, true?
8    A.   True.
9    Q.   And let's try not to talk over each
10  other because I have a bad habit of doing that.
11  I think you may as well.  Just sensing things.
12        The other one is try to answer -- I
13  know you've given this instruction to a witness
14  a lot.  Try to answer out loud, verbal.  The
15  court reporter can't take down shrugs,
16  et cetera.
17    A.   Right.
18    Q.   Let's start with a little bit about
19  yourself.
20        Did you grow up in this area?
21    A.   Yes.
22    Q.   And can you tell me where you went to
23  school?
24    A.   For college or high school?

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

6

1    Q.   High school, college, and law school.
2    A.   Mother McAuley for high school,
3  Illinois State University for college, and then
4  John Marshall for law school.
5    Q.   What did you major in in college?
6    A.   I double majored in criminal justice
7  and political science.
8    Q.   Were you thinking about being a
9  prosecutor back in college, or did you think law
10  enforcement?  Why criminal justice?
11    A.   Prosecutor.  My father was Chicago
12  police, so criminal justice is what I was
13  interested in.
14    Q.   And tell me a little about your dad
15  being a police officer?
16    A.   He was a Chicago police officer pretty
17  much his whole life.  He retired at 63 as a
18  sergeant.
19    Q.   Did he go detective sergeant?
20    A.   Yes.
21    Q.   So he worked -- he worked for, it has
22  to be what, over 30 years?
23    A.   Probably, yes.
24        When you were born, he was a Chicago

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

7

1  police officer?
2    A.   Yes.
3    Q.   And I assume you had a lot of friends
4  that were Chicago police officers as well?
5    A.   Yes.
6    Q.   Any other family members?
7    A.   Two uncles were Chicago police
8  officers.
9    Q.   Were they brothers of your dad?
10    A.   No.
11    Q.   On your mom's side?
12    A.   Yes.  My mom's brother and my mom's
13  sister's husband.
14    Q.   Okay.  Anyone else?
15    A.   Just friends.
16    Q.   Okay.  When you say friends, like when
17  you were growing up?
18    A.   No.  I mean, like, as an adult.  My
19  friends or people.
20    Q.   We'll get to that point.  I just wanted
21  to finish off the family.  Not finish them off,
22  but you know what I mean.
23    A.   Yes.
24    Q.   I assume -- it's fair to say, with your

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

8

1  dad as a police officer, you've gotten early
2  exposure to the criminal justice system and him
3  telling you a little bit about what's going on
4  as you grew older?
5    A.   Yes.
6    Q.   And did you do any activities in
7  college to help further the idea of being a
8  prosecutor?  Clerking?  Anything like that?
9    A.   Well, when I was in college, I worked
10  actually at the Liquor Commission for the City
11  of Chicago.  It was civil -- the Liquor
12  Commission at the Daley Center, like, every
13  summer.  I interned there during college.
14  Actually, during college sessions, no.  Just
15  attending classes.
16    Q.   And what year did you graduate from
17  college?
18    A.   1999.
19    Q.   And did you go to Marshall --
20    A.   I took a year off and then went to
21  Marshall 2001 because I started in January.
22    Q.   Were you a day student?  A night
23  student?
24    A.   I technically was a part-time student,

Wadlington Reporting Service, Inc.
(312) 372-5561

1  but I still graduated in three years because I
2  worked at a civil law firm during law school.
3      Q.  Okay.  What civil law firm?
4      A.  It was Richard Trainor, Ltd., and it
5  was personal injury/medical malpractice.
6      Q.  And why did you choose that?
7      A.  I actually waitressed as well.  One of
8  the waitresses there, it was her brother's firm.
9  I was looking to get into a law firm and get
10  some experience, so I went and worked for him.
11  And I worked for him all through law school.
12      Q.  When you were doing that, were you
13  going back and forth between, like, I want to be
14  a prosecutor or maybe you wanted to do PI?  Were
15  you thinking if prosecution doesn't work out
16  doing PI or vice versa?
17      A.  Just going back and forth, I'd say.  Or
18  just looking at all my options.
19      Q.  And then did you -- what year did you
20  graduate from John Marshall?  2004?
21      A.  Yes, 2004.
22          And then I was on the waiting list for
23  the State's Attorney's Office till June of 2005.
24      Q.  And so you waited almost a year --

1      A.  Almost a year.
2      Q.  -- to get in?
3      A.  Yes.
4      Q.  That doesn't say anything about you?
5  It's a job that's fairly prized, correct?
6      A.  Yes.
7      Q.  Even though we can all agree that the
8  pay isn't what it should be; fair to say?
9      A.  Fair to say.
10      Q.  When you went through the interview
11  process, had you had previous experience with
12  the State's Attorney's Office?
13      A.  I did.  Also, besides waitressing and
14  working at the law firm, I also clerked in the
15  Traffic Division at the Daley Center.  Yeah, it
16  was at the Daley Center when I did that.
17      Q.  You must have been quite busy?
18      A.  Yes.
19      Q.  And how long did you clerk in Traffic?
20      A.  I want to say maybe -- it wasn't --
21  maybe one semester, so, like, a half of a school
22  year.  And I think I only did two days a week,
23  maybe only the mornings, to fit in with the
24  schedule.

1      Q.  When you're clerking, that's completely
2  volunteer, right?
3      A.  Yes.
4      Q.  And was that after you'd been
5  waitlisted or before you'd been waitlisted?
6      A.  Before.  While I was in school.
7      Q.  And that was not for any credit or
8  anything like that?
9      A.  No.
10      Q.  Who did you work with in Traffic
11  Division?  Do you remember?
12      A.  I think it was Mike Hood maybe.
13      Q.  Now, Judge --
14      A.  Falagario, too, maybe.
15      Q.  All right.  I want to finish off the
16  friends line.
17          You said you had friends that were
18  Chicago police officers?
19      A.  Yes.  Once I became an adult, I would
20  say, like, after graduating college some of my
21  friends who were after college became police
22  officers.
23      Q.  Mostly Chicago police officers or other
24  departments?

1      A.  Some Cook County sheriffs.  I don't
2  think any other agencies.  Chicago police or
3  Cook County sheriffs.
4      Q.  Is it something where these are most of
5  your friends?  A couple of your friends?
6      A.  A couple.  I would say a handful of
7  friends.
8      Q.  Ones you're close to?  Not as close to?
9      A.  Not close to.  I didn't talk to them
10  much after graduating college.
11      Q.  Since 2005 when you joined, is it fair
12  to say you've been emersed in the criminal
13  justice system?
14      A.  Well, I was Child Support when I
15  started, so that was civil.  Then I was Juvenile
16  Court, which the beginning is civil.  The first
17  two years was civil.  Then I went to the
18  Delinquency side.  That's when I would say
19  criminal.
20      Q.  But your goal was always to wind up at
21  26th Street?
22      A.  Yes.
23      Q.  And that's where the felony cases are
24  heard, correct?

1    A.  Yes.
2    Q.  And we started to go through your
3  progression through the office a little bit.
4       You started in Juvenile Delinquency at
5  what time?
6    A.  So June of '05 was Child Support to
7  November of '06.  So then Juvenile Protection
8  was November of '06 to November of '08.  So then
9  that would have been Delinquency November of '08
10 to November of 2010.  Then after --
11   Q.  Let me just finish up Delinquency real
12 quick.
13      The Delinquency side, that's dealing
14 with criminal offenses committed by people under
15 18?
16   A.  Yes.
17   Q.  And it functions in some ways like the
18 criminal justice system, but there's more
19 considerations for the offenders?
20   A.  Yeah.  It's restorative justice, so
21 they try to restore the offenders instead of
22 incarceration, I guess.
23   Q.  But in terms of the prosecution, the
24 prosecution of a case is when you actually go to

1  trial.  It's subpoenaing police officers and
2  generally calling them to testify, correct?
3    A.  Yes.
4    Q.  Is it fair to say that there are a lot
5  of victim cases you deal with, but the majority
6  of cases you deal with as a state's attorney
7  involve police officers?
8    A.  Yes.
9    Q.  And probably even a majority involve
10 exclusively police officers, drug cases, gun
11 cases, things like that?
12   A.  Throughout my career, yes.
13   Q.  And it would be fair to say that you
14 probably had daily interaction with police
15 officers in your role as a state's attorney from
16 every point when you started in Juvenile
17 Delinquency forward?
18   A.  Yes, from Juvenile Delinquency.  At
19 some point, yes.
20   Q.  Let's finish off your career.  We'll
21 talk about the rest of your career.  Then we'll
22 come back and flush some things out.
23   A.  Okay.
24   Q.  How long were you in Delinquency?

1    A.  So Delinquency -- I have to run it
2  through my head -- 2006 to 2010.  So I did,
3  like, two years in each side of Juvenile Court
4  till November of 2010.  Then November of 2010
5  through November of 2012 I was in Felony Review.
6  And then the end of November 2012 through July
7  of 2013 I did Preliminary Hearings, then the
8  Grand Jury, then Branch 66 in that year and a
9  half.  And then July of 2013 I became a Third
10 Chair.
11   Q.  Okay.  And where are you currently?
12   A.  In the Sex Crimes and Domestic Violence
13 Division.
14   Q.  And when did you join the Sex Crimes
15 Division?
16   A.  About a year ago.  September of last
17 year.
18   Q.  Was that something you asked for and
19 chose to do or something that they just kind of
20 said, "Hey, this is where you're going"?
21   A.  They reached out to me and asked me if
22 I wanted to come.  I had done -- part of my
23 Felony Review stint was in the ICAC, the
24 Internet Crimes Against Children, so I had a bit

1  of experience dealing with Sex Crimes.  I think
2  they reached out to me and I chose to go.
3    Q.  What percentage would you say did you
4  do in ICAC?  What time period?
5    A.  If I were to guess -- it would just be
6  speculating.  But I want to say three to six
7  months of the Felony Review time.
8    Q.  Do you remember -- was it continuous?
9    A.  Yeah.  Like, the three to six months
10 was.  It wasn't immediately in the beginning
11 because I know I had, like, regular stuff first.
12 And then, like, somewhere in the middle, I would
13 say.  I don't think I ended Felony Review with
14 it.  It was somewhere in the middle.
15   Q.  Okay.  And that's your only trip
16 through the Felony Review Unit?
17   A.  Right.
18   Q.  Any plans to be going back as a trial
19 supervisor?
20   A.  Not currently because the way that
21 it's -- the way it's set up now is if you're in
22 Sex Crimes/Domestic Violence -- I am currently
23 on call as a notifier for any Sex Crimes or
24 domestic violence with intimate partners, so

1   I'll get a phone call -- I'm on call two days a
2   month for 24 hours, and I'll get a phone call
3   from the ASA working Felony Review if they have
4   questions or to just notify me of the situation
5   on the case.
6       Q.   Do you go out and review them at that
7   point, or no?
8       A.   No.
9       Q.   What does your husband do?
10      A.   He's a plumber.
11      Q.   And how long have you guys been
12  married?
13      A.   Five years.
14      Q.   Congratulations.
15      A.   Thanks.
16      Q.   All right.  Let's talk about your
17  general work, and then we'll go back to Felony
18  Review.
19      A.   Okay.
20      Q.   In all the different aspects you were
21  telling me about after -- including Juvenile
22  Delinquency and afterward, you said you dealt
23  with police officers pretty much on a daily
24  basis?

1       A.   Yes.
2       Q.   And that would be in a number of
3   different capacities; fair to say?
4       A.   Yes.
5       Q.   And a lot of them is all with the goal
6   of bringing successful prosecutions through the
7   criminal justice system in one form or another?
8       A.   Well, seeking justice, I guess.  Not
9   necessarily, but right.
10      Q.   The difference being the difference
11  between just winning and reaching -- making sure
12  only guilty people get convicted?
13      A.   Right.  I wasn't doing that.  I was
14  making sure that -- right.  Only the guilty, I
15  guess, get convicted.
16      Q.   That's what your goal is, right?
17      A.   Seeking justice, I guess, for victims
18  is what my goal would be, I would say.
19      Q.   And that would be only guilty offenders
20  getting convicted, right?
21      A.   I guess.  Seeking justice, yeah, for
22  victims.  I'm confused by the question.
23      Q.   You wouldn't seek justice by convicting
24  someone who didn't commit a crime?

1       A.   Oh, right.
2       Q.   I just wanted to clarify that.
3            So in this police officers will -- like
4   in the review setting, will provide you
5   information, correct?
6       A.   Yes.
7       Q.   And they'll do the investigation and
8   the cases will then come into the criminal
9   justice system?
10      A.   Yes, I guess.  Eventually, yeah.
11      Q.   It's not like you, as a state's
12  attorney, do any independent investigation,
13  correct?
14      A.   Right.
15      Q.   That's the -- although the police and
16  the prosecutors work together, they're the
17  investigators and you guys are the attorneys,
18  correct?
19      A.   Correct.
20      Q.   When you went through -- after the
21  Felony Review Unit, you said that you went
22  through Preliminary Hearings.  That's the
23  initial stage of the criminal prosecutions,
24  correct?

1       A.   Yes.
2       Q.   And those are small, brief, little
3   hearings that occur all the way throughout the
4   city?
5       A.   Yes.
6       Q.   And sometimes you can have, you know,
7   10, 15 hearings a day, correct?
8       A.   Yes.
9       Q.   And you'll do multiple hearings at that
10  time, correct?
11      A.   Yes.
12      Q.   And each time it's just interviewing an
13  officer briefly beforehand, correct?
14      A.   Yes.
15      Q.   And then you ask him questions after
16  they're put under oath, correct?
17      A.   Yes.
18      Q.   In this sense, you're relying on the
19  officer's testimony to start the criminal
20  prosecution, correct?
21      A.   Yes.
22      Q.   Now, you also did the Grand -- you say
23  you did Grand Jury or just Branch 66?
24      A.   Grand Jury briefly.

1  Q.   And Grand Jury is kind of like an
2  ultimate view of the preliminary hearing,
3  correct?
4  **A.   Yes.**
5  Q.   But you still have the same roles?  The
6  police officers bring the cases in with their
7  investigation and you, as the attorney, present
8  them to the Grand Jury?
9  **A.   Yes.**
10  Q.   And you're relying on the information
11  that the police officers bring you, correct?
12  **A.   Yes.**
13  Q.   And then you did Branch 66, which is
14  kind of primarily Grand Jury work, but it's done
15  on homicide sex cases -- serious sex cases and a
16  couple different types of cases, but
17  generally very serious, correct?
18  **A.   Yes.**
19  Q.   And that work's primarily in front of
20  the Grand Jury presenting cases to initiate
21  those types of cases, correct?
22  **A.   Yes.**
23  Q.   Again, the same thing?  The police
24  investigate the cases and you take that

1  information and you present it -- what they give
2  you to the Court, correct?
3  **A.   Yes.**
4  Q.   No independent investigations you do?
5  **A.   No.**
6  Q.   Now, the information that the police
7  provide is used in a lot of different capacities
8  in the criminal justice system; fair to say?
9  **A.   Yes.**
10  Q.   It's basically the root from where
11  everything comes from?
12  MR. KOWALCZYK:  Object to form.
13  But go ahead.
14  BY MR. ROBERTSON:
15  Q.   Unlike court where there's some ruling
16  on the objections, generally you're going to
17  answer all of the questions unless Mr. Garcia
18  tells you not to.  Then we'll do lawyer stuff.
19  The objection just preserves it for later.
20  **A.   When you say root -- I guess the police
21  are the people bringing forth the evidence.**
22  Q.   Right.
23  **A.   Yes.**
24  Q.   And the evidence is used in a variety

1  of different capacities, correct?
2  **A.   Could you explain what you mean?**
3  Q.   Sure.
4  The first thing is it's used in
5  determining whether or not the State's
6  Attorney's Office will bring felony charges in a
7  number of cases, correct?
8  **A.   Yes.**
9  Q.   We'll get more into that because that's
10  why you're here today.
11  But that's information solely taken
12  from the police that you look at and a
13  determination is made as to whether this is a
14  felony or whether it should not proceed in the
15  criminal justice system at that point?
16  MR. KOWALCZYK:  I just object to the form
17  insofar as the State's Attorney Office does take
18  written statements for Grand Jury witnesses.
19  Over my objection, go ahead.
20  THE WITNESS:  Sure.  So what was your
21  question again?
22  BY MR. ROBERTSON:
23  Q.   The information that the police give
24  you is used in a variety of different

1  capacities, correct?
2  **A.   Sure.  Yes.**
3  Q.   And that information can be used in
4  terms of the Felony Review decision whether to
5  charge or not?
6  **A.   Yes.**
7  Q.   And that information that is provided
8  by the police can be used once the case comes in
9  to determine what offenses should be charged?
10  **A.   Yes.**
11  Q.   And that information that's provided
12  with -- by the police, coupled with the
13  offender's background, is used at bond hearings
14  to determine whether someone should be released
15  or what type of bond -- conditions of bond that
16  they provide?
17  **A.   Yes.**
18  Q.   Is it fair to say that the police play
19  a central role in the criminal justice process?
20  **A.   Yes.**
21  Q.   Now, even after a case goes past the
22  bond hearing, you're using information provided
23  by the police to present it to either the judge
24  at a criminal hearing or the Grand Jury to

## Page 25

ASA Jacqueline Griffin
September 18, 2018

1  determine what -- whether there's probable cause
2  to keep that criminal prosecution going,
3  correct?
4      A.   Yes.
5      Q.   And is it fair to say that -- and then
6  eventually as the case proceeds that same
7  information is used with respect to certain
8  motions -- pretrial motions?
9      A.   Yes.
10     Q.   And then ultimately for determining
11 potential pleas?
12     A.   Yes.
13     Q.   And whether the State will enter into a
14 plea agreement or not and what counts they'd be
15 willing to accept the information on?
16     A.   Yes.
17     Q.   It would also be used obviously at
18 trial?
19     A.   Yes.
20     Q.   And is it fair to say that over the
21 course of your entire career you've touched over
22 a thousand cases -- or handled over a thousand
23 cases in one form or another?
24     A.   Yes.

Wadlington Reporting Service, Inc.
(312) 372-5561

## Page 26

ASA Jacqueline Griffin
September 18, 2018

1      Q.   And all of them have followed one of
2  these paths that we've talked about?
3      A.   Yes.
4      Q.   Is it fair to say that you trust the
5  information provided to you by the police?
6      A.   Yes.
7      Q.   You've worked with a number of
8  different officers, correct?
9      A.   Yes.
10     Q.   And both patrol officers and
11 detectives, correct?
12     A.   Yes.
13     Q.   In each one of those instances, you
14 rely on those -- the information provided to you
15 by the police in making a variety of different
16 decisions that we've talked about?
17     A.   Yes.
18     Q.   And let's talk a little bit about
19 Felony Review now.  Okay?
20     A.   Okay.
21     Q.   The Felony Review Unit may have changed
22 since I've been last there, but some of the
23 things probably stayed the same.
24          You said you were there in 2012?

Wadlington Reporting Service, Inc.
(312) 372-5561

## Page 27

ASA Jacqueline Griffin
September 18, 2018

1      A.   Yes.  2010 to 2012.
2      Q.   That's a long time.
3      A.   Yes.
4      Q.   At the time you were on it, would it be
5  fair to say approximately 32 to 40 attorneys in
6  the unit?
7      A.   About 8 to 10 per team and there were
8  four teams, so, yeah, about that.
9      Q.   In the supervisory structure, you would
10 have the head of the Felony Review Unit on the
11 top?
12     A.   Yes.
13     Q.   And then at the time there were three
14 deputy supervisors, correct?
15     A.   Yes.
16     Q.   And the deputy -- at that time, the
17 deputy supervisors, did they function -- did
18 they use an on-call system where each deputy or
19 the head was on for one day and that person
20 would be on call?
21     A.   I believe so.  I definitely know they
22 were on call at some point.  I don't know
23 exactly if it was, like, day by day.  But I
24 would assume it probably went day by day on the

Wadlington Reporting Service, Inc.
(312) 372-5561

## Page 28

ASA Jacqueline Griffin
September 18, 2018

1  24-hour period.  During the day, they
2  obviously -- all of them were in the office, so
3  they were there -- all four of them usually.
4      Q.   And you said there were -- it's a unit
5  that's staffed 24/7, correct?
6      A.   Yes.
7      Q.   And 365 days a year?
8      A.   Yes.
9      Q.   So whenever a police officer needed to
10 talk with Felony Review there's someone there
11 answering the phones?
12     A.   Yes.
13     Q.   And the theory is, if everything's
14 working right, you have between eight or ten
15 attorneys that are available at the disposal of
16 the police department to answer certain calls,
17 correct?
18     A.   Yes.
19     Q.   Now, comprised on the team, underneath
20 the deputy supervisor they have what are called
21 trial supervisors, correct?
22     A.   Yes.
23     Q.   And there are either one or two on each
24 team?

Wadlington Reporting Service, Inc.
(312) 372-5561

1    A.    Two or three it was at the time that I
2  was on.
3    Q.    And those were individuals who were --
4  were more seasoned prosecutors, correct?
5    A.    Yes.
6    Q.    They would have all been through the
7  Felony Review process before, correct?
8    A.    Yes.
9    Q.    And who were available for the younger
10 assistants for any questions or to give them
11 direction or help them work on cases, correct?
12    A.    Yes.
13    Q.    They were also responsible for their
14 own cases, correct?
15    A.    Yes.
16    Q.    At that time, trial supervisors were
17 responsible for handling all the murders,
18 correct?
19    A.    Yes.
20    Q.    And they would also handle all things
21 like police shootings, correct?
22    A.    Primarily, yes.
23    Q.    And it was -- the younger assistants
24 would only go out on the murders by themselves

1  under very limited circumstances, correct?
2    A.    True.
3    Q.    Only basically if everyone else was
4  busy and the -- none of the trial supervisors
5  could handle it, correct?
6    A.    Right.  The trial supervisors, if they
7  were busy, right.
8    Q.    When you started in Felony Review, do
9  you remember -- you probably -- I don't need a
10 day-by-day breakdown.  Can you give me an idea
11 of who your trial sups were?
12    A.    I know that I had Jennifer Ravin and
13 Torrie Corbin.  They were together.  Marina Para
14 was one of them.  I'm trying to think who it was
15 in the beginning.  I had, I believe, Brian
16 Boersma and Bob --
17    Q.    Schwartz?
18    A.    -- Schwartz, Cheryl Galvin.  I don't
19 know if she was my trial sup, but I may have
20 worked with her crossing over time frames.  That
21 is all I can think of.
22    Q.    When you say crossing over, there would
23 be times when you would work on a different team
24 other than your own team, switch shifts; would

1  that be fair to say?
2    A.    Yes.  Or I would still be out on a case
3  and a new team would come in.  But I'd still be
4  out on the case, so there would be supervisors
5  for the other team.
6    Q.    And I asked you about your trial sups,
7  but who were the big bosses in the Felony Review
8  Unit?  Do you know who the head was and who the
9  deputy sups were?
10    A.    When I started, it was Fabio Valentini.
11 And then John Brassil took over for him as head.
12 The deputies were Veryl Gambino, Margaret Wood,
13 and Jim Byrne.  And then I believe George took
14 over for -- George Canellis took over for Veryl.
15    Q.    All right.  Thank you.
16          I'd like to talk to you a little bit
17 more about the Felony Review Unit.
18    A.    Okay.
19    Q.    It's specifically located on the
20 14th floor of 26th and California, correct?
21    A.    Yes.
22    Q.    Besides the attorneys, there's
23 full-time dispatchers, correct?
24    A.    Yes.

1    Q.    And calls come in on a variety of types
2  of cases, correct?
3    A.    Yes.
4    Q.    The cases fall into one or two -- three
5  general categories.
6          You have cases that are just simply
7  phone cases, correct?
8    A.    Yes.
9    Q.    In those cases, an officer calls up and
10 in certain generally nonviolent offenses or
11 certain designated offenses they'll deal with
12 you exclusively over the phone, correct?
13    A.    Yes.
14    Q.    In that period of time, you'll take out
15 a Felony Review folder, correct?
16    A.    Yes.
17    Q.    You'll fill it out completely, correct?
18    A.    Yes, until the crime system came into
19 play.  Then we just put it right into the
20 computer.
21    Q.    This was Felony Review at this point,
22 though, right?
23    A.    During my time frame, crimes came into
24 the system.  I feel like it maybe came in pretty

1 early in my two years there.

2     Q.    When the crime system came in, would

3 you still fill out a Felony Review folder?

4     A.    Not always, no.  If you were working

5 phones, you would just put them right into the

6 system as you were on the phone.

7     Q.    And that would be taking the

8 information provided by the officer and putting

9 it directly into the computer, correct?

10    A.    Correct.

11    Q.    And either way you did it, you would

12 make the decision on the phone cases to

13 generally approve them or reject them, correct?

14    A.    Or CI them sometimes, too, yes.

15    Q.    It's much rarer to CI the phone cases,

16 though, correct?

17    A.    I don't know.  Not as often as personal

18 cases.  There were some CI's, too.

19    Q.    Just so we have it down for the record,

20 approval meaning, yes, we're going -- the

21 office -- the State's Attorney's Office is going

22 to bring felony charges against the defendant,

23 correct?

24    A.    Yes.

1     Q.    And rejection meaning we're choosing

2 not to proceed with felony charges, correct?

3     A.    Yes.

4     Q.    And that would still allow the police

5 officers to -- in non-murder cases, to either

6 charge it as a misdemeanor or to seek a deputy

7 override, correct?

8     A.    Yes.

9     Q.    And then the third one we talked about

10 was a CI, correct?

11    A.    Yes.

12    Q.    And CI stands for continued

13 investigation?

14    A.    Yes.

15    Q.    And tell me a little bit about what a

16 CI is?

17    A.    A CI is -- for instance, in a phone

18 case, like we were talking about -- in a retail

19 theft, for instance, the officer may call it in

20 and say that there's a video, but he doesn't

21 have the video.  They would suggest that they

22 get the video before any approval so that it's

23 inventoried in evidence before the approval

24 comes in.  So that would be a CI.

1     Q.    An example of a CI?

2     A.    Yes.  An example of a phone case, yeah.

3          In a personal, which would be a more

4 violent offense, we'd go out and interview and

5 take handwritten statements of witnesses.  Maybe

6 some witnesses weren't available at that time,

7 so we would CI it to do the investigation to

8 talk to all witnesses and gather any other --

9 have the police gather any other evidence and

10 present everything to us so we could see the

11 total picture.

12    Q.    The CI -- the idea behind the CI is

13 that you're looking for more information before

14 the decision is made to either charge it or

15 choose not to charge it, correct?

16    A.    Yeah.  Before we make an informed

17 decision, make sure all the information is

18 there.

19    Q.    In those instances with the CI, you're

20 asking the police officers to go basically run

21 down what they need to run down and provide you

22 all the information you feel is necessity to

23 make those decisions, correct?

24    A.    Correct.  They would have stuff that

1 they have left to do or that they're working on.

2 Until they have the answers to give to us,

3 right, we wouldn't make a decision.

4     Q.    It's not something you order them to

5 do.  They're responsible for how they do it or

6 how they investigate it.  You just are reviewing

7 information once it gets to you, correct?

8     A.    Yes.

9     Q.    Now, we were talking about phone cases.

10         You also have advice cases that come

11 in, correct?

12    A.    Yes.

13    Q.    And advice cases are cases where the

14 Chicago Police Department officers, both patrol

15 officers and detectives, can call in and just

16 simply ask you for advice on how to proceed with

17 a case, correct?

18    A.    Yes.

19    Q.    And those are generally nonbinding,

20 correct?

21    A.    Right.

22    Q.    And they're just kind of like, hey,

23 this is what I think.  At that point, the

24 officer's free to reject or accept what you said

ASA Jacqueline Griffin
September 18, 2018

37

1  and, if appropriate, bring the case back in
2  later, correct?
3      A.   Correct.
4      Q.   In advice folders -- you don't
5  generally enter advice into the crime system or
6  fill out a folder on that?
7      A.   No.
8      Q.   Is it fair to say when you're sitting
9  in -- you would probably say then the average
10  Felony Review gets over a hundred calls a day?
11      A.   Sure, probably.
12      Q.   Maybe even more?
13      A.   Maybe more.
14      Q.   Because it handles it for not only the
15  city, but at this time it was also all the
16  suburbs, correct?
17      A.   Yes.
18      Q.   All the 143 other municipalities in
19  Cook County, correct?
20      A.   Yes.
21      Q.   Now, when we're talking about personal
22  cases, they're really the guts of the Felony
23  Review Unit?
24      A.   As far as volume or as far as --

ASA Jacqueline Griffin
September 18, 2018

38

1      Q.   No.
2          In terms of, like, the importance?
3      A.   Yes.
4      Q.   And the volume is less than the phone
5  cases, correct?
6      A.   Yes.
7      Q.   And the personal cases are cases that
8  are generally violent crimes that involve
9  victims, correct?
10      A.   Yes.
11      Q.   And when you say personal, it means
12  you're not just generally talking to them over
13  the phone, but you're actually going out --
14  going to different locations to handle the case,
15  correct?
16      A.   Yes.
17      Q.   And the locations you go to are
18  generally to police stations, correct?
19      A.   Yes.
20      Q.   I'm sure your work has taken you to
21  other aspects on personal cases, but generally
22  you're going to police stations, right?
23      A.   Yes.
24      Q.   Is it fair to say generally you're

ASA Jacqueline Griffin
September 18, 2018

39

1  going to one of the detective areas?
2      A.   Yes.
3      Q.   At the time you were handling this,
4  were there three detective areas, or was it in a
5  transition from five?
6      A.   I think it was in transition.  I think
7  it was five when I started and then it went to
8  Area South, Central, and North.  Yeah, I think I
9  was in the transition.
10      Q.   And Area -- you said there were three
11  areas when you ended, and it was North, Central,
12  and South?
13      A.   Right.
14      Q.   And North was located at Grand and
15  Central, or do I have that wrong?  Was it
16  Belmont and Western?
17      A.   I think it's Belmont and Western.
18      Q.   It was after my time.
19      A.   It would have been -- Area 3, I think,
20  is the one they kept open.
21      Q.   Okay.  That would have been Belmont and
22  Western?
23      A.   Belmont and Western.
24      Q.   And you had worked a number of cases at

ASA Jacqueline Griffin
September 18, 2018

40

1  all of those different locations, correct?
2      A.   Yes.
3      Q.   When we're talking about personal
4  cases, we're talking -- what type of cases are
5  generally on the list of personal cases?
6      A.   Murder, criminal sexual assaults, most
7  sex -- pretty much anything -- almost all sex
8  cases, aggravated batteries, some harassment of
9  witnesses, robberies.
10      Q.   Armed robberies?
11      A.   Armed robberies.
12      Q.   Home invasions?  Kidnappings?
13      A.   Right.
14      Q.   In doing those, when you go out, you --
15  let's start at the beginning of this.
16          When you first go out, you talk to
17  police officers -- before you even go out, you
18  talk to police officers over the phone, correct?
19      A.   Correct.
20      Q.   If you're dealing with a person, it's
21  basically a detective, correct?
22      A.   Yes.
23      Q.   In the course of your work with the
24  Cook County State's Attorney's Felony Review

1 Unit, you've probably worked with hundreds of
2 different detectives?
3     A.    Yes.
4     Q.    And handled hundreds of different
5 personal cases -- just personal cases; fair to
6 say?
7     A.    Yes.
8     Q.    When you talk to a detective over the
9 phone, the detective gives you a rundown of the
10 case?
11     A.    Yes.
12     Q.    And gives you an idea of what you're
13 walking into in terms of potential witnesses or
14 potential issues, correct?
15     A.    Yes.
16     Q.    When you get out there to the area, you
17 will take a number of different actions,
18 correct?
19     A.    Yes.
20     Q.    Generally, you'll review what paperwork
21 is there, correct?
22     A.    Yes.
23     Q.    If the case is fresh/fairly new,
24 there's usually not much there, correct?

1     A.    Right.
2     Q.    Maybe the original RD offense report?
3     A.    Yes.
4     Q.    Maybe some GPRs?
5     A.    Yes.
6     Q.    If the case has been around a little
7 bit longer, maybe detective supplemental
8 reports, but that's rare?
9     A.    I would say, yeah, that's rare that
10 they're typed up.
11     Q.    You would say in less than five percent
12 of the cases?
13     A.    I don't know if I could give a
14 percentage.
15     Q.    It's rare?
16     A.    But rare.
17     Q.    And then at times you view different
18 types of evidence, correct?
19     A.    Yes.
20     Q.    And one of the types of evidence you
21 gave an example of earlier was video evidence,
22 correct?
23     A.    Yes.
24     Q.    And that's something that became more

1 and more prominent as your career has gone on,
2 correct?
3     A.    Yes.
4     Q.    And very important, wouldn't you say?
5     A.    Yes.
6     Q.    And when you -- when you go out -- when
7 you were going out during your time in Felony
8 Review, would you be the one in charge of the
9 case from the State's Attorney's Office, or
10 would it depend on what the charge was that was
11 being sought?
12     A.    You mean --
13     Q.    It's a bad question.
14     A.    Yeah.   Can you rephrase?
15     Q.    The ultimate power to approve and
16 reject charges, was that yours at the time?
17     A.    As a line ASA, I believe that at that
18 time we ran everything by our trial sups as far
19 as personal cases.   I believe that it was my
20 decision probably for phone cases.   But if we
21 went out on a personal, at that time we were
22 running everything by a trial sup.
23     Q.    If you went out on a murder, everything
24 had to be run by --

1     A.    The deputy usually.
2     Q.    The deputy or the head of the unit?
3     A.    Yes.
4     Q.    At that time, running it by a deputy or
5 the head of the unit, if the first -- the deputy
6 who was on call when the case was first called
7 in would generally follow that case when it was
8 called in subsequently, correct?
9     A.    I believe so, yes.
10     Q.    At least every attempt was made to do
11 that, correct?
12     A.    Yes.
13     Q.    So it wouldn't be like -- so there
14 would be continuity in the State's Attorney's
15 Office?
16     A.    Right.   Deputywise, yeah, for murders.
17     Q.    And your role in going out -- besides
18 the final approval or rejection on murders,
19 other decisions in the case -- for murder cases
20 would have to do the same thing, go all the way
21 up to the deputy supervisor, correct, whether to
22 take a handwritten or not?
23     A.    I would think so, but I honestly
24 couldn't give you an answer.   Because I was a

ASA Jacqueline Griffin
September 18, 2018

45

1  line ASA, so I would just relay my information
2  to my pretrial sup, who then would relay --
3  like, would tell me what to do.  Do you know
4  what I mean?
5      Q.   Okay.
6      A.   I don't know that they ever gave us
7  training saying, like, you have to do that.  I
8  don't know what my trial sups were doing.  Do
9  you know what I mean?  Maybe they were told that
10 they have to do that and then they would get
11 back to me.  Do you know what I'm saying?
12     Q.   We'll get into this in this case.
13          If you had information on murder and
14 you needed a Force of Action, you're a line ASA.
15 That usually meant that your trial sup was not
16 available to take the case?
17     A.   Right.
18     Q.   Would you still find one of your trial
19 sups to talk to, or would you just -- at that
20 point, just say, "Who's the deputy on call?  I
21 need to talk to the deputy on call"?
22     A.   I sometimes would reach out to my trial
23 sup.  It's the day of cell phones.  I'd text or
24 whatever.  Even if they were out on a case, they

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

46

1  would maybe -- if it was something I needed to
2  know, like I could call them or text them and
3  they would call me when they have a minute on
4  their case and talk to me and tell me what I
5  need to do or whatever.  I'm sure there were
6  times that I probably just called the deputy, so
7  I would say it was a little bit of both.
8      Q.   You'd agree with me that your role in
9  that unenviable position was being basically a
10 conduit of information?
11     A.   Yes.
12     Q.   You would take the information that was
13 provided to you and you would relay it as
14 accurately as possible up the chain?
15     A.   Yes.
16     Q.   I mean, you knew that information was
17 important, correct?
18     A.   Yes.
19     Q.   And you were dealing with the big
20 stakes with murders, correct?
21     A.   Yes.
22     Q.   Murders, at that time, generally were
23 20 years and 100 percent on the bottom --
24 100 percent time at IDOC up to 60 years,

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

47

1  correct?
2      A.   Yes.
3      Q.   Also, with firearms enhancements, they
4  would add on an extra 25 years to life at
5  100 percent, correct?
6      A.   Uh-huh.
7      Q.   Sorry.
8      A.   That's okay.
9      Q.   And then multiple murders were, at that
10 point, natural life, correct?
11     A.   Yes.
12     Q.   The death penalty was not in play at
13 that point in time, was it?
14     A.   I don't think so.  I think by the
15 time I started -- by the time of our case at
16 hand, no, it was not.
17     Q.   But if it had been, this would have
18 qualified for it, correct?
19     A.   Yes.
20     Q.   I want to finish one area up and then
21 take a quick break.
22     A.   Okay.
23     Q.   In preparation for the deposition, what
24 did you look at?  I don't want to know anything

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

48

1  you and Mr. Garcia talked about.  I just want to
2  know what you looked at.
3      A.   A photocopy of the Felony Review folder
4  and a photocopy of a handwritten statement I
5  took from Arturo De La Cruz.
6      Q.   Anything else?
7      A.   No.
8      Q.   Did you -- besides Mr. Garcia, did you
9  meet with anyone else?
10     A.   No.  Meet with in person, no.
11     Q.   And you don't know Mr. Kowalcyck,
12 right?
13     A.   No.
14     Q.   He's a very nice man.
15          MR. ROBERTSON:  We're going to take a brief
16 break and then we'll be right back in.
17          THE WITNESS:  Okay.
18               (WHEREUPON, a short recess
19               was had.)
20          MR. ROBERTSON:  Back on the record.
21 BY MR. ROBERTSON:
22     Q.   I'd like to talk to you a little bit
23 about -- well, a lot about the Ramiro Bahena
24 case.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

49

1   A.   Yes.
2   Q.   It's a case that you handled on review,
3   correct?
4   A.   Yes.
5   Q.   And we talked about what you reviewed.
6        And I'll show you --
7   MR. ROBERTSON:   Mark this as Griffin
8   Exhibit 1.
9              (WHEREUPON, said document was
10             marked Griffin Deposition
11             Exhibit No. 1.)
12  BY MR. ROBERTSON:
13  Q.   Leaf through this.
14       It's Bates stamped SAO 185 through --
15  actually, 184 through -- 183 through 190; is
16  that fair to say?  They're not in order, but
17  those are the pages it encompasses?
18  A.   It's eight pages.
19  Q.   Okay.
20  A.   Mine says SAO 185, 186, 187, 188, 184,
21  189, 183, and 190.  It's not in exact order.
22  Q.   All right.  So let's go through this a
23  little bit.
24       These Felony Review folders are kind of

ASA Jacqueline Griffin
September 18, 2018

50

1   oversized legal folders, correct?
2   A.   Yes.
3   Q.   And they ask for information that
4   initiates the Felony Review process, correct?
5   A.   Yes.
6   Q.   And these are the same folders that are
7   used for -- at the time, they were used for
8   phone cases and for personal cases, correct?
9   A.   Yes.
10  Q.   Now, this first part is -- the first
11  page, which is SAO 185, that's just the outside
12  of the folder, correct?
13  A.   Yes.
14  Q.   And this is the portion of the folder
15  that's used if the case proceeds and winds up
16  going to court, correct?
17  A.   Yes.
18  Q.   And that was not filled out by you,
19  correct?
20  A.   Actually, the "first degree murder" is
21  my handwriting.
22  Q.   Okay.  And that's because that's the
23  offense you were looking at, correct?
24  A.   Yes.

ASA Jacqueline Griffin
September 18, 2018

51

1   Q.   Now, looking at SAO 186, this is the
2   first page of the Felony Review Unit folder,
3   correct?
4   A.   Yes.
5   Q.   And I'm going to ask you -- we're going
6   to go through this, and it's going to be mostly
7   to identify certain things.  I'd like you to
8   identify what your handwriting is on it and what
9   is someone else's.  Okay?
10  A.   Okay.
11  Q.   Now, you were the first person to
12  handle this case, correct?
13  A.   Yes.
14  Q.   And you never handled this case after
15  that first time you handled it, correct?
16  A.   Correct.
17  Q.   And you were never called and asked
18  questions after the first time you handled it,
19  correct?
20  A.   I don't believe so.
21  Q.   It is possible that that happened, but
22  you don't think it happened, correct?
23  A.   I don't think it happened.
24  Q.   Okay.  And part of the goal in filling

ASA Jacqueline Griffin
September 18, 2018

52

1   out this Felony Review folder in the manner that
2   it's filled out is to provide enough information
3   that someone can just pick up the case and
4   handle it from this point forward, correct?
5   A.   Correct.
6   Q.   Now, starting with that top bar, you
7   have different choices up top, correct?
8   A.   Yes.
9   Q.   And the first one "Screen Felony" has
10  an X through it, correct?
11  A.   Yes.
12  Q.   And that's the X you put in through
13  there, correct?
14  A.   Most likely, yes.
15  Q.   Now, the next line "Number of
16  Defendants: 1," "Number of Victims/Witnesses:
17  3," and then "page 1," is that all your
18  handwriting?
19  A.   Most likely.  I'm not 100 percent sure,
20  but most likely, yes.
21  Q.   Now, this next section lists the
22  different -- has different spots for ASA's that
23  are working the case, correct?
24  A.   Yes.

ASA Jacqueline Griffin
September 18, 2018

53

1    Q.   It's an kind like of an identifier who,
2  when, and what they did, correct?
3    A.   Yes.
4    Q.   And the first line is you, correct?
5    A.   Yes.
6    Q.   And that's your handwriting?
7    A.   Yes.
8    Q.   It says you went out on June 18, 2012,
9  correct?
10    A.   Yes.
11    Q.   And this is involving Ramiro Bahena,
12  correct?
13    A.   Yes.
14    Q.   And the case you were looking at wound
15  up being the murders of Jaime Ocampo and
16  Santiago Delgado, correct?
17    A.   Yes.
18    Q.   Now, it has your start and your finish
19  time up there, correct?
20    A.   Yes.
21    Q.   Now, that start time is 8:45 p.m.?
22    A.   Yes.
23    Q.   And your finish time is 5:45 a.m. the
24  next day, correct, on the 19th?

ASA Jacqueline Griffin
September 18, 2018

54

1    A.   Yes.
2    Q.   Now, do you know -- what does the start
3  time mean and what does the finish time mean?
4    A.   Usually the start time is when I begin
5  actually speaking to a witness or begin
6  reviewing the case.
7    Q.   So that earlier part that we talked
8  about talking to the detectives over the phone,
9  driving to the area, talking to the detectives
10  once you reach the area, that's probably not
11  included in that?
12    A.   Not necessarily.  Sometimes I would
13  put -- it wasn't very, like -- what would be the
14  word -- concrete of a time.  Sometimes I would
15  put maybe when I got to the area.  Other times I
16  might just put when I first started the witness.
17  It was just sort of a general time frame as to
18  when the case began.  But I don't know exactly
19  if that was when I talked to the detectives at
20  the area or if that was when I interviewed the
21  first witness.
22    Q.   The same question with the finish time.
23  What does that mean?
24    A.   Usually a general time either when I

ASA Jacqueline Griffin
September 18, 2018

55

1  got back to 26th Street and put the case into
2  the crime system or it could be, like, the end
3  time when I left the police station or, like,
4  physically was out of the people involved with
5  the case -- away from the people involved in the
6  case.
7    Q.   Do you know in this instance which one
8  that represents?
9    A.   I do not know.
10    Q.   And do you know -- would you have
11  had to have -- would you have had to have gone
12  back in to 26th Street and enter this into the
13  crime system even though your shift was over?
14    A.   Not necessarily.  Sometimes we would do
15  that.  Sometimes we wouldn't.  It would just
16  depend.  Sometimes you would just leave the
17  folder there with whatever paperwork you have.
18    Q.   Do you know which one was this time?
19    A.   I do not know.  I don't recall.
20    Q.   Okay.  Now, the next is the defendant's
21  information, correct?
22    A.   Yes.  That does not appear to be my
23  handwriting, though.
24    Q.   Do you know if you had anyone out there

ASA Jacqueline Griffin
September 18, 2018

56

1  helping you?
2    A.   You mean, like, another ASA?
3    Q.   Only ASA's write on the Felony Review
4  folder, correct?
5    A.   Yes.
6    Q.   You never have a detective write on
7  your folder, correct?
8    A.   No.  But I don't believe there was
9  another ASA with me when I went out on this
10  case, no.
11    Q.   So you're thinking that someone else
12  filled this part in?
13    A.   That "Ramiro Bahena" does not appear to
14  be my handwriting, the name.
15    Q.   That's the first thing you usually put
16  on a folder, correct?
17    A.   Sometimes.  Sometimes, if it's an
18  unknown suspect, you don't fill it in till
19  later.  Usually they should be in custody.
20    Q.   Do you remember -- when you went out
21  there and you handled it, was Ramiro Bahena the
22  suspect in custody?
23    A.   Let's see.  I believe so, yes.
24    Q.   Okay.  All right.  And the next thing

ASA Jacqueline Griffin
September 18, 2018

57

1  is the charge that you were looking at, correct?
2      A.  Yes.
3      Q.  And now it says down here, "First
4  degree murder times two," correct?
5      A.  Yes.
6      Q.  Is that your handwriting?
7      A.  The "first degree murder" is.  I don't
8  know about the "times two."
9      Q.  Okay.  The "attempt murder," is that
10  your handwriting?
11      A.  I don't think so.
12      Q.  Now, moving over to the right of that,
13  it says "approved," correct?
14      A.  Yes.
15      Q.  Is that your handwriting?
16      A.  No.
17      Q.  Next to the final action there's a
18  little N with a circle, correct?
19      A.  Yes.
20      Q.  And it says "Byrne," correct?
21      A.  Yes.
22      Q.  Is that your handwriting?
23      A.  I can't tell for sure.  I would be
24  guessing.  But I usually will put, like, an N

ASA Jacqueline Griffin
September 18, 2018

58

1  with a circle as notify, so it could possibly be
2  mine.  But I don't know for sure.  It's hard to
3  tell on this copy.
4      Q.  Okay.  Do you have an independent
5  memory of going out on this case?
6      A.  A little bit.  I do recall going to an
7  apartment building and meeting with Arturo
8  upstairs and looking out the window where he
9  said he looked out when he saw the shooting.
10      Q.  And was that before or after -- you
11  subsequently took a statement from Arturo,
12  correct?
13      A.  Yes.
14      Q.  And was that before or after you took
15  the statement?
16      A.  I want to say before.  But, again, I
17  would be guessing.  I remember kind of a little
18  bit about both of those scenarios that I went
19  out to his -- the apartment and that I also took
20  a statement at the police station.  But I don't
21  know -- I would be guessing, but I think that I
22  was at the apartment first.
23      Q.  Would there be any reason why you would
24  go out and go to the apartment after taking a

ASA Jacqueline Griffin
September 18, 2018

59

1  statement from him?
2      A.  I don't think so.
3      Q.  Okay.  Was it your idea to go out to
4  the apartment or was it someone else's?
5      A.  I do not recall whose idea it was.  I
6  do remember, though, that it was me and two
7  detectives.  I don't know, you know -- I would
8  assume it was the two detectives assigned to the
9  case, but I have a recollection of me in the
10  backseat of an unmarked vehicle driving to the
11  location.
12      Q.  With Arturo?
13      A.  No.  Just me and the two detectives, so
14  probably on our way -- I would assume, I'm
15  guessing, that I met the detectives at the
16  police station.  We went to where Arturo was.
17      Q.  And Arturo was at that location with
18  other detectives?
19      A.  No.  Nobody -- he was there with his
20  mom I know for sure.  And there might have been
21  other people in the apartment.  Like, I don't
22  remember talking to anybody else except for him
23  and his mom, but everyone spoke Spanish.  And I
24  only, you know, just remember seeing him and his

ASA Jacqueline Griffin
September 18, 2018

60

1  mom.
2      Q.  Do you speak Spanish?
3      A.  No.
4      Q.  Anything or just --
5      A.  No.  I took Latin in high school.  That
6  was really helpful.
7      Q.  Now, when you say everyone spoke
8  Spanish, Arturo?
9      A.  Yes.
10      Q.  The mom?
11      A.  Maria, I believe her name was.  Yes.
12      Q.  And there was someone else you talked
13  to?
14      A.  I don't remember talking to anyone else
15  at the apartment, but I think later on at the
16  police station I talked to maybe Margarita.  I
17  believe she spoke Spanish, too.
18      Q.  So was it fair to say that you had to
19  have someone interpreting everyone for you?
20      A.  Yes.  There were times, I believe,
21  where maybe, like, I would say something and an
22  English answer would be given to me from Arturo
23  or his mother, but very rarely.
24      Q.  When you say, "Very rarely," are we

ASA Jacqueline Griffin
September 18, 2018

61

1 talking like --
2     **A.  If we're giving percentages, I would**
3 **say maybe 5 percent of the conversation he**
4 **would, like, say yes to me before it was**
5 **interpreted.**
6     Q.  But primarily all the communications
7 you had to Arturo went through a Spanish
8 interpreter, correct?
9     **A.  Correct.**
10     Q.  And the Spanish interpreter was one of
11 the detectives, correct?
12     **A.  Correct.**
13     Q.  Do you remember which detective it was?
14     **A.  I don't remember independently.  But,**
15 **like, reviewing the paperwork, I believe it was**
16 **Detective Alvarez.**
17     Q.  And the same thing with the mom?  All
18 the communications went through that same
19 Detective Alvarez?
20     **A.  Yes.**
21     Q.  And did you -- when you talked to --
22 which detectives did you talk to initially
23 before going out with them?
24     **A.  I honestly -- I really don't recall.**

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

62

1     Q.  Can you give me anything about their
2 descriptions?
3     **A.  I want to say the two that I remember**
4 **being at the apartment with me -- I only**
5 **actually really remember one of them being a --**
6 **like, I don't even recall what Alvarez looked**
7 **like physically.  But I recall the other**
8 **detective being a white male maybe with grayish**
9 **hair.**
10     Q.  Anything about size?
11     **A.  Tall and relatively -- not thin, but**
12 **medium, regular build.  I don't believe -- that**
13 **detective that I vaguely remember is -- was not**
14 **the Spanish interpreter detective.**
15     Q.  And was it only two detectives you
16 dealt with primarily?
17     **A.  I believe so.**
18     Q.  Okay.  Now, fair to say that, not just
19 on this case, but on other cases you've worked
20 on, the detectives worked in tandem?
21     **A.  Yes, usually there's two.**
22     Q.  And even more detectives will sometimes
23 help out on a single case, correct?
24     **A.  Yes.**

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

63

1     Q.  And one of -- the communication between
2 them is something that's involved on their end,
3 correct?
4     **A.  Yes.**
5     Q.  You'll frequently see them meeting,
6 huddling, doling out responsibilities, correct?
7     **A.  Yes.**
8     Q.  And all with the idea of providing
9 information to you, correct?
10     **A.  Yes.**
11     Q.  And you knew, in this case
12 particularly, how important the information you
13 were getting was because you were reviewing a
14 case that involved at least one murder and what
15 looked like to be two murders, correct?
16     **A.  Correct.  Three people shot for sure.**
17     Q.  And you thought the second possibly --
18 it looked bad for the second person even when
19 you were out there?
20     **A.  There was a possibility that I believe**
21 **he was in critical condition.**
22     Q.  Now, down here -- skip the charge and
23 actually go to the statement.  I'm going to go
24 to the arrest section here.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

64

1     **A.  Okay.**
2     Q.  Down here you have down a couple
3 officers here D. Healey, Star 20855; D. Jensen,
4 Star 20334; Mike Kennedy, Star 20162; and then
5 over to the right Detective Mike Moreth, Star
6 20939.  Were these the detectives you were
7 working with?
8     **A.  I can't say 100 percent.  Sometimes**
9 **filling in, like, the arrest information you**
10 **sometimes would get information from the arrest**
11 **report.  It does look like the "D. Healey" and**
12 **"D. Jensen" are definitely my handwriting.  The**
13 **RD number is definitely my handwriting and the**
14 **arresting agency and area are my handwriting.**
15 **The date and time of arrest does not look like**
16 **my handwriting and I don't think the address is**
17 **my handwriting.**
18     Q.  Okay.  Ramiro Bahena was in custody
19 when you were there, correct?
20     **A.  I believe so, yes.**
21     Q.  And you would have known what date and
22 what time he was arrested at that time, correct?
23     **A.  Most likely, yes.**
24     Q.  Okay.

Wadlington Reporting Service, Inc.
(312) 372-5561

1     MR. ROBERTSON: Just give me one second.
2           (WHEREUPON, a short recess
3           was had.)
4     MR. ROBERTSON: Back on.
5  BY MR. ROBERTSON:
6     Q. What I'm trying to figure out -- maybe
7  I'll just ask you. You tell me if you knew.
8     Do you know how some of this stuff on
9  here -- like some of this stuff that may be
10  considered kind of foundational times is not in
11  your handwriting -- you can't tell me whether
12  it's in your handwriting or not?
13     A. Oftentimes -- sometimes when you go out
14  you might just fill out the very minimum of the
15  file and stuff comes later obviously. It
16  doesn't mean I didn't necessarily have, like, an
17  arrest report. I might have had the arrest
18  report, but just didn't fill out the folder.
19     My main concern usually when you're
20  going out is there's witnesses to talk to, so
21  you don't want to inconvenience, like, civilian
22  people. Filling out the folder is sort of an
23  afterthought, you know. So I might have just
24  put in my name and the date and then, you know,

1  basic information just to get the file started.
2     Then there would be reports that would
3  be in here. Since I went, it looks like, for
4  quite some time, to almost past my shift, I
5  might not have filled out the rest of the stuff
6  and just left the CI folder with the paperwork
7  in there. Does that make sense?
8     Q. I understand.
9     When you say almost past your shift,
10  you were working a 12-hour shift that day,
11  correct?
12     A. Yes.
13     Q. And at that time the shifts were
14  running -- were they running 6:00 to 6:00 or
15  5:00 to 5:00?
16     A. We considered it 5:00 to 5:00. You had
17  to check in at 5:00.
18     Q. So you were starting at 5:00 p.m. and
19  working till 5:00 a.m.?
20     A. Yes. That shift, yes.
21     Q. As you said earlier in a different
22  context, that doesn't necessarily mean you would
23  stop at 5:00? If you were working a case, you
24  would keep going, correct?

1     A. Correct.
2     Q. You work almost as long as they have
3  information for you?
4     A. Correct.
5     Q. Can you tell me, in general, which
6  areas of this page 1 of 6 are your handwriting?
7     A. So starting at -- as I said, the
8  defendant information, that is not mine. But
9  then when you go to charges, the "first degree
10  murder" is mine. I don't know that the "times
11  two" is mine. In that section, "first degree
12  murder."
13     If you go to the right, the box for
14  "polygraph D," that looks like my handwriting.
15  The box with the "interview Santiago Delgado, if
16  possible," that's my handwriting. The box "GSR"
17  is my handwriting. I don't know what it says
18  next to it, but that does not look like my
19  handwriting. And then the box "911 calls" is my
20  handwriting in that section.
21     Q. What about when you continue below?
22     A. So then the next section, statement
23  section, "see ERI" with the little stars, that's
24  my handwriting. And that's all that I wrote in

1  that section.
2     Q. Okay. And let me ask you a little bit
3  about the ERI system. Okay?
4     A. Yes.
5     Q. At the detective area, there's a number
6  of different rooms that are equipped with audio
7  and video recording capacities, correct?
8     A. Yes.
9     Q. Is ERI short for electronic
10  recording --
11     A. Electronic recorded interview.
12     Q. In this case, Ramiro Bahena was placed
13  in a room, correct?
14     A. Yes.
15     Q. And he was interviewed there, correct?
16     A. I believe so, yes.
17     Q. You never interviewed him, correct?
18     A. I don't believe so.
19     Q. And you were out there to assess the
20  case against him, correct?
21     A. Yes.
22     Q. Any reason why you didn't choose to
23  interview Mr. Bahena?
24     A. I don't recall. If you're looking for

ASA Jacqueline Griffin
September 18, 2018

69

```
1   a guess, there may have been more -- other
2   witnesses that needed to be interviewed, other
3   information that needed to be gathered before
4   you interviewed the defendant.
5       Q.   Okay.  And one of the things that --
6   but you knew that detectives had been talking to
7   him, correct?
8       A.   I believe so, yes.
9       Q.   And they would inform you of what he
10  said, correct?
11      A.   I believe so, yes.
12      Q.   And that was all in Spanish as well,
13  correct?
14      A.   His interview or -- obviously, what
15  they were informing me was in English from them.
16  I believe so.  I would, again, guess.  I don't
17  recall.  I don't think I interviewed him.  If he
18  was only Spanish speaking, then yes.
19      Q.   Now, can you -- I want to go back to
20  you -- you go to the area of Belmont and
21  Western, correct?
22      A.   Yes.
23      Q.   And you talk to detectives, correct?
24      A.   Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

70

```
1       Q.   And you've described those two guys,
2   right?
3       A.   The one guy.  I don't recall what the
4   other one looked like.
5       Q.   Were there more detectives involved in
6   the periphery, or you just remember the two?
7       A.   I only remember meeting with the two
8   when I got there.
9       Q.   And then any idea how long you spent
10  there at Belmont and Western?
11      A.   Not a lot of time.  I want to say a
12  few -- not even -- like, I don't even think we
13  went up to, like, an interview spot.  We met
14  maybe at the doors because we were going back
15  outside to get in the car.
16      Q.   Okay.  So that was already discussed
17  even before you got there?
18      A.   I believe so on the phone possibly
19  because I don't recall going, like, up in the
20  building.  They were, like, waiting for me
21  downstairs.
22      Q.   And you then got in the car with them
23  and drove over to Laramie near Fullerton?
24      A.   Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

71

```
1       Q.   And maybe about a 15-minute drive?
2       A.   Possibly, yeah.  Not very long.
3       Q.   You were talking about the case as you
4   were driving?
5       A.   Probably, yes.
6       Q.   When you get there, can you tell me
7   what happened?
8       A.   From what I remember, I remember
9   getting there and -- I don't know how we got
10  upstairs, if someone had met us outside or if we
11  had knocked on the door or what.  But I do
12  remember going up on a porch and into the
13  building and up some stairs and going to the
14  second floor of the apartment building.  I
15  remember being in, like, this living room.  And
16  I remember Arturo being there and I believe
17  Maria, his mother, was there.
18          As I said, Arturo spoke, like, the
19  majority in Spanish, so one of the detectives,
20  not the guy I described, the other detective who
21  I can't really picture his face, translated and
22  kind of told me about what Arturo -- you know,
23  they translated what was going on.  And I was
24  asking Arturo questions that he would translate
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

72

```
1   to Arturo and then Arturo would answer.  We
2   didn't get into a lot about his life or
3   anything.  It was more just focused on the case
4   and the shooting.
5       Q.   When this happened, who was present for
6   this conversation?
7       A.   I believe it was only me, the two
8   detectives, and Arturo standing in the living
9   room by the front door and by the window that
10  Arturo was pointing that he was looking out.  I
11  think his mom was in the apartment.  Like, I
12  could see her, but she wasn't, like, standing
13  with us.  She was, like, back towards -- I
14  believe it was, like, a living room, kitchen,
15  and then there was, like, a hallway.  She was
16  near the back hallway.  I think there were other
17  people in the apartment, but I don't recall
18  seeing any of them.  They were maybe in bedrooms
19  in the back.
20      Q.   It wasn't a huge apartment, correct?
21      A.   Not ginormous, no.
22      Q.   And they were maybe 15 feet away, the
23  other people?  Fifteen?  Twenty?  What would
24  your estimate be?
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

73

1   A.  I would say a little further than that.

2   Q.  About 25?

3   A.  How long is this table about?

4   Q.  I'd say maybe six feet?

5   A.  Maybe they were three table lengths.

6   Q.  So 18?

7   A.  Yeah, 18.  Maybe a little bit further.

8  So let's say 20 to 25 feet toward the back.  It

9  was a big, open space.

10   Q.  You obviously could see them and they

11  could you see?

12   A.  I could see her at times.  Not during

13  the whole conversation, but at times.  I think

14  she was moving around the apartment.

15   Q.  How long would you say you talked to

16  Arturo in this setting?

17   A.  Maybe 15 minutes.  Maybe ten minutes

18  even.  Not very long.  It was more just kind of

19  what he saw at that location.

20   Q.  When you did this, it was dark out?

21   A.  Yes.

22   Q.  And you looked out the same window that

23  Arturo pointed out of, correct?

24   A.  Yes.

ASA Jacqueline Griffin
September 18, 2018

74

1   Q.  And there were some trees there?

2   A.  There was trees on the block and there

3  was -- I do remember the block, I think, being

4  like a T.  It was sort of an unusual residential

5  block.  The apartment was, like, on -- where the

6  top of the T would be, I guess.  And then there

7  was, like, a street that ran perpendicular.

8   Q.  It basically dead-ended into the house,

9  right?

10   A.  Almost, right.  Except a little bit

11  over, yes.

12      And then I remember it was dark out.

13  There were street lights.  It was pretty well

14  lit from the street lights.  There was trees on

15  the block, and I think there was one kind of

16  sort of out in front of the house.  You could

17  only see partial across the street.

18   Q.  And you knew going out there that

19  Arturo spoke almost exclusively Spanish, right?

20   A.  I don't know if I knew that going out

21  there.  I might have learned it on the way or

22  when we got there.  I don't recall when I

23  learned he spoke Spanish, you know.  Obviously,

24  when I started talking to him, I definitely knew

ASA Jacqueline Griffin
September 18, 2018

75

1  at that point.

2   Q.  And do you remember what the detective

3  who was interpreting for you and Arturo told you

4  Arturo said at that time?

5   A.  What I remember is that he said -- it

6  was -- like I said, we were just briefly talking

7  about --

8   Q.  When you said "he," we're talking about

9  the detective --

10   A.  Interpreting for Arturo, right.

11      Arturo said that he had -- I think

12  there was a little bit he told me at the scene,

13  that Arturo was, like, at a party and he had his

14  mom's phone and that he had received calls from

15  Ramiro and that he was worried about his mom.

16  So he came home from the party with his

17  girlfriend, and they went upstairs.  At some

18  point, he looked out the window.  When he looked

19  out the window, he heard shots.  Then he saw

20  Ramiro coming down the street.

21      And then I think I asked him, with the

22  interpretation of the detective, you know, "You

23  were looking out this window.  Which window?"  I

24  think there was, like, three windows maybe

ASA Jacqueline Griffin
September 18, 2018

76

1  across the front of the apartment.  He showed me

2  it was the furthest, I think, left window.  I

3  might be guessing.  But he pointed out which

4  window he was looking out of.  When I looked out

5  the window, I noticed, like, a tree over here on

6  the left.  I said, you know, "Where was the

7  shooter Ramiro," or whatever.  I don't know if I

8  referred to him as Ramiro or the defendant or

9  the shooter.  I said, "Where was the shooter?"

10  He said he came from this direction.  At first

11  he didn't see him, but then he kept running down

12  the block.  Then I think he directed me to which

13  direction he went at that point.  But then he

14  had ran basically across the front of the

15  apartment building as he looked out the window,

16  but that the shooter was across the street.

17   Q.  And would the phrase "the shooter" be

18  used, or were they using the name?

19   A.  I don't recall.  But oftentimes I may

20  have been using "the shooter" just because, you

21  know, my memory wouldn't be so good as to the

22  name of the defendant, or whatever, at that

23  point.  Since it was a fresh case, I might have

24  been calling him "the suspect" or "the shooter."

1   Q.   You never met Ramiro Bahena?

2   A.   Right.

3   Q.   And you just want to get information at

4   that point, right?

5   A.   Right.

6   Q.   Did Arturo say how he knew the shooter?

7   A.   Yes.  He said it was his mom's

8   boyfriend and his mom was Maria.

9   Q.   Did he indicate how long he knew the

10  shooter?

11  A.   I don't know that we talked about it at

12  that point.  It was more just a general while we

13  were at the apartment kind of what did he see

14  from here.  Then I believe back at the station

15  we may have gotten back into more details and

16  maybe he told me how long his mom had been with

17  him.

18  Q.   Now, did you know when you were out

19  with Arturo in the apartment on the second floor

20  that there was a video that captured the

21  shooter?

22  A.   I don't recall knowing that.

23  Definitely not at that apartment.  I don't

24  recall.  I did learn about a video at some point

1   because I know that I wrote a check box with

2   video next to it because that's my handwriting.

3   I don't know when I learned there was a video,

4   if it was there or later on at the station.

5   Q.   That's obviously something that you

6   would say would be very important, correct?

7   A.   To obtain that, yes.

8   Q.   And is it something that you watched?

9   A.   I don't recall seeing it.

10  Q.   Okay.  Do me a favor.  Could you

11  flip to -- we're going to go through this in

12  more detail -- SAO 183.

13  A.   Yes.  That's a continuing on.

14  Q.   Do you know whose handwriting that is?

15  A.   That is my handwriting, yes.

16  Q.   Okay.

17  A.   And I did read that and I was wondering

18  if I -- I may have gotten it -- most of this

19  stuff that's in the incident box is information

20  obviously I'm getting from the police officers.

21  I don't know that I saw the video or if the

22  detective told me what was on the video because

23  it does say stuff about the video.  So I would

24  have known that one existed at some point while

1   I was reviewing the case, but I don't know if I

2   saw it or if they saw it and told me what it

3   looked like because they hadn't obtained their

4   own copy yet.

5   Q.   It says here, "Video not clear on face

6   of defendant," correct?

7   A.   Yes.  And that's my handwriting.

8   Q.   So you either think that you watched

9   the video and came to that conclusion or that's

10  what the detectives told you, correct?

11  A.   Right.

12  Q.   And you knew the identity --

13  determining the identity of the shooter from the

14  video was very important, correct?

15  A.   Yeah.  It would be if you could

16  determine it, yes.

17  Q.   That's powerful evidence, correct?

18  A.   Yes.

19  Q.   And powerful evidence both ways,

20  correct, to get the right person?

21  A.   Correct.

22  Q.   And it was something that was -- if the

23  video didn't show who the person was, it would

24  have made the eyewitness identification

1   essential; fair to say?

2   A.   Yes.  If you couldn't tell from the

3   video, yes.  If the eyewitness says it's the

4   person, yes.

5   Q.   I mean, you would need that in order to

6   charge this case?

7   A.   The eyewitness?

8   Q.   Yes.

9   A.   If the eyewitness is saying it's that

10  person and you couldn't tell, but it

11  corroborated the video, then you couldn't make

12  out who the person was, but it was the shooter.

13  Do you know what I mean?

14  Q.   You would need --

15  A.   Yes.  Then you would need the person to

16  say that they identify the person.

17  Q.   If you couldn't see the video, you

18  would need the eyewitness to say --

19  A.   Who that was, yeah.

20  Q.   If the video didn't show who the

21  shooter was, you would need that eyewitness

22  identification, correct?

23  A.   Correct, if the video did not depict

24  who the person was.  If you couldn't make out

1  the face or who the person was, you would need
2  the eyewitness to identify that individual, yes.
3      Q.   In this case, you couldn't tell from
4  the video who the shooter was, correct?
5      A.   It appears in my notes that the
6  detective or possibly me -- but I believe I did
7  not see the video -- that the video was not
8  clear on the face of the defendant.  You would
9  need the eyewitness testimony, yes.
10     Q.   Do you know when you learned that it
11 wasn't clear?
12     A.   I don't know at what point in my review
13 process, but it had to be at some point during
14 that 8:45 to 5:45 time frame.
15     Q.   Let me ask it this way.  If you know,
16 you know.  If you don't, you don't.
17          Do you know if you knew that
18 information before you got back to the police
19 station?
20     A.   That I don't know.
21     Q.   Do you know whether you had that
22 information about the video -- not being able to
23 identify the shooter from the video, did you
24 have that information before or after the

1  interview of Arturo at the police station?
2      A.   That I don't know, but I would guess
3  possibly.  This is a guess, but possibly after.
4      Q.   And what makes you believe it was
5  after -- you got that information after you had
6  the interview with Arturo?
7      A.   So why I'm guessing is that -- like I
8  said before, when we have civilians that we are
9  interviewing, we try to, like, talk to them
10 first and get their statements memorialized and
11 sort of -- so that we're not inconveniencing
12 them to, like, talk about certain things with
13 the case.  Do you know what I mean -- what needs
14 to be done or what the police are working on
15 still.
16          So I am just guessing.  I would assume
17 that my main focus, since Arturo was identifying
18 him as the shooter and he was giving a statement
19 that was going to be memorialized, that I wanted
20 to get him out of there kind of.  Do you know
21 what I'm saying?
22     Q.   To your understanding, Arturo was the
23 only eyewitness to --
24     A.   Yes.  I believe --

1      Q.   Arturo was the only eyewitness in this
2  case, correct?
3      A.   Yes.
4      Q.   And that's what you were told at that
5  time, correct?
6      A.   Yes.
7      Q.   Now, when you first -- this incident --
8  the shooting happened on June 17 of 2012,
9  correct?
10     A.   Yes.
11     Q.   So that was about -- and that was just
12 after midnight, correct?  Like 12:00 -- or
13 12:36 a.m.?
14     A.   Yes.
15     Q.   And that was a full maybe 36 hours,
16 even more, before you got out of there, correct?
17     A.   Yes.
18     Q.   Now, you knew that Arturo had contact
19 with the detectives during that period of time,
20 correct?
21     A.   Yes.
22     Q.   In terms of having contact with the
23 detectives, you knew that he had been previously
24 interviewed by detectives on multiple occasions?

1      A.   I wouldn't say multiple, but that he
2  had at least -- been interviewed at least once
3  by a detective.
4      Q.   Do you know who that detective was?
5      A.   I don't.
6      Q.   And do you know -- do you know where
7  that interview occurred?
8      A.   I don't.
9      Q.   Do you know what Arturo said in that
10 interview?
11     A.   I don't.
12     Q.   There would have been a General
13 Progress Report taken, correct?
14     A.   At some point, yes.
15     Q.   Generally, that should be done
16 contemporaneously with the interview, correct?
17     A.   You would hope so, yes.
18     Q.   You would hope so, right?  Otherwise,
19 you don't want to recreate stuff like that from
20 memory, especially if time has passed, correct?
21     A.   Right.
22     Q.   In this case, you knew that Arturo had
23 looked at a photo array, correct?
24     A.   Yes.  I was provided that information.

ASA Jacqueline Griffin
September 18, 2018

85

1     Q.  And that was by the detectives,
2  correct?
3     A.  Yes.
4     Q.  And you were -- and he also viewed a
5  lineup, correct?
6     A.  Yes.
7     Q.  And that was all done prior to you
8  seeing him, correct?
9     A.  Yes.
10     Q.  When -- you don't know -- is it fair to
11  say you don't know what Arturo said to
12  detectives prior to you meeting him?
13     A.  That would be fair to say.
14     Q.  And also fair to say that even after
15  you met Arturo you don't know exactly what he
16  told detectives because it was in a different
17  language?
18     A.  That would be fair to say.
19     Q.  Okay.  I want to ask you a couple
20  questions here.
21     Do you know what?  Is this incident box
22  here on 186 your handwriting?
23     A.  Incident box on 186?  Yes.
24     Q.  Okay.  And that continues on to 189; am

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

86

1  I correct on that?
2     A.  186 and then -- yes.
3     Q.  And then it continues on -- finishes up
4  at 183, correct?
5     A.  Yes.
6     Q.  Okay.  And this is -- previously you
7  stated that this was information you received
8  primarily from the detectives, correct?
9     A.  Yes.
10     Q.  Could you, please, read this into the
11  record so we have an accurate statement?
12     A.  Yes.
13     On or from date 6-17-12, at or between
14  time 00:36, location 2338 North Laramie.
15  Incident Summary:  W (Maria Rabada-Arrocena) and
16  D, defendant, are dating.  On this DTL, D came
17  by W (Maria)'s house, and W (Maria) was sitting
18  on porch with Victim 1 (Jaime Ocampo), Victim 2
19  (Santiago Delgado), and Victim 3 (Margarita
20  Martinez) drinking.  D was upset with witness --
21  or W (Maria) because Victim 1 (Jamie) was
22  sitting close to witness (Maria).  Defendant
23  argued with witness (Maria) and Victim 1 (Jamie)
24  got involved.  Police were called and witness

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

87

1  (Maria) told police not to arrest D.  D was told
2  to leave.  D --
3     I can't really read that part -- what
4  that says.
5     Q.  Let me see if it's clear on my
6  computer.
7     MR. KOWALCZYK:  Could that word be "friend"?
8     MR. ROBERTSON:  Mr. Kowalczyk would like it
9  to be.
10     THE WITNESS:  It could be.  It's really light
11  on my copy.  Oh, my gosh.  I can't tell.  I
12  honestly can't make it out.
13  BY MR. ROBERTSON:
14     Q.  Okay.  All right.  Just pick it up.
15     A.  D something, witness (Maria), victim
16  (Jamie), victim (Santiago), and Victim 3
17  (Margarita).  At approximately 00:36 witness
18  (Maria), victim (Jamie), Victim 2 (Santiago),
19  Victim 3 (Margarita), and ■■■■■■■, I think it
20  says, Maria's ten-year-old daughter were on
21  porch.
22     Defendant walked, I believe that says,
23  westbound on Laramie and stood in front of
24  2338 North Laramie across the street and began

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

88

1  firing at the porch.  EW Arturo was looking out
2  second-floor window and saw D shooting and
3  running southbound on Laramie.  Victim 1 (Jamie)
4  got shot one time in his right front chest -
5  fatal.  Victim 2 (Santiago) got shot one time
6  (through and through) in right chest, exit
7  through left chest.  Victim 3 (Margarita) got
8  shot one time in left ankle.  Victim 1 (Jamie)
9  deceased.  Victim 2 (Santiago) is in critical
10  condition.
11     EW positive ID'd defendant in photo
12  array on 6-17-12, in positive lineup on 6-17-12.
13  Video from house next door shows earlier
14  incident when D arguing with witness (Maria) at
15  approximately 9:30 p.m. and shows D shooting in
16  direction of porch.  Video not clear on face of
17  D.
18     Q.  Now, sitting here -- I know we've gone
19  over this.  But any reason why you wouldn't have
20  wanted to see the video if it was available to
21  you?
22     A.  Me personally?
23     Q.  Yes.
24     A.  If it wasn't available -- I would

Wadlington Reporting Service, Inc.
(312) 372-5561

89

```
1   assume that it wasn't available and that it
2   needs to be obtained and look at the whole --
3   all the evidence to make a decision, which is
4   why I would have continued the investigation.
5       Q.   Okay.
6       A.   So I don't believe I had access to it.
7       Q.   And that -- it was the police officer
8   that told you the video was not available,
9   correct?
10      A.   Yes.  At that time, yeah.
11      Q.   Now, going -- flip back to 186 for me
12  here.  It says in the "Evidence/Investigation"
13  box -- do you see that there?
14      A.   Yes.
15      Q.   Now, that's where you generally note
16  certain physical evidence that is connected with
17  the case?  It's recovered in connection with the
18  case, correct?
19      A.   Yes.
20      Q.   And it says, "ME report," correct?
21      A.   Yes.
22      Q.   And that's the medical examiner's
23  report, right?
24      A.   Yes.
```

90

```
1       Q.   And then it says, "Video from
2   neighbor," correct?
3       A.   Yes.
4       Q.   To the left of both of those, there's,
5   like, a little box with an X through it,
6   correct?
7       A.   Yes.
8       Q.   That's all your handwriting, correct?
9       A.   The box is for sure.  I don't know if I
10  put the X's.  So I would have put the box.  If
11  things needed to be obtained or if we needed a
12  copy for our office, I would put a box and then
13  write what it is.  Then maybe the next ASA would
14  check the box.
15      Q.   So the box next to, "Video from
16  neighbor," indicates that that's still needed to
17  be gotten?
18      A.   That's what I believe, yes.
19      Q.   Now, go to page 190 where you have
20  Victim 3 and Witness 1 written out, correct?
21      A.   Yes.
22      Q.   And those were -- that's all your
23  handwriting on page 190; is that correct?
24      A.   Yes.
```

91

```
1       Q.   And this indicates that you personally
2   met with and spoke with Margarita Martinez,
3   correct?
4       A.   Yes.
5       Q.   And it indicates here that it was done
6   in Spanish, correct?
7       A.   Yes.
8       Q.   And that it was a Detective Cenner?
9       A.   Yes.
10      Q.   And this occurred at the Area?
11      A.   Yes.
12      Q.   And it occurred at approximately
13  9:45 p.m., correct?
14      A.   Correct.
15      Q.   Now, the 8:45 start time that we've
16  talked about --
17      A.   Yes.
18      Q.   You talked to Margarita after you got
19  back from talking to Arturo, correct?
20      A.   Yes.
21      Q.   If you start at 8:45, would Margarita
22  have been the first person you interviewed when
23  you got back to the station?
24      A.   Possibly.
```

92

```
1       Q.   On the way back to the station, did you
2   ride with any of -- Margarita, Maria, or Arturo?
3       A.   I don't believe so, no.
4       Q.   Do you know how they got to the --
5       A.   I don't know, but I don't remember them
6   coming with us.
7       Q.   Were there multiple detective cars out
8   there?
9       A.   I don't recall there being.  At least
10  for sure when we arrived there, I don't recall.
11  I believe it was just our car.  I'm not sure
12  though if on the way out there were.  I really
13  don't recall how they got there.
14      Q.   And do you know how long you talked to
15  Margarita Martinez?
16      A.   It wasn't very long because -- from
17  what I remember, she was on the porch and maybe
18  her back was to the street.  She didn't see --
19  she had been drinking and her back was to the
20  street.  The two gentlemen who got shot were
21  facing out toward the street.  So I don't think
22  her conversation was very long.  She said she
23  couldn't see who did it.  Do you know what I
24  mean?
```

ASA Jacqueline Griffin
September 18, 2018

93

```
 1      Q.   Okay.  And there was no ID attempted
 2  with her, correct?
 3      A.   No.  Yes, correct.  No ID attempted.
 4      Q.   And she was really only an acquaintance
 5  of the defendant, correct?
 6      A.   Right.
 7      Q.   And she was present for that earlier
 8  incident?
 9      A.   Yes.
10      Q.   But there was no ID done with respect
11  to her as to whether Ramiro Bahena was at that
12  earlier incident, correct?
13      A.   Right.  I don't believe they -- I think
14  just the ID they were looking for was who shot
15  the people.  I don't think they asked about any
16  kind of ID as to the earlier thing, no.
17      Q.   There was no photo array or no lineup,
18  correct?
19      A.   That information was not provided to
20  me, no.
21      Q.   If it was, you would have just circled
22  it right there, correct?
23      A.   Yes.
24      Q.   I mean, there was a special preprinted
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

94

```
 1  spot for photo array, lineup, showup, knows
 2  defendant, on scene, negative ID, or no ID?
 3  They have a whole variety of choices there,
 4  correct?
 5      A.   They do, yes.
 6      Q.   Now, I want to talk to you a little bit
 7  about photo arrays and lineups in particular.
 8          A photo array is an investigative tool
 9  used by the police, correct?
10      A.   Yes.
11      Q.   And it basically takes a number of
12  different photos that are pulled from whatever
13  source and asks a witness to see if they can
14  make an identification from those photos,
15  correct?
16      A.   Yes.
17      Q.   When a witness makes such an
18  identification, there's usually some kind of
19  memorialization of that, some kind of mark, or
20  something along those lines, correct?
21      A.   Yes.
22      Q.   In fact, those photo arrays now, they
23  videotape some of them, correct?
24
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

95

```
 1      Q.   Were they videotaping photo arrays back
 2  in 2012?
 3      A.   I do not believe so, no.
 4      Q.   Do you know why they're videotaping
 5  photo arrays now?
 6      A.   I do not know, no.
 7      Q.   And the photo arrays can have
 8  evidentiary value, correct?
 9      A.   Yes.
10      Q.   Besides the investigative value of,
11  "Hey, this is the guy," they can be introduced
12  at trial, correct?
13      A.   Yes.
14      Q.   And they are frequently used in the
15  various phases we talked about, bond hearings to
16  identify the photo array, in prelims to give the
17  judge indication that there is such an ID,
18  correct?
19      A.   Yes.
20      Q.   And they can also be used as
21  substantive evidence in trial to either make or
22  bolster identification against a defendant,
23  correct?
24      A.   Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

96

```
 1      Q.   Lineups are something that are
 2  different than photo arrays, correct?
 3      A.   Yes.
 4      Q.   And I know you know all this.  And I
 5  know we all know this.  I want to put it on the
 6  record.  Okay?
 7      A.   Yeah.
 8      Q.   And a lineup is where they take a group
 9  of individuals ideally of similar age, height,
10  and weight and they put them in a room, correct?
11  Usually between four and six guys, correct?
12      A.   Yes.
13      Q.   And the witness then views that lineup
14  and then picks out an individual from the
15  lineup, correct?
16      A.   Yes.
17      Q.   If an individual does pick out that
18  individual, that's memorialized as well,
19  correct?
20      A.   Yes.
21      Q.   And evidence technicians are ordered to
22  take photos of the lineup, correct?
23      A.   Yes.
24      Q.   And to take photos of who was
```

Wadlington Reporting Service, Inc.
(312) 372-5561

1  identified in that lineup, correct?
2     **A.  Yes.**
3     Q.  Like the photo array, the lineup
4  identification has independent evidentiary
5  value, correct?
6     **A.  Yes.**
7     Q.  It can be used to indicate for purposes
8  from bond to initial charging proceedings,
9  correct?
10    **A.  Yes.**
11    Q.  And it can also be used as substantive
12 evidence at trial for identification purposes or
13 to bolster identification, correct?
14    **A.  Yes.**
15    Q.  Now, you were -- both of these
16 procedures at this time required that the
17 witness be informed of certain things, correct?
18    **A.  Yes.**
19    Q.  And the witness would have to sign off
20 on basically the photo array procedure and the
21 lineup procedure, correct?
22    **A.  Yes.**
23    Q.  And it would be explained to them, have
24 to read a form, and have to sign off with their

1  name, correct?
2     **A.  Yes.**
3     Q.  But that was all done by the police,
4  correct?
5     **A.  Yes.**
6     Q.  You had nothing to do with anything
7  with the photo array or the lineup, true?
8     **A.  Correct.**
9     Q.  It would just be the police telling
10 you -- the detectives telling you what the
11 results were?
12    **A.  Correct.**
13    Q.  Now, moving down to that second box,
14 Witness No. 1, that's Maria, correct?
15    **A.  Yes.**
16    Q.  And that's Arturo's mother?
17    **A.  Yes.**
18    Q.  And that indicates on your notes
19 section that she knows the defendant, correct?
20    **A.  Yes.**
21    Q.  And there was no photo array or lineup
22 done with her, correct?
23    **A.  Correct.**
24    Q.  And the "No ID Attempted" section

1  wasn't circled either, correct?
2     **A.  Correct.**
3     Q.  She never said that Ramiro was the
4  shooter, correct?
5     **A.  Correct, she never said that.**
6     Q.  And you have here in your notes
7  interviewed on 6-18-12 at 10:30 p.m., correct?
8     **A.  Yes.**
9     Q.  And it says there that Detective
10 Kennedy and Detective Alvarez were there,
11 correct?
12    **A.  Yes.**
13    Q.  And it says that Detective Alvarez was
14 the Spanish interpreter, correct?
15    **A.  Yes.**
16    Q.  Now, these interviews occurred some
17 45 minutes apart?
18    **A.  Approximately, yes.**
19    Q.  They began 45 minutes apart?
20    **A.  Right.**
21    Q.  So they would have occurred a lot
22 closer in time than that, correct, the end of
23 one to the beginning of the other?
24    **A.  Yes.**

1     Q.  Do you know why you had two different
2  Spanish interpreters?
3     **A.  Now looking at it, I do recall that**
4  **maybe Detective Cenner had to go -- somebody was**
5  **calling him to another part of the police**
6  **station to talk to him about something else or**
7  **about another witness or even another case.  He**
8  **no longer could be the interpreter because he**
9  **had something else to work on.  He was pulled**
10 **away.**
11    Q.  So Detective Alvarez was -- stepped --
12 was working on the case then, correct?
13    **A.  Correct.**
14    Q.  And you -- did you know that Detective
15 Alvarez had an earlier role in the case prior to
16 coming on and interpreting for you for Maria?
17    **A.  I don't know that I knew that.**
18    Q.  Okay.  You have no information either
19 way?
20    **A.  No.**
21    Q.  Okay.  Now, let's go back through a
22 little bit more of this.  Okay?
23    **A.  Yes.**
24    Q.  I'm going to come back to the CI

1  section.

2  Looking at page 187, those are -- the

3  two boxes are the two victims, correct?

4  A.  Yes.

5  Q.  And is that your handwriting in those

6  boxes?

7  A.  Yes, I believe so.

8  Q.  Okay.  Is there anything on the earlier

9  part of the page, like the preprinted stuff,

10  that's not yours?  I'm not talking about the

11  stuff below yet.

12  A.  I don't believe so.  I believe that

13  that is all.  I can't really make out what it

14  says next to "ambulance."  "By CFD Ambulance 7."

15  Oh, "Our Lady of Resurrection," that's my

16  handwriting.  I do believe I wrote "deceased"

17  and "one GSW to right" --

18  Q.  Probably chest?

19  A.  Chest probably.  I don't know what the

20  underneath part is, like right over there on

21  that side of the line.  It's, like, small.  I

22  don't know if that's my handwriting or if

23  that's --

24  Q.  Do you want to see a blowup of that?

1  A.  Yeah.

2  Yeah, I don't think this is my

3  handwriting.

4  Q.  When you say "this," describe it like

5  you were in court for the record.

6  A.  To the right of the box.  So the

7  vertical line of the box, it appears there's

8  handwriting that goes off into the margin

9  vertically down about -- it's in the second line

10  of that box going down to the fourth line.  The

11  only handwriting over there is I have the "one

12  GSW right" and then probably "chest."  But all

13  that scribbles, I don't believe that's my

14  handwriting.

15  Q.  Now, going down to the second box, can

16  you read for me what's in that same type of area

17  on the right with regards to Santiago Delgado?

18  A.  Yes.

19  Will you fix it on your screen?

20  Q.  Do you want to do it from my screen or

21  yours?

22  A.  Yes.  Yours is a little bit clearer.

23  So the section you pulled up here, I

24  wrote "Santiago Delgado, Illinois Masonic,

1  Ambulance 7, male H," male Hispanic.  And then

2  to the right of the box I wrote "critical," and

3  then someone else must have crossed off

4  "critical" and wrote "now dead."  That's not my

5  handwriting.  I wrote "GSW number one."  And

6  then the rest of the stuff to the right of that

7  I don't believe that is my handwriting.  I can't

8  really make it out.

9  Q.  Now, I want to talk about the stuff on

10  the bottom of the page that's written there.

11  A.  Yes.

12  Q.  Is any of that your handwriting?

13  A.  No.

14  Q.  Was any of that put on the folder while

15  you still had the case?

16  A.  I believe it was after I had the case.

17  Q.  I want to talk to you a little bit

18  about the information that's down there and

19  whether you had any discussions with the

20  detectives about it.  Okay?

21  A.  Okay.

22  Q.  Where it says "video" on the right

23  portion -- "Video Dunkin Donuts not recording.

24  S&L Liquors not recording," is that information

1  that you were aware of, that they were looking

2  at other places to recover video evidence?

3  A.  I honestly don't recall.

4  Q.  Do you know why the detectives would

5  have been looking for additional video evidence?

6  A.  Well, they usually do a canvass of the

7  scene to get any video that could possibly be in

8  the area.

9  Q.  Now, this Tina Figueroa, do you see

10  that on the bottom right?

11  A.  Yes.

12  Q.  It says, "List of questions at poly.

13  Final report."  Do you see that?

14  A.  Yes.  I did not write that.

15  Q.  Oh, I know.

16  A.  Yeah.

17  Q.  Do you know if you can -- one of the

18  reasons you CI'd the case was for a polygraph?

19  A.  I believe that earlier in the check

20  boxes that was my handwriting to polygraph D.

21  If you look on page 186, that is my handwriting.

22  So that must have been discussed.  Like, the

23  detectives must have had that idea or we

24  discussed it and they were going to be doing

ASA Jacqueline Griffin
September 18, 2018

105

1  that or attempting to do it because I did put
2  the check box to have that -- basically get the
3  results of that.  It does say polygraph D.
4      Q.  And your understanding was that Ramiro
5  Bahena was indicating that he did not do the
6  shooting, correct?
7      A.  Yes, I would assume.  I didn't talk to
8  him.  I would assume they had that knowledge,
9  which is why they would be polygraphing him.
10     Q.  The detectives would have told you what
11 he was saying, and certainly you would have
12 asked them, "What's he saying"?
13     A.  Yes.
14     Q.  That may have been, like, one of the
15 first questions out of your mouth in the whole
16 case; fair to say?
17     A.  Fair to say.
18     Q.  Now, in terms of the polygraph, that's
19 something the detectives set up on their end,
20 correct?
21     A.  Yes.
22     Q.  You don't have any involvement with
23 telling them, "Hey, you have to take this guy to
24 the polygraph"?  Nothing like that?

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

106

1      A.  No.
2      Q.  That's all done by CPD, correct?
3      A.  Yes.
4      Q.  And that's the detective who's working
5  the case's decision, correct?
6      A.  Yes.
7      Q.  Now, this thing in the center here --
8  and I know it's not your handwriting -- says,
9  "All GPRs and all docs completed," and then it
10 says underneath that something, "If approved."
11 Do you know what that word is before "if
12 approved"?
13     A.  I think -- again, it's not my
14 handwriting, so I'm just interpreting someone
15 else's.  It looks like an equals sign with a
16 slash through it.  But I don't know what that
17 means.
18     Q.  Okay.  At this time, were -- was the
19 State's Attorney's Office Felony Review Unit
20 collecting GPRs and reports from CPD?
21     A.  On any case, we would try and get
22 whatever reports were available when we went out
23 on the case.  You would try and get the reports,
24 whatever they were, while you're reviewing the

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

107

1  case.
2      Q.  Would that include GPRs?
3      A.  If there are some.  If there were
4  witnesses that still needed to be interviewed,
5  obviously those GPRs you wouldn't -- like, I
6  wouldn't have had those.  I don't know who that
7  person's writing is.  But, you know, they would
8  have to get the GPRs for the witnesses that were
9  interviewed at that time.
10     Q.  And sometimes the GPRs wouldn't be
11 provided even if the witness had been
12 interviewed; fair to say?
13     A.  To the ASA, right.  Sometimes, yeah.
14     Q.  Sometimes detectives wouldn't turn them
15 over saying they hadn't been approved yet or not
16 final yet?
17     A.  Right.  Or if they were at the office
18 and maybe you guys met somewhere else or
19 something.  They didn't have them on them.
20     Q.  Sure.
21         The last thing.  On that bottom section
22 there on the top left, it talks about GSR.  Is
23 that your handwriting?
24     A.  No.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

108

1      Q.  I should have asked.
2         Do you know -- you've looked at this
3  before the deposition started, correct?
4      A.  Yes.
5      Q.  Have you recognized anyone else's
6  handwriting on this?
7      A.  I don't recognize the handwriting
8  per se.  But when looking at the first page of
9  186, I was able to make out ASA No. 2 I believe
10 says L. Toledo.  Lois Toledo I think that is
11 maybe.  And then ASA No. 3 it looks like is
12 D. Herrera, which I believe is Dave Herrera.  I
13 don't recognize their handwriting, but I could
14 make out their names.
15     Q.  And both of those individuals were on
16 Felony Review at the same time you were,
17 correct?
18     A.  I believe so, yes.
19     Q.  And ASA Toledo, was she also a line
20 ASA?
21     A.  She was a line ASA.  And I believe
22 Herrera was a trial sup.
23     Q.  Okay.  Now, getting back to this GSR on
24 187, did the topic of GSR come up with the

Wadlington Reporting Service, Inc.
(312) 372-5561

1  detectives?

2     **A.  I believe it did only because there is**

3  **a box that I made back on page 186.  There's a**

4  **box that says "GSR."  Then it says something**

5  **next to it, but I don't know if that's my**

6  **handwriting or not.  I can't make it out.**

7     Q.  And GSR is short for gunshot residue,

8  correct?

9     **A.  Yes.**

10     Q.  And the detectives talked to you about

11  wanting to get gunshot residue from Ramiro

12  Bahena, correct?

13     **A.  Yes.  Or attempting to see if there was**

14  **any, right.**

15     Q.  Also, besides taking -- potentially

16  taking gunshot residue from someone's hands, you

17  can also get it off of clothing, correct?

18     **A.  Correct.**

19     Q.  The gunshot residue they saw in this

20  case they told you about was getting it off a

21  piece of clothing?

22     **A.  I don't recall.  I can't really say.**

23     Q.  Either way, the gunshot residue can be

24  a powerful evidentiary tool either way, correct?

1     **A.  Correct.**

2     Q.  Whether to show someone was shooting or

3  show someone was not shooting, correct?

4     **A.  True.**

5     Q.  And that's something that you would

6  have wanted the detectives to investigate and

7  provide information to you for -- to the State's

8  Attorney's Office, correct?

9     **A.  Yes.**

10     Q.  Now, I want to look at 184.

11     And is this your handwriting,

12  everything on this page?

13     **A.  Yes, I believe everything is.**

14     Q.  And this basically all pertains to

15  Arturo, correct?

16     **A.  Yes.**

17     Q.  In the "Means of ID" section, we have a

18  number of boxes circled, correct?

19     **A.  Yes.**

20     Q.  Photo array, correct?

21     **A.  Yes.**

22     Q.  Lineup?

23     **A.  Yes.**

24     Q.  And knows defendant, correct?

1     **A.  Yes.**

2     Q.  For the photo array, there's a little

3  arrow that said "positive," correct?

4     **A.  Yes.**

5     Q.  And it says 6-17-12 at 7:20 a.m.?

6     **A.  Correct.**

7     Q.  And that photo array would have been

8  done at Area North?

9     **A.  I would be guessing.  I didn't write**

10  **that particular information down, but yes.**

11     Q.  There would be documents that would

12  show that it was done there, correct?

13     **A.  If it was done there, yes.**

14     Q.  For the lineup, there's a little arrow

15  that goes, "Positive 10:50 on 6-17-12," correct?

16     **A.  Yes.**

17     Q.  And that certainly would have been at a

18  police station, most likely Area North, correct?

19     **A.  Correct.**

20     Q.  And then it says for notes, "I on

21  6-18-12"?

22     **A.  Yes.**

23     Q.  And then there's a section that's

24  crossed out, correct?

1     **A.  Yes.**

2     Q.  Do you know what was there?  I know

3  it's hard to say years later.  But do you know

4  what was there?

5     **A.  I don't.  I'm guessing I would have put**

6  **a time, but I might have -- since I talked to**

7  **him twice, I just scratched out the time.  I**

8  **kind of talked to him at the apartment and then**

9  **I took a handwritten.  I might have just**

10  **scratched it out and left it blank.  But I can't**

11  **say for sure.**

12     Q.  Did you talk to him before you took the

13  handwritten statement?

14     **A.  At the apartment, we briefly spoke, as**

15  **I talked about.  When we got to the station, I**

16  **kind of recall us sitting down at the computer**

17  **and him sitting next to me and me typing it as**

18  **we went along with the detective interpreting.**

19     Q.  Okay.

20     **A.  But I don't know that I had a full**

21  **second sit-down interview before I began typing,**

22  **if that makes sense.**

23     Q.  Sure.

24     I think that -- so the only two times

113

1  you remember talking to Arturo were the
2  apartment time and the time you had your
3  statement?
4      A.   Correct.
5      Q.   By here it says by ASA Kwilos and
6  Detective Kennedy and Detective Alvarez, Spanish
7  interpreter, correct?
8      A.   Yes.
9      Q.   Can you tell me a little bit about that
10 handwritten statement and how it worked with the
11 Spanish interpreter?  I call it a handwritten
12 statement.  Do you guys still call it a
13 handwritten statement?
14     A.   Yes.  Even though it's typed, yes.
15     Q.   Okay.  Can you tell me -- we'll get
16 into what a handwritten statement is.  Right now
17 just tell me a little bit about how it worked in
18 this case?
19     A.   Well, usually I explain I'm an
20 assistant state's attorney.  I'm not your
21 attorney or --
22     Q.   Let me stop you.  That wasn't where I'm
23 going.
24          With the Spanish interpreter, how does

114

1  it work with -- in this case, how did it work
2  with Detective Alvarez interpreting for you?
3      A.   I just, like I said, explained who I
4  was.  Then he would say what I said.  If Arturo
5  had anything to say, he would say something.  If
6  I was just explaining things, it would just be
7  interpreted by Detective Alvarez.  Does that
8  make sense?
9      Q.   Would it be fair to say that the
10 process was the same as any English handwritten
11 statement except that you had a person
12 interpreting everything that you said to Arturo
13 and everything Arturo said to you?
14     A.   Correct.
15     Q.   Let's talk a little bit about
16 the process of the handwritten.
17     A.   Okay.
18     Q.   One of the things you can do is -- when
19 you're interviewing witnesses, is just to read
20 their statement as an oral statement, correct?
21     A.   Yes.
22     Q.   And that's what you did with respect to
23 Margarita and Maria, correct?
24     A.   Correct.

115

1      Q.   In those instances, you make no notes
2  as to what the witness said, correct?
3      A.   Correct.
4      Q.   And you simply rely upon the detectives
5  to take down what was -- what was said at that
6  time, correct?
7      A.   Correct.
8      Q.   Oftentimes, detectives don't even take
9  down what was said to you because they've
10 previously interviewed the individual in
11 question, correct?
12     A.   Correct.
13     Q.   And have taken notes, contemporaneous
14 GPRs, and that subsequently is put into
15 detective sups, correct?
16     A.   Correct.
17     Q.   Now, when -- in terms of the
18 evidentiary value of oral statements, to you
19 there really is none if you take a simple oral
20 statement, correct?
21     A.   For me personally or --
22     Q.   In general.
23          For use at trial, you're not really
24 anticipating any evidentiary value to anything

116

1  you've talked to the witness about at that time,
2  correct?
3      A.   Or value where -- I guess usually we
4  lock people in because we think they're going to
5  flip or they're going to change their story or
6  they might forget something important, like a
7  crucial part of the case.  So we would lock them
8  in.  So the oral would just -- if there is
9  something different on the oral, it would be
10 consistent with the detective's GPR.
11     Q.   You couldn't really do anything with it
12 on your end?
13     A.   Right.  Like trialwise, right.
14          Use it for impeachment, you mean?
15     Q.   Yeah.
16     A.   No.
17     Q.   What I'm doing is I'm contrasting the
18 two.  I'm contrasting the orals with how the
19 handwritten is used and why the handwritten is
20 taken.
21     A.   Okay.
22     Q.   So the oral is just like -- that's
23 pretty much done right then and there, correct?
24     A.   Right.

ASA Jacqueline Griffin
September 18, 2018

117

1    Q.   Now, with a handwritten statement, I
2  guess you have the statement types here in these
3  boxes.  It says, "Circle one."
4       "Oral only," we talked about that one,
5  correct?
6    **A.   Correct.**
7    Q.   Then it says, "Handwritten," correct?
8    **A.   Right.**
9    Q.   And it's circled here?
10    **A.   Right.**
11    Q.   Then it says, "Video," correct?
12    **A.   Right.**
13    Q.   Then it says, "Sent to Grand Jury,"
14  correct?
15    **A.   Right.**
16    Q.   Now, the video is -- you have the
17  capacity to call out and have a videographer
18  come out?
19    **A.   Sometimes, yes.**
20    Q.   And there's also the -- certain witness
21  statements have been recorded on the ERI system
22  as well, correct?
23    **A.   Yes.**
24    Q.   And that's something that the

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

118

1  detectives can do, correct?
2    **A.   Yes, nowadays.  They can do them more**
3  **often.  Back in the day a lot of the equipment**
4  **wasn't working.**
5    Q.   We know it was at least working at
6  Area 3 because at least they were recording
7  Ramiro, correct?
8    **A.   I hope, yes.  I don't know, but yes.**
9    Q.   Well, it says, "See ERI," on there,
10  so --
11    **A.   Yes.**
12    Q.   Actually, by law you had to record,
13  correct?
14    **A.   Because he was -- yes.**
15    Q.   And do you know why the recordings had
16  to be done of certain individuals in a video
17  form?
18    **A.   For certain charges for, like, murder**
19  **and stuff, you mean?**
20    Q.   Yeah.
21    **A.   Yes.**
22    Q.   And here the handwritten statement is
23  circled, correct?
24    **A.   Yes.**

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

119

1    Q.   Now, whose decision is it to -- as to
2  whether a handwritten is taken or not?
3    **A.   I don't know if it's a decision or just**
4  **a collaboration of speaking to the detectives**
5  **and the -- I don't know if I would have talked**
6  **to my trial sup or my deputy on the case.  But**
7  **relaying the information -- if the evidence that**
8  **was contained in it was crucial to prove the**
9  **elements, then it would probably be documented.**
10    Q.   And Arturo was certainly crucial,
11  correct?
12    **A.   Correct.**
13    Q.   He was the entire pillar the case was
14  really built on?
15    **A.   Right.**
16    Q.   In terms of -- and this is something --
17  whether you take a handwritten or not depends on
18  a variety of factors, correct?
19    **A.   Yes.**
20    Q.   And you get input from the detectives,
21  correct?
22    **A.   Yes.**
23    Q.   And you get input from possibly your
24  supervisors, correct?

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

120

1    **A.   Right.**
2    Q.   And the handwritten has independent
3  evidentiary value, correct?
4    **A.   Yes.**
5    Q.   Where it can be introduced in trial as
6  substantive evidence to prove an individual's
7  guilt, correct?
8    **A.   Right.**
9    Q.   In doing so, in many -- it can be used
10  certainly for impeachment if the witness says
11  something different, correct?
12    **A.   Yes.**
13    Q.   But it can also be admitted in total in
14  certain circumstances and just given to the
15  trier of fact, correct?
16    **A.   Right.**
17    Q.   And treated just as if the witness had
18  said that on the stand, correct?
19    **A.   Right.**
20    Q.   I mean, that's really one of the
21  purposes behind the handwritten statement,
22  correct?
23    **A.   Right.**
24    Q.   Now, the handwritten statement in this

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

121

```
 1   case, what do you remember about any discussions
 2   you had with the detectives regarding the
 3   handwritten of Arturo De La Cruz?
 4       A.   When you say what do I remember about
 5   discussions, what exactly do you mean?
 6       Q.   Can you tell us anything that was said
 7   about the handwritten about De La Cruz before it
 8   was taken in the process of determining whether
 9   it be taken or not?
10       A.   I honestly don't recall having any
11   discussions about it.  I'm sure there were some,
12   but I don't know what.
13       Q.   I was just asking.
14       A.   Okay.
15       Q.   And this would have occurred -- I know
16   you reviewed the handwritten statement.  Let's
17   get that out here now.
18       A.   Okay.
19       MR. ROBERTSON:  Let's mark this as No. 2, if
20   you could.
21                   (WHEREUPON, said document was
22                    marked Griffin Deposition
23                    Exhibit No. 2.)
24
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

122

```
 1   BY MR. ROBERTSON:
 2       Q.   Now, take a look and look through all
 3   the pages.  Then I'll ask you if this is the
 4   statement you took.
 5            This is the statement you took from
 6   Arturo De La Cruz?
 7       A.   Yes.
 8       Q.   Other than what we've talked about, did
 9   you do anything else in connection with this
10   investigation between that 8:45 time and that
11   5:45 p.m. time?
12       A.   That I recall?
13       Q.   Yes.
14       MR. KOWALCZYK:  You mean 5:45 a.m.
15       MR. ROBERTSON:  5:45 a.m.  Thank you very
16   much.
17            THE WITNESS:  I interviewed Arturo at the
18   apartment briefly.  I recall interviewing Arturo
19   again back at the police station.  Maria and
20   Margarita, I believe, at the police station.
21   And then took -- I believe I took Arturo's
22   handwritten at the police station.  Other than
23   that, nothing else.
24
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

123

```
 1   BY MR. ROBERTSON:
 2       Q.   When we talked about this earlier, you
 3   said Arturo at the apartment and then the next
 4   thing you remember is -- not sequentially next,
 5   but the next time you talked to Arturo you
 6   believe you were sitting down typing?
 7       A.   Right.
 8       Q.   Did you have -- and the way you said it
 9   that time made it appear like you had a full
10   second interview with him and then the
11   handwritten?
12       A.   No.  There were only two, like,
13   conversations between me and Arturo.
14       Q.   Okay.  I wanted to clarify.
15       A.   Yeah.
16       Q.   Apartment conversation and police
17   station conversation?
18       A.   Right.
19       Q.   And it was -- when you get back to the
20   station, it was Margarita, Maria, and then
21   Maria's at 10:30, right?
22       A.   Looking at my notes, I don't have
23   independent recollection of who --
24       Q.   I know.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

124

```
 1       A.   Looking at the notes --
 2       Q.   And you've had your notes there the
 3   entire time.  Feel free to look at them.
 4       A.   Yes.
 5            I don't recall offhand, but I recall,
 6   like, him at the apartment and then the rest of
 7   the people -- do you know what I mean?  The rest
 8   of the witnesses at the station and then him at
 9   the station obviously.  I don't believe we had
10   any other conversations in between.
11       Q.   For purposes of a timeline, if that
12   interview with Maria takes place at 10:30-ish --
13   I think it says there.  I don't have it in front
14   of me.
15       A.   We have 9:45 for Margarita and then
16   10:30 for Maria.
17       Q.   And then Arturo's statement, which is
18   marked as No. 2, says taken June 19, 2012, at
19   3:20 a.m.?
20       A.   Correct.
21       Q.   So that's --
22       A.   About, like, five hours.
23       Q.   Five hours after Maria started?
24       A.   Right.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

125

1  Q.  So there's still a pretty wide time gap
2  in there?
3  A.  There is.
4  Q.  Do you know -- probably the Maria
5  interview was, would you say, a half hour tops?
6  Maybe less?
7  A.  Hers might have been a little longer
8  because she had a relationship with Ramiro.  I
9  don't know if we talked about -- and, again,
10 this is all just speculation because I don't
11 really recall exactly.  But we might have talked
12 more about the relationship and the fight that
13 happened earlier and other details, so hers
14 might have been longer.  Hers was definitely
15 longer than Margarita's.  I don't know how long.
16 I couldn't really put a number on it.
17     Q.  It certainly was under an hour, though,
18 you would say?
19     A.  I can't even say that.  I don't know.
20 I don't remember -- like, I don't remember, you
21 know, the length of it.
22     Q.  You know the point I'm trying to make
23 here.  There's still a couple --
24     A.  There's still some hours, yes.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

126

1  Q.  There's still some hours.  I'm just
2  wondering what's going on during that time?
3  A.  Quite possibly we could have, like, got
4  some food.  Like, the detectives could have ran
5  out and got food for people.  I probably would
6  have ate because this is now going on a long
7  time of being out on the case.  They might have,
8  like, taken a break.  The detectives -- I do
9  recall the one detective when we were talking at
10 the station he got pulled away on something, so
11 I don't know if something happened where the
12 detectives couldn't sit with me to take the
13 statement or, like, the interpreter.
14     Q.  You certainly needed Detective Alvarez
15 because he was the one who was doing all of
16 this?
17     A.  A Spanish-speaking detective, right.  I
18 needed someone who spoke Spanish.
19          I don't recall there being a lot of,
20 like, people sitting around.  Do you know what I
21 mean?  I feel like it was pretty empty.  Like,
22 everyone was out of the station.  Do you know
23 what I mean?  Like, out on cases or not a lot of
24 people, like, in the area.  I don't know if they

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

127

1  got pulled away to do something else and we were
2  kind of waiting around till I could have a
3  Spanish-speaking person.  I don't 100 percent
4  have an exact recollection of that.
5     Q.  And there's nothing that could --
6     A.  I don't know of anything that could
7  help me remember it, honestly.
8     Q.  Let's talk about -- we talked a little
9  bit earlier about the process for handwritten
10 statements.  We left off with that handwritten
11 statement in this case was taken just like you
12 would any other handwritten statement except for
13 Detective Alvarez was interpreting everything
14 both ways for you?
15     A.  Right.
16     Q.  For you and Arturo?
17     A.  Right.
18     Q.  So let's talk about generally how a
19 handwritten statement is done.
20     A.  Okay.
21     Q.  Is it fair to say you've done hundreds
22 of these?
23     A.  Yes, approximately.  Probably, yeah.
24     Q.  And that you've done -- some cases you

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

128

1  do multiples on, correct?
2     A.  Yes.
3     Q.  And other cases you may do just one,
4  correct?
5     A.  Right.
6     Q.  And there are a number of cases where
7  multiple different ASA's will each take a
8  handwritten statement of different witnesses,
9  correct?
10    A.  Right.
11    Q.  And those are always done with a
12 detective -- at least one detective present, if
13 not more, correct?
14    A.  Right.
15    Q.  In all these cases, the witnesses will
16 have been talked to by the detective prior to?
17    A.  Right.
18    Q.  And then you sit down and you sit down
19 and talk to the witness, correct, with the
20 detective present?
21    A.  Right.
22    Q.  And that's for -- in sitting down with
23 the detective, it's usually the detective's
24 choice who is going to sit with you for the

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

129

```
1   statement, true?
2       A.   True.
3       Q.   It's not like you say, "Oh, no, I want
4   Steve Garcia on this one"?
5       A.   Right.
6       Q.   And then it follows kind of a general
7   pattern?  Each of these handwritten statements
8   follows a general pattern; fair to say?
9       A.   Yes.
10      Q.   The first paragraph concerns, like,
11  who's giving the statement, where it is, and
12  who's present, right?
13      A.   Right.
14      Q.   And then you have what the case is
15  about and kind of a brief description as to who
16  was hurt, where it was, what the crime was?
17      A.   Right.
18      Q.   Then there's kind of an advisement
19  section, correct?
20      A.   Yes.
21      Q.   And that's, like, where you, as
22  assistant state's attorney, would tell the
23  individual who you were, what your role was?
24  And if that person were given their Miranda
```

ASA Jacqueline Griffin
September 18, 2018

130

```
1   rights, that section would be there, correct?
2       A.   Right.
3       Q.   And every handwritten statement that
4   you've done has followed this same general
5   pattern, correct?
6       A.   Correct.
7       Q.   And after that is -- in each one of
8   those handwritten statements, you had detectives
9   sitting in with you, correct?
10      A.   Right.
11      Q.   This is not just the Kwilos method, now
12  Griffin method?  This is the same method used by
13  pretty much every one of the state's attorneys
14  that has come through the Felony Review Unit in
15  the last 20 years?
16      A.   Correct.
17      Q.   Probably longer than that.
18           The next section is the section where
19  you're talking -- or the statement talks about a
20  little bit of background information over the
21  person giving the statement, correct?
22      A.   Correct.
23      Q.   In terms of who they are, who the
24  family is, a little bit about them, where they
```

ASA Jacqueline Griffin
September 18, 2018

131

```
1   went to school, stuff like that?
2       A.   Yes.
3       Q.   And it usually includes the age and the
4   date of birth, correct?
5       A.   Right.
6       Q.   The specific schools and specific
7   family members?
8       A.   True.
9       Q.   Now, this next section here I want to
10  come back to where it says, "Arturo states he
11  can read, write, speak, and understand Spanish
12  and that he can understand, read, and write some
13  English."  I'm going to come back to that
14  section.  Okay?
15      A.   Yes.
16      Q.   After that we have a situation where
17  you basically -- the statement basically runs
18  through the events of that night, correct?
19      A.   Right.
20      Q.   And then skipping ahead some pages
21  to -- I know they're not numbered, but it's the
22  one with, what I'll call, the treatment
23  paragraph.  Do you know what I'm talking about?
24      A.   Yes.
```

ASA Jacqueline Griffin
September 18, 2018

132

```
1       Q.   And that's the second-to-the-last
2   paragraph in the statement, correct?
3       A.   Yes.
4       Q.   And that's something that's included in
5   every handwritten statement, correct?
6       A.   Yes.
7       Q.   And that's something that documents how
8   the person giving the statement was treated by
9   yourself and the police, correct?
10      A.   Yes.
11      Q.   And that's not only your method again?
12  That's what is done with every single statement
13  taken by any Felony Review assistant state's
14  attorney in the last 20, 30 years?
15      A.   Right.
16      Q.   In there it talks about being treated
17  well, correct?
18      A.   Yes.
19      Q.   It usually includes what the individual
20  had to eat or drink?
21      A.   Yes.
22      Q.   Use of the bathroom, correct?
23      A.   Yes.
24      Q.   And that no threats or promises were
```

1  made in connection with the statement and the
2  statement is being given freely and voluntarily,
3  right?
4      A.  Right.
5      Q.  Finally, it's whether or not the
6  witness was under the influence of any alcohol
7  or drugs, correct?
8      A.  Yes.
9      Q.  This is almost like the checklist of
10 things that are in every statement, correct?
11     A.  Right.
12     Q.  And then the last paragraph is kind of
13 like, what I call, the review paragraph; fair to
14 say?
15     A.  Yes.
16     Q.  And that describes -- and that's
17 done -- and that paragraph is done after the
18 statement is completed, right?
19     A.  Yes.
20     Q.  And it describes the process used to
21 review the statement, correct?
22     A.  Yes.
23     Q.  And in there you -- the statement
24 indicates exactly how the statement was done and

1  how it was went through, correct?
2      A.  Right.
3      Q.  All right.  Now, I want to get into a
4  little bit -- I want to do a little bit more in
5  general with the statement -- I want to get into
6  a little more in general with the statement and
7  then I want to go though some specifics.  Okay?
8      A.  Okay.
9      Q.  Tell me about how the handwritten
10 statements work with computers?
11     A.  Usually, with the statements, we have
12 some -- I have something saved on my flash drive
13 that will just say "statement of" and either it
14 will be blank and then "taken" blank.  Then you
15 kind of fill in the information from the
16 beginning.
17         Oftentimes, the second paragraph about
18 being advised, that, I think, is usually on my
19 statement.  I fill in the person's name.  So I
20 have, like, kind of a boilerplate as to some of
21 the things that are in every statement.  As to
22 the facts and the specifics of those for each
23 case, those are inputted as I'm talking to the
24 witness.

1      Q.  And this method that you're describing
2  is something that was regularly in use by the
3  Felony Review assistant state's attorneys at
4  that time?
5      A.  Yes.
6      Q.  The areas that are boilerplate or you
7  work off of preexisting documents, those would
8  be, like, the advisement paragraph?
9      A.  Advisement, like, in the beginning?
10     Q.  Yeah.
11     A.  Yeah, like who I am.  Most of that
12 would be in there except for the person's name.
13     Q.  And I assume you possibly could do it
14 with the background section?  Although, you may
15 just retype that?
16     A.  Yeah.  Most of the time I would just
17 retype it.  Most everybody usually has a
18 different background.  Maybe I would say is
19 blank years old and the date of birth.  The rest
20 would be blank.  Do you know what I'm saying?
21 Then I would put the person's name or whatever.
22     Q.  The treatment paragraph you could work
23 off of, correct?
24     A.  Treatment we work off of, yes.

1      Q.  And that's something that the bones of
2  it are in that preexisting --
3      A.  In the boilerplate so that we make sure
4  that we ask people those questions.
5      Q.  Do you know why you go through and ask
6  those people those questions?
7      A.  To make sure their statement is true
8  and accurate and that they're giving a fair
9  account of everything and that no one has told
10 them what to say or they're not under any duress
11 when giving the statement.
12     Q.  Any other reason?  I don't have one in
13 mind.  I'm just asking.
14     A.  No.
15     Q.  It wasn't a test.
16     A.  Okay.
17     Q.  And then the review paragraph, I assume
18 in most instances is probably boilerplate?  But
19 in this one you couldn't really use the
20 boilerplate, correct?
21     A.  Right.  I had to add because he was
22 Spanish speaking and spoke some English.  That
23 kind of stuff, that was all added.  It wasn't
24 necessarily boilerplate, but the theme was

1   boilerplate.
2       Q.   Ordinarily, you would use the
3   boilerplate there, but --
4       A.   I had to type it in and be creative.
5       Q.   Since we've come up with the language,
6   let's go to that one paragraph.
7           On the second page where it says,
8   "Arturo states he can read and write," do you
9   see that?
10      A.   Yes.
11      Q.   Do you know why, if he can understand,
12  read, and write some English, this was being
13  translated for him?
14      A.   I don't have an independent
15  recollection in this instance, but I would
16  assume that oftentimes if someone doesn't speak
17  English as their first language -- they prefer
18  speaking in their first language.  If he spoke
19  Spanish as a first language and English as a
20  second language, to give the statement he
21  preferred speaking in Spanish.
22      Q.   But you weren't told by Arturo.  At the
23  beginning, it was the detectives.  And
24  everything you had you discussed with him was in

1   Spanish, correct?
2       A.   Right.  Except sometimes, like I was
3   saying earlier, he would answer sometimes before
4   the detective would translate, so I knew he was
5   understanding my questions.  He would say yes or
6   no.
7       Q.   Right.
8           You knew that he spoke some English,
9   correct?
10      A.   Right.
11      Q.   My question was -- it's not like you
12  tried to communicate with him in English?  It
13  was more the whole thing was in Spanish, but you
14  knew he spoke a little English, correct?
15      A.   Right.  Like, the detective was
16  translating in Spanish everything I was saying.
17  Sometimes he would answer in English and
18  sometimes it would be translated back to me.  It
19  would vary between questions.
20      Q.   I think you said it was rare, though,
21  that it came back to you?
22      A.   Yeah.  It wasn't as often.  It was
23  mostly Spanish speaking.
24      Q.   It was usually just "yes" when it came

1   back in English?
2       A.   Yes, smaller answers.
3       Q.   All right.  Now, let's go through this.
4   Oh, there's some exhibits here.  Let's talk
5   about those.
6           These exhibits, were they used with the
7   statements?
8       A.   Yes.
9       Q.   And is that your handwriting that says
10  "Exhibit A" on it?
11      A.   Yes.
12      Q.   Okay.  And that's a picture of Ramiro
13  Bahena?
14      A.   Yes.
15      Q.   And where did you get that picture?
16      A.   The police.
17      Q.   And the second picture is a picture of
18  Arturo, correct?
19      A.   Yes.
20      Q.   And did you take that picture?
21      A.   Most likely, yes.
22      Q.   And how did you take it?
23      A.   I don't recall 100 percent, but I know
24  that we had digital cameras that we were

1   provided through Felony Review.  So I would
2   bring the digital camera with me out on a case
3   and take a picture of the person giving the
4   handwritten or signing the statement or --
5   usually at the end of the statement.  And then I
6   would take the camera and plug it into one of
7   the computers at the station and print out the
8   picture and then have the person sign the
9   picture.
10      Q.   You used a CPD computer to do it?
11      A.   Yeah.
12      Q.   And that's Arturo signing the
13  statement, correct?
14      A.   Right.
15      Q.   Now, the computer you had, that was
16  yours, correct?
17      A.   It wasn't a computer.  It was a digital
18  camera.
19      Q.   No, no.  I'm slipping back now.
20          The computer when you type -- when I
21  say yours, was that Felony Review's?
22      A.   No.  I just had a flash drive.  It was
23  a CPD computer.  I didn't bring a laptop or
24  anything.

141

1    Q.   Okay.  So you're just using a CPD
2  computer?
3    A.   Right.
4    Q.   But that boilerplate was on yours?
5    A.   Right, on my flash drive -- or on a
6  flash drive.
7    Q.   Now, you have access to the computer
8  and the printer, correct?
9    A.   Yes.
10   Q.   After the statement is done, you print
11 it out, correct?
12   A.   Right.
13   Q.   And then you do the review process,
14 right?
15   A.   Right.
16   Q.   Do you type the review process out
17 ahead of time, or do you type it out after -- do
18 you type it out after the rest of the statement
19 is read, or do you type it out before?
20   A.   I think it's, like, during.  So then
21 I'll -- you mean as we read aloud?
22   Q.   Yeah.
23   A.   Let me look.
24       Usually the part about -- sometimes

142

1  it's on a separate page.
2    Q.   It is on a separate page.
3    A.   Then I might have done it after if it's
4  on a separate page.  Let me look which part I'm
5  talking about.
6    Q.   It's the end of the page.
7    A.   See, this page -- the one where -- the
8  treated well by police and that part was
9  probably during the statement as we're sitting
10 going back and forth.  And I usually have
11 them -- well, in this case he was Spanish
12 translated.  Well, that part, if he ate anything
13 and went to the bathroom.  But then the part
14 about any changes, this might have been after --
15 printed after.  It still would be up on the
16 computer, but, like, printed after and signed.
17   Q.   Maybe typed beforehand, but printed and
18 reviewed after?
19   A.   Are you talking about the --
20   Q.   I'm talking about the last part, the
21 review portion.  The paragraph states, "Arturo
22 states that ASA Jacqueline Kwilos read" --
23   A.   So it might have been -- again, this is
24 all just guessing -- like, up on the screen, but

143

1  then printed after.  Do you know what I mean?
2  If there was something different, then we would
3  change that.
4    Q.   Okay.  Now, let's flip back.
5        You raised an issue with the treatment.
6  Let's go through that treatment paragraph.
7    A.   Yes.
8    Q.   "Arturo states that he has been treated
9  well." And this is on -- this is on page 1, 2,
10 3, 4 -- the fifth page of the statement, the
11 last full paragraph.
12   A.   Okay.
13   Q.   "Arturo states that he has been treated
14 well by the police and Assistant State's
15 Attorney Jacqueline Kwilos."
16       Is "well" the word that was translated
17 to you?
18   A.   It probably was a word that I would
19 have asked.  "Were you treated well by the
20 police or how were you treated?"  I don't recall
21 if it was something he said or if it was, like,
22 the way I phrased this question.  I don't
23 honestly have any recollection.
24   Q.   Okay.  And the next sentence says,

144

1  "Arturo states that he was given chips to eat
2  and soda water to drink."
3    A.   Yes.
4    Q.   I'm sorry.  "Soda and water to drink."
5    A.   Yes.
6    Q.   And is that something that you would
7  have asked him?
8    A.   Yes.
9    Q.   We talked potentially about getting
10 food earlier.  That wouldn't have been something
11 that if -- Arturo would have theoretically
12 gotten the same food you guys got, right?
13   A.   Right.  Well, hopefully, yes.  I don't
14 know for sure if it was something that that
15 person -- I don't know.  I don't know if they
16 got -- the food was got was chips.
17   Q.   I got you.
18   A.   And soda.
19   Q.   "Arturo states he was allowed to go to
20 the bathroom when needed."
21   A.   Yes.
22   Q.   And that's something you would have
23 just asked him flat out, right?
24   A.   Were you allowed to go to the bathroom,

ASA Jacqueline Griffin
September 18, 2018

145

1   yeah.
2       Q.   And it says here, "Arturo told
3   Assistant State's Attorney Jacqueline Kwilos
4   outside the presence of any police officer that
5   no threats or promises have been made to him to
6   get him to make this statement and he is giving
7   this statement freely and voluntarily."
8       A.   Yes.
9       Q.   And this is the part we were talking
10  earlier when I think you caught it and you said
11  basically not in this case, right?
12      A.   Well, I don't have any independent
13  recollection, but I -- I would be guessing.  In
14  an instant where the only Spanish interpreter
15  was a police officer, he would interpret it for
16  me.  But then what I normally would do is ask
17  him to step out.  If this person spoke English,
18  like ask him in English and see what the
19  response was.  I didn't specifically indicate I
20  did that.  I wouldn't normally indicate it
21  anyway.  But I don't recall if I did that.  Does
22  that make sense?
23      Q.   Okay.  So you have no memory of exactly
24  how this occurred, correct?

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

146

1       A.   Right.
2       Q.   You know that -- your only memory is
3   having Detective Alvarez translate everything
4   for you?
5       A.   Correct.
6       Q.   And you don't have any memory of any
7   substantive conversation with Arturo in English?
8       A.   That's why I feel like -- but I don't
9   know this for sure.  I don't know if it was this
10  case or a different case that I asked the
11  officer to step out.  That's normally what I
12  would do, but I don't know.  I don't have an
13  independent recollection of that.
14      Q.   Any reason why you didn't indicate it
15  in the statement?
16      A.   Because I indicated that he does speak
17  English, so that's why.  I would have had -- you
18  know, I just -- I don't know.  I never would
19  indicate.  If they spoke and understood some
20  English, then I would just indicate that in the
21  statement.  Do you know what I mean?  I wouldn't
22  specify as to that part.
23      Q.   Fair to say the treatment is something
24  that can be dealt with with a handful of

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

147

1   questions, maybe five questions?
2       A.   Yes.
3       Q.   And they're pretty direct questions,
4   correct?
5       A.   Right.
6       Q.   And the period of time it takes to go
7   through the treatment is only a minute or two;
8   fair to say?
9       A.   Yes.
10      Q.   Okay.  If the detective steps out, it's
11  not like the detective goes, like, outside the
12  building?
13      A.   No.  Just steps out of the room.
14      Q.   And this was taken -- this was probably
15  taken in the bullpen area, correct?
16      A.   I believe so.
17      Q.   And the bullpen area -- because you
18  were working with a computer, right?
19      A.   Right.
20      Q.   So this would have been that large area
21  that's like a room the size of maybe 60x80?
22      A.   Probably, yeah.
23      Q.   With maybe 30 desks in it?
24      A.   Yes.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

148

1       Q.   And you remember it being on a little
2   on the empty side.  But generally those desks
3   are all for police officers, correct?
4       A.   Right.
5       Q.   It's wide open?  You can see what's
6   going on there?
7       A.   Yes.
8       Q.   And then he states he's not under the
9   influence of drugs or alcohol at this time?
10      A.   Right.
11      Q.   Okay.  Now, I know the way the
12  handwritten is taken you have "Arturo states" at
13  pretty much the beginning of every sentence;
14  fair to say?
15      A.   Yes.
16      Q.   In some of those, it's not just that
17  Arturo is stating it, but it's more just like
18  you explain -- I'm up on paragraph -- on
19  page 2 -- like the process of how the statement
20  was taken?
21      A.   Yes.
22      Q.   It's not like Arturo is stating that he
23  would then answer in Spanish and in English and
24  Detective Alvarez would translate back in

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

149

1  English. That would be you explaining to him
2  how the statement was going to go and informing
3  him of that, correct?
4      A.  Right.
5      Q.  And you wanted to document that fact in
6  the statement, correct?
7      A.  Right.
8      Q.  Now, I want to direct you to one
9  specific portion of this statement.
10     MR. ROBERTSON:  Jeff, what page was that on?
11     MR. NESLUND:  The second-to-last page.
12     MR. ROBERTSON:  Okay.
13     THE WITNESS:  Am I on the right page?
14 BY MR. ROBERTSON:
15     Q.  It is the second-to-the-last page of
16 the statement.  I think it's page 5.
17         On page 5 in the end of the first
18 paragraph -- it's not the full paragraph, but
19 the first paragraph on the page.  It says
20 here -- the last two sentences I want to direct
21 your attention to.  "Arturo states that police
22 took his mother to the police station a short
23 time after so Arturo went upstairs to the
24 apartment.  Arturo states that he was looking

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

150

1  out the front window and two detectives called
2  to him and asked if he was Arturo."
3         Do you know who those two detectives
4  are?
5      A.  No.
6      Q.  Did you -- when you were -- and this
7  was all occurring -- you not only had Detective
8  Alvarez present, but you had Detective Kennedy
9  present with you?
10     A.  Right.
11     Q.  Did you ask anyone who those two
12 detectives were?
13     A.  I don't recall asking them.
14     Q.  Well, let me rephrase it.
15         Did the detectives tell you who those
16 detectives were?
17     A.  No, not that I can recall.
18     Q.  They would have been the first
19 individuals to have contact with Arturo from the
20 Chicago Police Department, correct?
21     A.  True.
22     Q.  And they could be potential important
23 witnesses, true?
24     A.  True.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

151

1      Q.  Do you know why -- strike that.
2         "Arturo states that he went
3  downstairs" --
4         Pick me up at the next full paragraph.
5  Okay?
6      A.  Yes.
7      Q.  -- "and spoke to detectives and told
8  them that he saw Ramiro shoot at the porch."
9      A.  Yes.
10     Q.  So this is him -- Arturo going
11 downstairs and saying -- making the
12 identification of Ramiro Bahena?
13     A.  Right.
14     Q.  That's what's down here, right?
15     A.  That's what I believed he was telling
16 me, yes.
17     Q.  Okay.
18     A.  Or that was being told to me through
19 the translator.
20     Q.  Translated to you by Detective Alvarez,
21 correct?
22     A.  Right.
23     Q.  And he said -- this is the first --
24 outcry would be the wrong word.  But the first

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

152

1  identification made by Ramiro, correct, to these
2  two detectives, correct?
3      A.  Made by Arturo?
4      Q.  Yes.
5      A.  Of Ramiro?
6      Q.  Thank you for catching that.
7         Of Ramiro by Arturo?
8      A.  Yes, right.
9      Q.  And they would have -- that would have
10 made them even more critical witnesses, correct?
11     A.  Who?  The detectives?
12     Q.  Yes.
13     MR. KOWALCZYK:  Object to the form.
14     THE WITNESS:  I don't know how to say this.
15 I don't know that, at this time, the two
16 detectives who were with me were not those two
17 detectives and I don't know that they were two
18 different detectives.  This is just what Arturo
19 was saying.  So I don't know that Arturo could
20 identify, either, who the two detectives were,
21 just that two detectives came to the apartment
22 and called his name.  Does that make sense?
23 BY MR. ROBERTSON:
24     Q.  I get you.

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

153

1   If a witness makes a statement to a
2   detective describing an incident, that could be
3   used at trial as substantive evidence, correct?
4   **A.   Yes.**
5   Q.   Even without a statement, correct?
6   **A.   You mean like a handwritten statement?**
7   Q.   Right.
8       As a statement of identification?
9   **A.   Yes.   That he made that identification,**
10  **yes.**
11  Q.   Okay.   And it would have been important
12  for the detectives to tell you who this initial
13  outcry was to, correct?
14  MR. KOWALCZYK:   Object to the form.
15      But go ahead.
16  THE WITNESS:   To tell me personally?
17  BY MR. ROBERTSON:
18  Q.   Well, as the assistant who was
19  reviewing it.
20  **A.   At this juncture, I don't know that --**
21  **what I was doing was memorializing Arturo's**
22  **statement, so I don't know that that would be**
23  **necessarily -- you know, I don't know what**
24  **would -- because they're detectives.   You know,**

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

154

1   **I was just memorializing what Arturo was saying.**
2   **So I don't know that.   I wouldn't say that.**
3   Q.   You weren't doing it in a -- or were
4   you doing it in a vacuum or not in a vacuum?
5   **A.   I don't understand your question.**
6   Q.   Are you just focused on what Arturo is
7   saying when you do the statement -- I'm sorry.
8       When you say Arturo, Detective Alvarez
9   was interpreting what Arturo was saying?
10  **A.   Right.   I wanted to know what Arturo**
11  **was saying because I was taking his statement.**
12  Q.   And that's what the focus was?
13  **A.   Yes, right.**
14  Q.   And still -- when you're out there,
15  you're still assessing the case as a whole,
16  though, correct?
17  **A.   Preliminarily -- because I was the**
18  **first person out there, there was a lot of**
19  **investigating still to be done.   Preliminarily,**
20  **I was trying to memorialize statements and**
21  **do things that were ready at that juncture, if**
22  **that makes sense.**
23  Q.   Sure.
24  **A.   If it were I on the end, then I**

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

155

1   **definitely would probably have a list of**
2   **questions and things that I needed to be**
3   **answered to look at the total evidence when**
4   **making a final decision.**
5   Q.   Let me go at it a little bit
6   differently.
7       As the first assistant state's attorney
8   to talk to Arturo and as the assistant state's
9   attorney to take a handwritten from Arturo, you
10  would have been the -- probably the only Felony
11  Review assistant to talk to Arturo?
12  **A.   In this case, yes.**
13  Q.   Because it's not like the Felony Review
14  assistants -- multiple assistants talk to the
15  same witness?
16  **A.   Well, if he was going to get sworn to**
17  **the Grand Jury, I guess -- right.   With this**
18  **case, yes.   Right.**
19  Q.   I'll talk about the Grand Jury in a
20  couple minutes.
21      In terms of -- before the decision is
22  made to approve or to reject charges, you would
23  have been the only assistant state's attorney to
24  talk to Arturo and you would have laid the

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

156

1   groundwork with this statement and whatever else
2   you noted for other State's Attorneys to make
3   their decision?
4   **A.   That would be true.**
5   Q.   We've already talked about the critical
6   role that Arturo played in this case, correct?
7   **A.   Yes.**
8   Q.   And it would be important to know the
9   factors that might influence Arturo's testimony?
10  **A.   If -- yes.**
11  Q.   And it would be important to know why
12  he made certain statements or even if he made
13  certain statements, correct?
14  **A.   Right.**
15  Q.   Did the detectives ever tell you, at
16  any point in time, that the individual
17  identified as committing this double murder was
18  identified as an unknown male Hispanic
19  initially?
20  MR. KOWALCZYK:   Object to the form and
21  foundation.
22      Go ahead.
23  THE WITNESS:   I don't recall one way or the
24  other.   They may have.   They may not have.   I

Wadlington Reporting Service, Inc.
(312) 372-5561

```
 1    don't recall.
 2    BY MR. ROBERTSON:
 3        Q.   Would that have given you some
 4    concern -- and that person was identified as an
 5    unknown male Hispanic by Arturo De La Cruz?
 6        MR. KOWALCZYK:   The same objection.
 7        THE WITNESS:   Again, that would be cause for
 8    speculation.   I don't know if I was informed of
 9    that information.   In a general sense, that
10    would give me some concern.   As an ASA reviewing
11    the case, it would be something I would look
12    into.
13    BY MR. ROBERTSON:
14        Q.   And the detectives -- and there's no
15    indication that you looked into this, correct?
16        A.   That I was given that information,
17    right.  No.
18        Q.   And that's something that if it was in
19    the detectives' possession they should have
20    given to you, correct?
21        MR. KOWALCZYK:   Object to form, foundation.
22        THE WITNESS:   If they had it, I would assume
23    that they would give it to as many people -- any
24    ASA that was reviewing the case.   Me personally,
```

```
 1    I don't know -- you know, it depends on when
 2    they obtained it.
 3    BY MR. ROBERTSON:
 4        Q.   That's critical evidence if a witness
 5    describes someone that they purportedly know as
 6    someone that is unknown, correct?
 7        A.   Yes.  If a witness says, "I don't know
 8    who the shooter was," and it's someone they
 9    know, that would be critical, yes.
10        Q.   And that would be something that you
11    would look upon negatively in reviewing the
12    case, true?
13        A.   I would definitely question that, yes.
14        MR. ROBERTSON:   Let's mark this as Exhibit 3.
15        THE WITNESS:   And question the witness
16    probably as to that.
17                    (WHEREUPON, said document was
18                    marked Griffin Deposition
19                    Exhibit No. 3.)
20    BY MR. ROBERTSON:
21        Q.   I'm showing you -- take a look at that
22    and look through that for me.   Okay?
23        MR. NESLUND:   Anybody need a bathroom break
24    while we're reading through reports?
```

```
 1        THE WITNESS:   I do.
 2                    (WHEREUPON, a short recess
 3                    was had.)
 4        MR. ROBERTSON:   Back on the record.
 5    BY MR. ROBERTSON:
 6        Q.   I'm showing you what's been marked
 7    Exhibit No. 3.
 8        And you recognize this as an Original
 9    Case Incident Report, correct?
10        A.   I do.
11        Q.   Did the detectives -- any detective in
12    connection with this case ever give you a copy
13    of this report?
14        A.   I don't recall.  I would assume at some
15    point I would have looked at it, but I don't
16    recall in this case.
17        Q.   You know the part -- do you see that
18    Arturo De La Cruz is listed as a witness on
19    page 2 of this, correct?
20        A.   Yes.
21        Q.   And he's -- as we've established, he's
22    the only eyewitness, correct?
23        A.   Yes.
24        Q.   And the narrative in the Case Incident
```

```
 1    Report describes what was -- the original
 2    officers on the scene observed or learned from
 3    witnesses on the scene, correct?
 4        A.   Yes.
 5        Q.   And this is the type of information
 6    that is typed into a report like this one,
 7    correct?
 8        A.   Yes.
 9        Q.   And it's accessible by any Chicago
10    police officer in the Chicago Police Department
11    system, correct?
12        A.   Yes.
13        Q.   And, in fact, when a report is
14    submitted, it's electrically date and time
15    stamped, correct?
16        A.   Yes.
17        Q.   And it is in this case, correct, by
18    Officer Rene Duran submitting it?
19        Q.   And that's at 3:49, correct?
20        A.   Yes.
21        Q.   And that's on June 17, correct?
22        A.   Right.
23        Q.   And that would have been how long
```

ASA Jacqueline Griffin
September 18, 2018

161

```
 1    before you got out?
 2        A.  Approximately -- I'm bad with math.
 3    Over 24 hours.
 4        Q.  Okay.  And the detectives who were
 5    working this case certainly would have wanted to
 6    have this report, correct?
 7        A.  Yes.
 8        Q.  And this is the only police report
 9    that's generated prior to detectives' sups other
10    than possibly an arrest report; fair to say?
11        A.  Yes.
12        Q.  Kind of the starting point?
13        A.  Yes.
14        Q.  Now, in this report I'd like to talk to
15    you a little bit about the narrative.  Okay?
16        A.  Yes.
17        Q.  In here it states -- about halfway down
18    where it says, "Witness No. 2," do you see that
19    point?
20        A.  Yes.
21        Q.  Halfway down on the left?
22        A.  Yes.
23        Q.  "Witness No. 2 related that he was
24    inside the second floor apartment when he heard
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

162

```
 1    shots fired."  Did I read that correctly?
 2        A.  Yes.
 3        Q.  "He immediately ran to the living room
 4    window and looked out the window"?
 5        A.  Yes.
 6        Q.  "He saw an unknown male Hispanic
 7    wearing a blue shirt run southbound on Laramie"?
 8        A.  Yes.
 9        Q.  The witness that we're talking about,
10    Witness No. 2, is Arturo De La Cruz, correct?
11        A.  Yes.
12        Q.  And he describes the individual as an
13    unknown male Hispanic, correct?
14        A.  In this incident box, yes.
15        Q.  And he describes -- he does not
16    describe this individual as Ramiro Bahena,
17    correct?
18        MR. KOWALCZYK:  I'm going to object just to
19    the form in terms of "he describes."  Do you
20    mean Officer Duran?  Just over form.
21        Go ahead.  You can answer.
22        MR. ROBERTSON:  That's an excellent point.
23    Thank you.
24
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

163

```
 1    BY MR. ROBERTSON:
 2        Q.  The report indicates that Arturo
 3    De La Cruz stated -- the report does not state
 4    that Arturo De La Cruz stated that it was Ramiro
 5    Bahena, does it?
 6        A.  Correct, the report does not indicate
 7    that.
 8        Q.  Arturo De La Cruz is reported to have
 9    indicated, "Unknown male Hispanic," correct?
10        MR. KOWALCZYK:  Object to the form and
11    foundation.
12        Go ahead.
13        THE WITNESS:  That's correct.
14    BY MR. ROBERTSON:
15        Q.  And this is the same Arturo De La Cruz
16    that indicated to you -- strike that.
17        This is the same Arturo De La Cruz that
18    detectives told you indicated that -- strike
19    that.  I have to get this right.
20        This is the same Arturo De La Cruz that
21    detectives told you said he saw Ramiro
22    Bahena commit the shooting, correct?
23        A.  Correct.
24        Q.  This is the same Arturo De La Cruz that
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

164

```
 1    detectives told you that Arturo De La Cruz knew
 2    as his mother's boyfriend?
 3        A.  Correct.
 4        Q.  Now, it says here -- I'm picking up --
 5    I'm going a little bit off the Arturo thing.
 6    The next thing.
 7        Witness No. 3, Felix Camacho, related
 8    he heard shots from outside and related he has a
 9    camera which had footage of reported shooting."
10    Did I read that correctly?
11        A.  Yes.
12        Q.  Okay.  And that's the video that we've
13    been talking about, correct?
14        A.  Yes.
15        Q.  As of some 12 hours before you're out
16    there, the Chicago Police Department knows
17    there's a video right next door, correct?
18        A.  Yes.
19        Q.  At any time when you went out to the
20    scene and you were out there with the
21    detectives, did the detectives take you next
22    door and let you look at the video?
23        A.  I don't recall that, no.
24        Q.  Did the detectives ever have you talk
```

Wadlington Reporting Service, Inc.
(312) 372-5561

165

1  to Felix Camacho?
2      A.  I don't recall that, either.
3      Q.  That's something you would have written
4  down in your Felony Review folder, correct?
5      A.  Most likely, yes.
6      Q.  And it's something that you would
7  have -- if given to you, you would have wanted
8  to preserve that video and watch that video,
9  correct?
10     A.  Yes.
11     Q.  Ideally, you would want to watch that
12 video as much as possible, correct?
13     A.  Yes.
14     Q.  Then it says in here -- picking up at
15 the same spot -- I know it's not fair because
16 you look away and then I take you right back.
17         "PO Gilmour view ED said camera
18 recording" -- I'm sorry -- "viewed said camera
19 recording and was able to observe offender
20 firing shots from across the street and gave out
21 flash message via radio," correct?
22     A.  Yes.
23     Q.  Again, I read that correctly?
24     A.  Yes.

166

1      Q.  And that shows that the detectives in
2  this case had knowledge of that recording well
3  before you came out, correct?
4      MR. KOWALCZYK:  Object to form.
5      THE WITNESS:  Yes.
6  BY MR. ROBERTSON:
7      Q.  Now, besides this report having been
8  submitted some 12 hours -- more than 12 hours
9  before you got out, this also indicates when
10 this report was printed, correct?
11     A.  I believe so.
12     Q.  Okay.  And that's generated on the
13 bottom, correct?
14     A.  Yes.
15     Q.  It says print generated by David
16 Healey, correct?
17     A.  Yes.
18     Q.  And that's one of the detectives you
19 noted in your -- that was noted in your Felony
20 Review folder, correct?
21     A.  I noted it in the "Arresting Officer"
22 section.  But, yes, one of the officers.
23     Q.  And that indicates over on the right
24 side there that this was printed -- a hard copy

167

1  was printed at 5:01 a.m. on June 17, 2012,
2  correct?
3      A.  Yes.
4      Q.  And that would have been more than 12
5  hours before you got out there, correct?
6      A.  Yes.
7      Q.  There's no way you would have missed
8  such a critical fact as this one involving the
9  only eyewitness to what was looking like a
10 double murder; would that be fair to say?
11     MR. KOWALCZYK:  Object to the form of that.
12 What do you mean by "critical fact"?  She didn't
13 author the report.
14         Go ahead.
15     THE WITNESS:  I --
16 BY MR. ROBERTSON:
17     Q.  Do you want me to break that down a
18 little bit?
19     A.  I don't know that I would have -- if
20 this has been directed to my attention, I
21 definitely would have addressed that the witness
22 had changed his story, if that's what --
23     Q.  If the detectives had told you that
24 Ramiro Bahena had changed -- sorry -- that

168

1  Arturo De La Cruz had changed his story, that
2  would have impacted everything about how you
3  dealt with Arturo De La Cruz, correct?
4      MR. KOWALCZYK:  Object to form.  Assumes he
5  changed his story as opposed to he didn't
6  mention who it was to the officer.
7          Go ahead.
8      THE WITNESS:  If it had been drawn to my
9  attention that he was saying he didn't know who
10 it was and now he knows who it was, then I would
11 have asked him about it if I had known that.
12 BY MR. ROBERTSON:
13     Q.  Well, that would have been a critical
14 fact --
15     MR. ROBERTSON:  I know you're going to
16 object.  Don't say "critical."
17 BY MR. ROBERTSON:
18     Q.  A critical fact -- I don't mean that in
19 a pejorative way.
20     MR. KOWALCZYK:  It's a critical objection.
21 BY MR. ROBERTSON:
22     Q.  But the fact that we're talking about
23 the single finger on a double murder changing
24 their story, that's a critical fact, right?

169

```
 1      MR. KOWALCZYK:  Object to form.
 2      THE WITNESS:  Again, if it was under the
 3   changing of story, yes.  If it was -- what I
 4   have often seen in my career, especially with
 5   Spanish translating, reporting officers' reports
 6   aren't as detailed or specific, I guess, as the
 7   detectives' reports.  That being said, if it was
 8   something where --
 9      Q.   Don't you think it's something you had
10   to address either way if it were brought to your
11   attention by the detectives?
12      A.   If it were brought to my attention that
13   the witness had said he didn't know who it was
14   and now he knows who it was, yes, I would have
15   addressed it with the witness.
16      Q.   Okay.  And you would have expected any
17   detective to bring this to your attention,
18   especially one who had printed off a copy of the
19   Original Case Incident Report, true?
20      A.   Yes.
21      Q.   I want to ask you -- I mean, there's
22   some tough questions.  I'm not asking -- I'm not
23   in any way being critical of you.  I'm just want
24   to ask these questions.
```

170

```
 1      A.   Yes.
 2      Q.   All right.  So we have a situation
 3   where you were told by the detectives that
 4   Arturo De La Cruz identified a person he knew as
 5   his mother's boyfriend as the shooter in this
 6   case, true?
 7      A.   True.
 8      Q.   Yet, this is also a case where they
 9   did -- the detectives did a photo array with
10   Arturo De La Cruz, correct?
11      A.   Yes.
12      Q.   Ever seen a case where detectives would
13   do a photo array involving someone whom the
14   witness says he knows?
15      A.   In my history as a state's attorney,
16   yes.  I have had that when it is someone who
17   they know acquaintancewise or don't have --
18   obviously, if it's their biological father, then
19   it would usually just be one photograph.  If it
20   was someone that they knew, but wasn't -- I have
21   seen it, yes.
22      Q.   In this case, what you were told is
23   that -- by Detective Alvarez via Arturo that
24   Arturo tells the detectives who arrive at his
```

171

```
 1   home that it was Ramiro who was the shooter,
 2   right?
 3      A.   His mom's boyfriend, right.
 4      Q.   Well, it's in the statement as Ramiro,
 5   correct?
 6      A.   Yes.
 7      Q.   So it's like he clearly identifies that
 8   person, true?
 9      A.   True.  By name, yes.
10      Q.   When he's picking out the person from
11   the photo array, he's picking out the person who
12   is Ramiro, correct?
13      A.   I would be guessing because I wasn't
14   there, but yes.
15      Q.   And the same thing with the lineup?
16   There would be no reason to do a lineup if the
17   individual who's being asked to view the lineup
18   knew the individual in question, correct?
19      MR. KOWALCZYK:  Object to form.
20      THE WITNESS:  Again, hypothetically, no.
21   BY MR. ROBERTSON:
22      Q.   And one of the problems -- you could
23   actually have problems down the road if you
24   subject someone to a photo array or to a lineup
```

172

```
 1   when it's not necessary to do so, true?
 2      A.   Hypothetically, yes.
 3      Q.   Because it could result in
 4   suggestiveness, true?
 5      MR. KOWALCZYK:  Object to form.
 6   BY MR. ROBERTSON:
 7      Q.   That this is the person?
 8      A.   Hypothetically, again, I'm just
 9   guessing, but yes.
10      Q.   And one of the things we have in this
11   instance is the only person that -- did the
12   detectives ever tell you that the only person
13   that Arturo De La Cruz knew in either the photo
14   array or the lineup was Ramiro Bahena?
15      A.   Did the detectives ever tell me that?
16      Q.   Yes.
17      A.   No.
18      Q.   Did the detectives ever tell you that
19   the only person that Arturo De La Cruz had any
20   prior contact with that was either in the photo
21   array or the lineup was Ramiro Bahena?
22      A.   No.
23      Q.   Now, the photo array -- you've been
24   asked in this case and you've documented it was
```

```
 1    done at -- you've got it in here somewhere,
 2    Exhibit 1.  It was documented at what time, the
 3    photo array?  It's in the Arturo De La Cruz box.
 4        A.   June 17, 2012, at 7:20 a.m.
 5        Q.   Okay.  So that was some seven hours
 6    after the shooting, correct?
 7        A.   Yes.
 8        Q.   And well before you got out there,
 9    correct?
10        A.   Yes.
11        Q.   At that time -- I want to go back to
12    the handwritten.
13        A.   Yes.
14        Q.   The handwritten statement talks about
15    how the two detectives were down there and
16    detectives called down to him and he said
17    it's -- you know, it's Ramiro, right?  On page 5
18    there.
19        A.   Yeah.  The detectives called him down,
20    yes.
21        Q.   And that --
22        A.   And then he identified Ramiro as the
23    shooter, right.
24        Q.   And then he went to the police station,
```

```
 1    correct?
 2        A.   Yes.
 3        Q.   How many hours elapsed between the time
 4    the detectives -- that Arturo told the
 5    detectives that it was Ramiro till the time that
 6    Arturo went to the police station to do a photo
 7    array?
 8        A.   I don't know based on this because I
 9    did not put, like, time frames as to the
10    detectives that called him down and showed him
11    the photo array.  I don't have a time frame
12    written, so I don't know.
13        Q.   We know it's somehow capped at seven
14    hours, correct?
15        A.   From the incident, yes.
16        Q.   So it had to be sometime within that
17    time if the time that you were given for the
18    photo array by the detective is correct,
19    correct?
20        A.   Right.
21        Q.   Okay.  Now, I wanted to ask you --
22        MR. ROBERTSON:  Would you mark this as
23    No. 4, please.
24
```

```
 1             (WHEREUPON, said document was
 2             marked Griffin Deposition
 3             Exhibit No. 4.)
 4    BY MR. ROBERTSON:
 5        Q.   If you could look at No. 4 for me,
 6    please, and it's Bates stamped 494.
 7             It purports to be a Lineup/Photo Spread
 8    Advisory Form, correct?
 9        A.   Yes.
10        Q.   And in this one -- this is -- this form
11    is entirely in English, correct?
12        A.   Yes.
13        Q.   And that's from -- dated June 17, 2012,
14    at 10:30 a.m.?
15        A.   Yes.
16        Q.   And it's filled out by Detective
17    M. Kennedy, correct?
18        A.   Yes.
19        Q.   And it's signed by Arturo De La Cruz?
20        A.   Yes.
21        Q.   And this 10:30, June 12, 2017, lines up
22    with the time from the lineup that you were told
23    by detectives, correct?
24        A.   Yes.
```

```
 1        Q.   And this form is entirely in English?
 2        A.   Yes.
 3        Q.   Obviously, detectives didn't give you a
 4    copy of this form, correct?
 5        A.   I don't believe so.  Usually -- if I
 6    was provided, usually I include it in the
 7    statement as an exhibit with the photo array.
 8        Q.   And it certainly doesn't indicate that
 9    there's a Spanish-speaking officer interpreting
10    on this, correct?
11        A.   It does not indicate that, no.
12        Q.   And I want to show you what I'll mark
13    as Exhibit 5.
14             (WHEREUPON, said document was
15             marked Griffin Deposition
16             Exhibit No. 5.)
17    BY MR. ROBERTSON:
18        Q.   This is Bates stamped 493.  And I'll
19    represent to you that this is the Spanish
20    version of the form that is contained in 494.
21    Okay?
22        A.   Yes.
23        Q.   Now, this is done at 7:20?
24        A.   Yes.
```

ASA Jacqueline Griffin
September 18, 2018

177

```
 1        Q.   On June 17, 2012?
 2        A.   Yes.
 3        Q.   By Detective Velazquez, correct?
 4        A.   Yes.
 5        Q.   And there's also a Detective
 6   J. Wilson listed, correct - J. Hillman, correct?
 7        A.   Yes.
 8        Q.   And did you deal with either Detective
 9   Velazquez or Detective Hillman or you do not
10   know?
11        A.   I do not know.
12        Q.   This Exhibit 5 is entirely in Spanish,
13   correct?
14        A.   Yes.
15        Q.   Did the detectives ever tell you that
16   they had Arturo De La Cruz execute one form in
17   Spanish and one in English?
18        A.   I don't believe I was given that
19   information, no.
20        Q.   It's fair to say you'd like as much
21   information as possible in reviewing cases,
22   correct?
23        A.   Yes.
24        Q.   Okay.  Now, do you know how long Arturo
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

178

```
 1   was at the police station before he did the
 2   photo array and lineup?
 3        A.   I do not have that information.
 4        Q.   Do you know how long he stayed after
 5   the lineup?
 6        A.   I do not have that information.
 7        Q.   Do you know where he stayed while he
 8   was in the police station outside of your
 9   presence?
10        A.   When I was there?
11        Q.   Before you got there, you don't know
12   where he stayed?
13        A.   No.
14        Q.   And they do have, like, smaller
15   interview rooms there?
16        A.   Yes.
17        Q.   And those rooms, even though they are
18   equipped with video and audio equipment, that's
19   a detective decision whether to turn that on or
20   not, correct?
21        A.   Yes.
22        Q.   Otherwise, they can just function as
23   rooms where people are kept awaiting -- waiting
24   for something, correct?
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

179

```
 1        A.   Yes.
 2        Q.   And these are small concrete rooms with
 3   a metal doorway and a small window?
 4        A.   Yes.
 5        Q.   The window often being covered up with
 6   either paper or cardboard?
 7        A.   Yes.
 8        Q.   And also there's a spot when it's
 9   necessary to handcuff someone and things of
10   those nature?
11        A.   Yes.
12        Q.   I know you indicated that you went to
13   the scene of the shooting on that second floor.
14   I want to go back to that.  Okay?
15        A.   Yes.
16        Q.   Now, I show you --
17   MR. ROBERTSON:  Let's do this in a group.
18   I'll assemble the group.
19             Would you mark that as Group 6, please.
20             (WHEREUPON, said photographs
21              were marked Griffin Deposition
22              Exhibit No. 6.)
23   BY MR. ROBERTSON:
24        Q.   Now, I'll represent to you that these
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

180

```
 1   are crime scene processing reports that were
 2   taken by the Chicago -- crime scene processing
 3   photos that were taken by the Chicago Police
 4   Department.
 5             Does this generally depict the view
 6   that you saw when you looked out the second
 7   floor window down on to the street when you were
 8   out there?
 9        A.   In all honesty, I believe -- I'm not
10   sure.  But I think that, like, the picture of
11   the apartment isn't here.  But I was looking,
12   like, out to this street.  Do you know what I
13   mean?  I think.
14        Q.   So this may show the scene, but not
15   necessarily your exact --
16        A.   View perspective, no.  I think.
17        Q.   But it was dark at the time, correct?
18        A.   It was dark.
19             From what I remember, I believe that --
20   I don't know.  You're not marking this A.  But
21   this is the building.  And then, looking across
22   this street, I remember that light post being,
23   like, right directly across from the window.
24        Q.   I'll mark this A.  I'll mark this one
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

181

1    B.
2        A.    Off of memory, you know, from what I
3    remember --
4        MR. KOWALCZYK:    These are photos taken from
5    the street.
6        MS. ALONSO:    We have the photos from the
7    second floor.
8        MR. ROBERTSON:    We corrected it, guys.  I'm
9    sorry.  Jackie corrected me and I appreciate
10   that.
11       THE WITNESS:    From what I remember, in
12   Group 6A, that photograph depicts the actual
13   apartment where the incident occurred.  It's
14   directly in the middle of the photograph.  And
15   then B is sort of further back down that -- like
16   I said, down that T street, and it's kind of a
17   perspective of it.  It's on the left-hand side
18   of the apartment where the shooting happened.
19   BY MR. ROBERTSON:
20       Q.    And this is how the scene generally was
21   depicted when you went out there that night in
22   terms of the tree type of coverage, the wetness
23   from the rain, the darkness?
24       A.    I would say yes.  I did not go to that

ASA Jacqueline Griffin
September 18, 2018

182

1    side of the street or this actual perspective to
2    look.  Do you know what I'm saying?  I only
3    looked from the second floor and, like,
4    basically the front area of the apartment where
5    the incident occurred, so I didn't have that
6    perspective per se to say yes or no one way or
7    the other.
8        MR. ROBERTSON:    Would you mark this as
9    Exhibit 7.
10                      (WHEREUPON, said photographs
11                      were marked Griffin Deposition
12                      Exhibit No. 7.)
13   BY MR. ROBERTSON:
14       Q.    Do you recognize -- I'll represent to
15   you that Group 7 are photos taken from the
16   vantage point that you've described earlier that
17   Arturo De La Cruz indicated he made his -- the
18   detectives told you he made his identification
19   of Ramiro Bahena from.
20       A.    Yes.
21       Q.    And this is what you looked out -- the
22   window you looked out of when you visited the
23   scene?
24       A.    Yes, I believe this is.

ASA Jacqueline Griffin
September 18, 2018

183

1        Q.    And fair to say that this truly and
2    accurately depicts what you saw when you looked
3    out that window with the detectives and Arturo
4    De La Cruz there?
5        A.    Yes.
6        Q.    Do you know -- any idea why the scene
7    visit you've described to all of us doesn't
8    appear in any police reports?
9        A.    No, I don't know why.
10       Q.    Obviously, it's not something you have,
11   like, any issues that would cause you to imagine
12   such a visit, correct, in such vivid detail,
13   right?
14       A.    No.  I'm pretty sure I made the visit.
15   I don't know why or how or whatever, but I made
16   the visit.  I do recall looking out the window.
17   And this does look familiar because I do
18   remember the tree, like I said, being on the
19   left and asking Arturo about it.
20       MR. ROBERTSON:    Would you mark that as 8?
21                      (WHEREUPON, said photograph was
22                      marked Griffin Deposition
23                      Exhibit No. 8.)
24

ASA Jacqueline Griffin
September 18, 2018

184

1    BY MR. ROBERTSON:
2        Q.    I'm showing you Exhibit 8.
3              That's the house you went to?
4        A.    Yes.  I believe so, yes.
5        Q.    And the second floor is -- the second
6    floor is the one in the middle, right?
7        A.    Yes, this floor.
8        Q.    Why don't you just circle that for me?
9    Can you circle that area?
10       A.    This is the second floor.
11       Q.    I want to go back to the statement for
12   a little bit.  Okay?
13       A.    Okay.
14       Q.    That 3:20 a.m., is that when you first
15   put finger to key?
16       A.    Quite possibly.
17       Q.    Okay.  Any idea -- I know it's hard.
18   Any idea -- we know you finish at 5:45, correct?
19       A.    Right.
20       Q.    Any idea how long it took?
21       A.    The typewriting?
22       Q.    Yeah.  From when you first put finger
23   to key to when you start the review process?
24       A.    So 8:45 till 3:20, I guess, would be --

ASA Jacqueline Griffin
September 18, 2018

185

Q. No. When you first put finger to key
on this at 3:20 to 5:45 when you ended?

A. Oh, a.m.? See, that's why I'm
wondering if -- again, sometimes the time frames
of when things are put in -- like, maybe I put
that 3:20 in after the end of the statement when
we completed it. I don't recall for sure. But
if we were to assume that I put 3:20 as a begin
time, then I probably end very close to 5:45.
It probably took at least an hour.

Q. You try to do everything -- I know
there's always exceptions. You always try to do
the same thing the same way on review?

A. Yes.

Q. I know there's exceptions.

A. I would assume that I started this at
3:20 a.m. -- started typing at 3:20 a.m., and it
probably would have taken a while. I would
assume with the translation and reading it back
and everything at least an hour or two.

Q. And you're sitting there and Arturo's
sitting there?

A. Yes.

Q. And he's not reading along with you

ASA Jacqueline Griffin
September 18, 2018

186

obviously?

A. Well, when I'm typing it, you mean?

Q. Yeah.

A. I don't know if he's reading the
screen. He's sitting next to me where he could
read the screen if he could read English. I
don't know if he was or wasn't. He was sitting
next to me.

Q. Now, there are a number of corrections
that are throughout the handwritten statement,
which is Exhibit No. 2, and those corrections
are all initialed, correct?

A. Yes.

Q. And they're initialed by yourself,
Arturo De La Cruz, Detective Alvarez, and
Detective Kennedy?

A. Yes.

Q. Now, since you're there with the
statements -- when you're doing the review
process, you still have the statement right up
on the computer, correct?

A. Yes.

Q. Obviously, in today's electronic age,
these are all changes that could have been made

ASA Jacqueline Griffin
September 18, 2018

187

on the statement that was up on the computer,
correct?

A. Yes, if I was reading it out loud as I
was typing it.

Q. Even after it's printed out, you still
have it up on the computer?

A. Oh, and go back, you mean?

Q. Yeah.

A. Yeah. I mean, I probably could have
went back in. Normally, we just read through
it -- if I printed it, we read through it to see
what the changes are, if there are any.

Q. It's something that could have -- these
corrections could have been put in in maybe less
time than it would have been to just have it
passed around and initialed by everyone?

A. True.

Q. Is there any reason why you didn't do
it that way?

A. That's not the way we do it. I usually
print out the statement and then read it out
loud. If there's changes that come across as
we're reading it out loud, that's when we make
the changes.

ASA Jacqueline Griffin
September 18, 2018

188

Q. Well, I understand that's the way it's
done. I understand.

A. That's why I did it that way.

MR. KOWALCZYK: So they could document the
changes perhaps.

THE WITNESS: Yes, so you could document the
changes.

BY MR. ROBERTSON:

Q. One of the things that these statements
are used later at trial -- one of the things
that you want is -- not you want, but is looked
for is that it's another level that shows that
the individual has reviewed the statement,
correct?

A. Yes, correct.

Q. And that the initialling part is
something that shows that the statement was read
out loud and certain mistakes were caught?

A. Yes.

Q. It's not mistakes that you
intentionally put in there, but just mistakes
that through the ordinary course of typing and
through the translations given by Detective
Alvarez just naturally occurred, correct?

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

189

1    A.   Correct.

2    Q.   When you read the statement out loud,

3 is it something you just gave Detective Alvarez

4 and said, "Read this to him in Spanish," or did

5 you go through the entire process of reading it

6 out loud in English only to have Detective

7 Alvarez read it out loud in Spanish?  Do you

8 know what I mean?

9    A.   Yes.  I don't have any independent

10 recollection of this case in general.  Usually

11 any case where my witness spoke a different

12 language I would read it myself and have it

13 translated again.  Do you know what I mean?  So

14 I would read everything usually line by line or

15 maybe sometimes two lines if it's a short

16 sentence and then have it translated again.  So

17 I would read it myself in English first.

18    Q.   At any point during the reading of the

19 statement, did Arturo indicate his ascent to the

20 correctness of this, or is this just something

21 where once you started it kept going and at the

22 end of the page you signed?

23    A.   So, like, I don't remember him

24 stopping.  Except I kind of just by this maybe

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

190

1 have some independent recollection of where the

2 "girlfriend" and "wife" is crossed out -- where,

3 as I was reading it through, when we got to that

4 part, there was some conversation in Spanish and

5 there was, like, a mishap.  So I think he might

6 have said, "I'm not married to her," or

7 something.  I don't know because it was in

8 Spanish.  He corrected Detective Alvarez on her

9 not being his wife and being the girlfriend.

10 And then I think that we went through and just

11 changed all of them at that point.

12    So the first one is where it says,

13 "Arturo states that on June 16 at around 7:30 he

14 and his wife."  When I was reading it through, I

15 maybe have some independent recollection of the

16 detective saying to him something and them

17 having a conversation and then me being told

18 that it's actually his girlfriend, not his wife.

19    Q.   Got you.

20    Are the pages signed at the end of each

21 page, or at the end when you get done with the

22 statement you sign off that they reviewed it?

23    A.   I want to say -- gosh.  Let me think.

24    At the end after each -- like, after we

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

191

1 review the whole thing.

2    Q.   Okay.  Are the initials done on a

3 per-page basis or all initials at the end?

4    A.   Those are as they come along, the

5 initialing.

6    Q.   And the exhibit that is signed, when is

7 that signed?  Is that signed on each page of the

8 statement or at the end?

9    A.   That varies.  If I mention it in the

10 statement and reference it, sometimes that's

11 when I would have it signed.  Sometimes I would

12 just have it signed at the end.

13    Q.   Obviously, the picture of Ramiro is

14 signed at the end, correct?

15    A.   If I didn't mention it in there, then

16 it probably would have been at the end.

17    Q.   I'm sorry.  I meant the picture of

18 Arturo.

19    The picture of Arturo was signed at the

20 end, correct?

21    A.   Yes.  He has the typed-out copy there.

22    Q.   Okay.  Now, you said you had the

23 digital camera, correct?

24    A.   Yes.

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

192

1    Q.   And the purpose of this photo -- it's

2 taken for every handwritten statement you've

3 ever taken, correct?

4    A.   Yes.

5    Q.   And that's to show the individual

6 preferably looking like he had been treated well

7 and, in some instances, with the statement if

8 possible; fair to say?

9    A.   Yes.

10    Q.   And that would be used -- it's intended

11 to be used for potential cross-examination down

12 the road, correct?

13    A.   Yes.

14    MR. ROBERTSON:  Let's take one brief break.

15    (WHEREUPON, a short recess

16    was had.)

17    MR. ROBERTSON:  Would you mark this as the

18 next exhibit.

19    (WHEREUPON, said photographs

20    were marked Griffin Deposition

21    Exhibit No. 9.)

22    MR. ROBERTSON:  Back on.

23 BY MR. ROBERTSON:

24    Q.   I'm showing you what's been marked as

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

193

```
1    Exhibit No. 9.  I'll represent to you those are
2    color photos -- some of them are color photos of
3    what I showed you previously in Exhibit No. 7.
4         Does that show the vantage point that
5    when you looked out that window from the spot
6    where Arturo -- detectives told you that Arturo
7    said he viewed the shooting?
8         A.   I believe so.  Particularly, the last
9    picture in the group.
10        Q.   Let's work with that last picture.
11        MR. ROBERTSON:  Just for the record, why
12   don't we mark this as -- I'll mark them A, B, C,
13   D, E, F.
14   BY MR. ROBERTSON:
15        Q.   So it will be F.
16        A.   It would be G.  You missed one.
17        Q.   I'm sorry.
18             You said G was the --
19        A.   I remember -- yeah, the one I remember
20   the most.
21        Q.   And where did you -- after you received
22   the information from the detective, who was -- I
23   think he was translating for Arturo, did you get
24   a sense of where the shooting occurred as it
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

194

```
1    happened in this picture?
2         A.   Yes.
3         Q.   Would you mark that for me?
4         A.   I recall Arturo saying it started to
5    the left of the photograph that the defendant
6    was -- started kind of to the left, came from
7    that direction.
8         Q.   Did you write a D?
9         A.   I wrote an X.
10        Q.   You wrote it in a dark spot in the
11   trees with a black pen, but you can still make
12   it out if you look, right?
13        A.   Yes.
14        Q.   Okay.
15        A.   From what I remember Arturo saying --
16   because I said, "There's a tree over there.  At
17   what point did you see the guy" -- "were you
18   able to identify him?"  He said he saw an image
19   coming from this direction.  I believe he said
20   he saw, like, a flash from this direction.  And
21   it wasn't until he was, like, maybe, like, here
22   that he was able to identify that he knew the
23   person, and then the defendant kept running all
24   the way to the end of the block.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

195

```
1         Q.   Could you write that?  Is that the
2    direction -- could you put an arrow there?  Is
3    that the direction that the shooter traveled?
4         A.   Yes.
5         Q.   And went all the way through?
6         A.   Yes.
7         Q.   Okay.
8         A.   I believe -- I'm not 100 percent, but I
9    believe he kept going here.  And maybe Arturo
10   said he lost sight of him or he didn't see which
11   direction he went, if he kept running that way
12   or running around this corner.
13        Q.   The corner of the picture, that would
14   be going from left to right?
15        A.   Correct.
16        Q.   I'm looking at it upside-down.
17        A.   Yes.
18        Q.   Now, the account that's contained in
19   that RD that we looked at, the original report,
20   which was Exhibit No. 3, I think, that has
21   Arturo being drawn to the window by the shots,
22   correct?  It's about midway down.
23        A.   Let me reread.
24             It says that he related he was inside
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

196

```
1    the second-floor apartment when he heard shots
2    fired.  He immediately ran to the living room
3    and looked out the window.
4         Q.   So pursuant to the report that was in
5    the possession of the detectives, Arturo didn't
6    see the first part of the shooting and actually
7    had to run to the window after hearing the
8    shots?
9         A.   Yes.  According to the RD, yes.
10        Q.   Okay.  I want to ask you a little
11   bit -- remember, we had that whole thing about
12   use of a photo array, use of a lineup, and when
13   you know someone or not?
14        A.   Yes.
15        Q.   If the person making identification
16   knew the person that was being identified for a
17   period of a decade, can you think of any
18   circumstance where you would -- where you would
19   think a photo array or a lineup would be
20   appropriate?
21        MR. KOWALCZYK:  Object to the form and asked
22   and answered, to some degree.
23        MR. ROBERTSON:  I think I get pardoned this
24   dep.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

1    THE WITNESS:  I think that -- the question
2  being, if I were to be the person,
3  hypothetically, giving the photo array, would I
4  use one if someone knew someone for a decade?
5  Not me particularly.  If you're asking, like,
6  have I ever seen officers use a photo array
7  where maybe it wasn't, like, necessary -- I
8  guess would be the word -- where you could just
9  show one picture and not have an identification
10  between six, I've seen that done before in my
11  career.
12  BY MR. ROBERTSON:
13    Q.   But it's rare, correct?
14    **A.   Right, it's rare.  Normally, if they**
15  **know the person, it's easier to not do a photo**
16  **array.  They would just show the picture of the**
17  **person if they had one, yeah.**
18    Q.   When you say easier, it would be
19  easier -- strike that.
20    And the detectives you were working
21  with were not novices, true?
22    **A.   I couldn't tell you one way or the**
23  **other.  I don't know that we had that discussion**
24  **or that I knew -- like I said, I don't really**

1  **recall what they looked like, you know.  I**
2  **didn't know one way or the other myself**
3  **personally.**
4    Q.   But nothing that gave you cause for --
5  nothing that they told you that gave you cause
6  for concern, correct?
7    **A.   Correct.**
8    Q.   Okay.  I want to go back to your Felony
9  Review review folder.
10    **A.   Okay.**
11    Q.   And I -- remember I told you I would go
12  back to that part about the CI stuff?
13    **A.   Yes.**
14    Q.   Let's go to that part.
15    Now, when you -- when you get out
16  there, Mr. Bahena had been in custody for
17  approximately nine hours already; is that right?
18    **A.   Let's see.**
19    Q.   The date and time of arrest is
20  6-17-12 -- no.  I'm sorry.  I got that wrong.
21    **A.   Longer than that, right?**
22    Q.   Right.  Much longer than that,
23  actually.
24    It's closer to 36 hours, correct?

1    **A.   Correct.**
2    Q.   By the time you finished your case, he
3  had been in custody for close to 44 hours
4  roughly?
5    **A.   Yes.**
6    Q.   None of us are math geniuses.
7    But about 44 hours?
8    **A.   Yes.**
9    Q.   At that time, if someone wasn't charged
10  within 48 hours, they had to be released,
11  correct?
12    **A.   That is normally the procedure, I**
13  **believe, yes.**
14    Q.   Okay.  And you were aware that if
15  Ramiro Bahena was not charged at that point in
16  time it was likely -- when you were done with
17  the case, it was likely that he was going to be
18  released pending the CI?
19    **A.   Yes.**
20    Q.   And the detectives were given a list --
21  or you discussed -- strike that.
22    You discussed the status of the
23  investigation with detectives, correct?
24    **A.   Yes.**

1    Q.   When you were discussing the status of
2  the investigation, you were talking to them
3  about things that would be helpful to
4  corroborate the statement of Arturo De La Cruz,
5  correct?
6    **A.   Yes.**
7    Q.   Do you know if you ever -- did the
8  detectives ever tell you if they showed the
9  video from the neighbor to Arturo at any point
10  in time and went through it with him?
11    **A.   At that point, I honestly don't recall**
12  **if -- I don't believe so, that they told me that**
13  **they showed him the video.  I don't recall**
14  **exactly -- all I recall them telling me was that**
15  **he was denying that was him.  Like, I**
16  **remember that that was said at some point, not**
17  **that he was admitting.  I don't remember if they**
18  **told me that they showed him the video or not.**
19    Q.   Did they show Arturo -- did the
20  detectives say they showed Arturo De La Cruz the
21  video?
22    **A.   I don't believe -- they definitely did**
23  **not say that, and I don't believe Arturo**
24  **mentioned seeing the video.**

ASA Jacqueline Griffin
September 18, 2018

201

```
 1      Q.  And that's a factor you would have
 2   wanted the detectives to tell you if they done
 3   that, correct?
 4      A.  Yes.  And I would hope that Arturo
 5   would say he saw the video, too, if he had.
 6      Q.  It would also be something that you
 7   would have wanted detectives to show Arturo the
 8   video to possibly use it as an exhibit?
 9      MR. KOWALCZYK:  Object to form and
10   foundation.
11         Go ahead.
12      THE WITNESS:  Yes.  And -- yes, it would be
13   nice to have the video handy to show it to a
14   witness or any evidence handy to show to
15   witnesses, if it's possible to do that, before
16   taking their statement.
17   BY MR. ROBERTSON:
18      Q.  Do you know why -- do you know if the
19   detectives -- do you know why the detectives did
20   not have -- strike that.
21         Do you know after -- we've gone over
22   this for a little bit.  Do you know if the
23   detectives ever showed you the video?
24      A.  I don't recall.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

202

```
 1      Q.  Okay.  Do you know -- one of the
 2   reasons to view the video and to possibly show
 3   it to witnesses was not one of the reasons you
 4   listed on the CI, correct?
 5      A.  I did not list that, no.
 6      Q.  Let's go through those reasons real
 7   quick.
 8         You knew that -- you were told that
 9   there was -- the video also captioned what was
10   described as the earlier incident, correct?
11      A.  Correct.
12      Q.  And that earlier incident was one which
13   witnesses had testified to, correct?
14      A.  Correct.
15      Q.  And it was an incident where there were
16   threats made both ways reportedly, correct?
17      A.  When you say "testified," you mean they
18   had said that?
19      Q.  Yes.
20      A.  Yes.
21      Q.  And it was threats that were made both
22   ways, correct?  It was smack talk going back and
23   forth?
24      A.  That was not how it was reported to me,
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

203

```
 1   that I recall.  I do remember that -- from what
 2   I remember, it was Ramiro and Maria arguing
 3   about their relationship.  I don't recall
 4   anything about smack talk going both ways, but I
 5   do believe that one -- Jamie, one of the
 6   victims, got involved or, like, tried to
 7   separate them or something.
 8      Q.  Did the detectives tell you that Jamie
 9   was a Latin King?
10      A.  That I don't recall.
11      Q.  Okay.  And the video -- you were told
12   that the video had captured that earlier
13   portion, correct?
14      A.  Yes.  That the video captured the
15   argument between the defendant and Maria, yes.
16      Q.  Also, that the video captured the
17   actual shooting, correct?
18      A.  Correct.
19      Q.  At any point, did the detectives tell
20   you whether or not they made a comparison of the
21   individual who was identified as Ramiro Bahena
22   as participating in the first incident and the
23   shooter shown on that second part of the video?
24      A.  I don't recall them saying that, but --
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

204

```
 1   the only thing that they must have relayed to me
 2   was that the video was not clear on the face of
 3   the defendant because I indicated that in my
 4   notes.
 5      Q.  It's obviously something you would have
 6   wanted to know about whether -- how Ramiro
 7   Bahena, as he's pictured on the video in the
 8   first instance, compared with the person who was
 9   the shooter in the second incident; fair to say?
10      MR. KOWALCZYK:  Object to form.
11      THE WITNESS:  Yes.  If you could tell if it
12   was the same, it would be good to know.
13   BY MR. ROBERTSON:
14      Q.  And you could do that by more means
15   than the face, correct?
16      A.  Hypothetically, yes.
17      Q.  You could tell age possibly from the
18   way someone moved, correct?
19      MR. KOWALCZYK:  Object to form.
20      THE WITNESS:  Possibly.
21   BY MR. ROBERTSON:
22      Q.  And you could tell whether someone had
23   some type of infirmity possibly?
24      A.  Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

205

1   Q.   And you could also look at things such
2   as stature, correct?
3   A.   **Yeah, heavy or thin.**
4   Q.   Height?  Weight?
5   A.   Yes.
6   Q.   You could also -- even if you can't
7   make out something clear, you could also see
8   potentially facial hair?
9   A.   Yes.
10  Q.   Distinguishing marks?
11  A.   **Depending on the video, yes.**
12  Q.   Also, possibly clothing could be
13  something as well, correct?
14  A.   Yes.
15  Q.   And that type of comparison would have
16  been critical in a case such as this one where
17  identification was the main issue?
18  MR. KOWALCZYK:  Object to the form of the
19  question.
20  THE WITNESS:  Seeing as how there was an
21  eyewitness who was identifying him, I think that
22  the video would probably corroborate his
23  statement.  If it didn't, then it would be
24  questionable.

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

206

1   BY MR. ROBERTSON:
2   Q.   Right.
3        That's where the critical part comes
4   in.  It's like you just had a single -- what's
5   called a single finger, correct?
6   A.   Yes.
7   Q.   And the single finger you want to
8   corroborate as much as possible, correct?
9   A.   **Right.**
10  Q.   As the review assistant out there, you
11  would have wanted to corroborate that single
12  finger with the video to make sure that it was
13  accurate, correct?
14  A.   Yes.
15  Q.   If it wasn't accurate, the same thing?
16  You'd want know so you could say, "Listen, I
17  think it's the wrong guy," correct?
18  A.   Yes.
19  Q.   And if the video didn't corroborate it,
20  that's something that would have forced more of
21  the evidentiary burden on to the statement made
22  by Arturo De La Cruz -- not the statement, but
23  the identification made by Arturo De La Cruz;
24  fair to say?

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

207

1   A.   **If you could tell in the video that it**
2   **wasn't the defendant, yes, that would be fair to**
3   **say.**
4   Q.   You know that this case was
5   subsequently nolled, correct?
6   A.   Yes.
7   Q.   And fair to say -- I know that -- I
8   know that you're in the Sex Crimes Unit now, but
9   fair to say that the State's Attorney's Office
10  doesn't frequently nolle cases prior to trial
11  for lack of evidence, correct?
12  A.   Correct.
13  Q.   You would say it's incredibly rare,
14  correct?
15  A.   **Pretty rare, yes.**
16  Q.   And that's because Felony Review things
17  are taken to make sure that innocent people
18  aren't charged with crimes, correct.
19  A.   **That's the purpose of Felony Review,**
20  **right.**
21  Q.   Right.
22       And that's still -- with Felony Review,
23  the information still comes from the detectives,
24  correct?

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

208

1   A.   Yes.
2   Q.   Fair to say that the more serious the
3   crime the more hard a case is looked at before a
4   case is dismissed?
5   A.   **Hypothetically, yes.**
6   Q.   I mean, it's going to look -- someone's
7   going to look a lot harder at a double murder
8   natural life case before dismissing it than they
9   would a criminal trespass to vehicles, true?
10  A.   **I would hope so, yes.**
11  Q.   Before this case was nolle prossed, did
12  you have a discussion with anyone about it?
13  A.   **No.**
14  Q.   Did Fabio Valentini or Nancy Galassini,
15  now Nancy Aducci, call you and say, "Hey,
16  Jackie, I want to talk to you about this case
17  and what was going on at the time"?
18  A.   **No.**
19  Q.   How did you learn that the case was
20  nolled?
21  A.   **When I received a subpoena from -- I**
22  **believe it was Ms. Flowers from our Civil**
23  **Department is the first I heard about it.**
24  Q.   Okay.  Then did you have any

Wadlington Reporting Service, Inc.
(312) 372-5561

1    conversations with -- not with Mr. Garcia, but

2    anyone involved in this case?

3        **A.   Involved in the case, no.**

4        Q.   So not, like, going back to Nancy and

5    saying, "Hey, why didn't you give me the

6    heads-up on this nolle," or anything like that?

7        **A.   No.  I talked to Rob Holland about it**

8    **because he was my first year when I got this**

9    **subpoena.  He's like, "I know that case."  He**

10   **said it got nolled because -- by Nancy because**

11   **the video didn't -- or the witness ended up**

12   **recanting the video that showed that it wasn't**

13   **possibly the defendant.**

14       Q.   Okay.

15       **A.   And I don't know how Rob knew that.  I**

16   **don't think Rob was involved.  I think he maybe**

17   **talked to Nancy.  Then I did talk to Nancy, and**

18   **she confirmed what Rob had told me.**

19       Q.   I think Nancy has indicated, in one

20   form or another, that she kind of shopped it

21   around in terms of having different state's

22   attorneys look at it on the wing to see if it's

23   the same person in that first part of the video

24   where Ramiro Bahena was having that

1    confrontation and the second part where the

2    shooter was.

3        **A.   Okay.  I was not that person.**

4        Q.   Oh, I know.  If it would have come up,

5    you would have probably remembered seeing the

6    video?

7        **A.   Yes.**

8        Q.   Did you hear anything like that?

9        **A.   I don't recall hearing that part, no.**

10      Q.   GPRs in this case you said you didn't

11   have, correct?

12      **A.   I don't recall if I did or didn't.**

13      Q.   GPRs are maintained by the Chicago

14   Police Department, correct?

15      **A.   Yes.**

16      Q.   You can just send a subpoena over there

17   and they'll turn them right over, correct?

18      **A.   Yes.  Or you'll notify the officer to**

19   **bring them sometimes.**

20      Q.   Sometimes they don't come right away?

21      **A.   Right.**

22      Q.   And then the officer will bring them

23   in?

24      **A.   Yes.**

1       Q.   Were you ever told by detectives, at

2    any point, that the person wearing the

3    clothing -- Ramiro Bahena in the initial

4    incident and the person who was doing the

5    shooting were wearing two different types of

6    clothing?

7        **A.   I don't recall that, no.**

8        Q.   Were you ever told, at any point in

9    time, that the -- Ramiro Bahena has a physical

10   infirmity with his arm that is -- that the

11   person who was the shooter does not have?

12      **A.   I don't recall that.**

13      Q.   Both of those things are things that

14   could have alerted your senses that, "Hey, there

15   could have been something going on here," right?

16      MR. KOWALCZYK:  Object to the form.

17      THE WITNESS:  If there was some reason to

18   alert it, yes.

19   BY MR. ROBERTSON:

20      Q.   If detectives had told you that, "Hey,

21   the guy in the first part, Bahena, and the

22   shooter, they're wearing different clothes.  You

23   can't make out their face, but they're wearing

24   different sets of clothes," that would have

1    given you some pause for concern?

2        **A.   I would probably wonder about it and**

3    **look at maybe if it was, like -- if there was a**

4    **time difference between the incidents.  I would**

5    **question any kind of difference.**

6        Q.   It's the same night a couple hours

7    later.  I mean, it would have been unusual for

8    someone to just go and change, true?

9      MR. KOWALCZYK:  Object to the form.

10      THE WITNESS:  Yes and no.  I mean -- sure.

11   It wouldn't cause me concern if I was aware that

12   there were two different outfits.  If someone

13   were going to murder someone, I don't know if

14   they would necessarily want to wear the same

15   clothes.  Do you know what I'm saying?

16   BY MR. ROBERTSON:

17      Q.   Well, under that same theory, this

18   wasn't a case where changing the clothes would

19   have been significant in terms of trying to hide

20   the identity?  I mean, the person -- Ramiro

21   Bahena had just been at the scene, correct, like

22   hours earlier?

23      **A.   Yes.**

24      Q.   Had just had a confrontation with

ASA Jacqueline Griffin
September 18, 2018

213

1   people who he has known for over a decade, some
2   of them intimately?
3       A.   Yes.
4       Q.   I mean, it doesn't make any sense that
5   this would be a case where, like, "Hey, I'll
6   change my shirt.  They'll never know it's me,"
7   right?
8       A.   Well, hypothetically, if he was going
9   to go, you know, shoot some -- this is just
10  my opinion.  If you're going to go shoot, you
11  might put on a hoodie and try and cover up so
12  people don't see your face.  That's, again, a
13  hypothetical guess.
14      Q.   There was no indication of anyone
15  wearing a hoodie in this case, true?
16      A.   I don't believe so, no.
17      Q.   Did Arturo tell you that he was present
18  at the earlier confrontation?
19      A.   I believe so.
20      Q.   Did he ever -- and he indicated that
21  that was clearly Ramiro Bahena who was present
22  at that time, correct?
23      A.   I believe so.
24      Q.   Do you know why the video wasn't pulled

ASA Jacqueline Griffin
September 18, 2018

214

1   for the period of time when the detectives went
2   and shouted up to Arturo and said, "Hey, are you
3   Arturo?  Come on down"?  Do you know why at that
4   point in time, which would have corroborated all
5   this, why the detectives didn't pull that video
6   and present it?
7       MR. KOWALCZYK:  Object to form and foundation
8   and ability to do that at that point.
9       THE WITNESS:  And I would just say I have no
10  knowledge that they didn't do that.  I'm just
11  taking your word that they didn't do that or
12  that it wasn't done.  I don't know anything
13  about if they did or didn't.
14  BY MR. ROBERTSON:
15      Q.   If they pulled video, they would have
16  to inventory, right?
17      A.   Yes, I would assume.
18      Q.   They just can't decide we don't want
19  this evidence and just throw it away in the
20  garbage, right?
21      A.   They shouldn't, no.
22      Q.   The phone records can be awfully
23  important, correct?
24      A.   Yes.

ASA Jacqueline Griffin
September 18, 2018

215

1       Q.   Phone records can show time, correct?
2       A.   Yes.
3       Q.   They can show location with cell
4   towers, correct?
5       A.   Yes.
6       Q.   Sometimes they're a tool for the truth,
7   true?
8       A.   True.
9       Q.   Did detectives ever tell you anything
10  regarding the phone records of Ramiro Bahena and
11  what they may have showed about his location at
12  the time of the murder?
13      A.   No.
14      Q.   Did they -- detectives ever tell you
15  anything about the phone records and what they
16  may have showed about Mr. Bahena at the time of
17  that earlier confrontation about 9:30 p.m.?
18      A.   No, I don't believe so.
19      Q.   Arturo indicated that he saw Ramiro
20  Bahena at the Laramie address even earlier than
21  that 9:30 confrontation, correct?
22      A.   That I don't remember.
23      Q.   Were you ever told by detectives that
24  Arturo indicated that he saw Ramiro there two

ASA Jacqueline Griffin
September 18, 2018

216

1   hours earlier at 7:30 p.m.?
2       A.   Can I reference the statement?  I don't
3   recall offhand.  I would have probably put it in
4   here.
5       Q.   That would be an important fact,
6   correct?
7       A.   Yeah.
8       Yeah, it says that he -- at 7:30 they
9   were leaving and he saw Ramiro out front arguing
10  with his mother.
11      Q.   At that point in time, did the
12  detectives ever present you with any video
13  showing that argument at that same location just
14  a few hours earlier?
15      A.   I don't recall seeing the video.
16      Q.   No, I know that.
17      But were you ever --
18      A.   Or any video.
19      Q.   Let me rephrase it.  I'm sorry.
20      A.   That's okay.
21      Q.   Was it ever represented to you we've
22  got this video -- by detectives, we've got this
23  video at the 7:30 incident that Arturo is saying
24  that also covers that portion?

ASA Jacqueline Griffin
September 18, 2018

217

1    A.   Let me reread what I wrote.

2    Q.   Sure.

3    A.   I only wrote that, "The video from

4  house next door shows earlier incident when

5  defendant arguing with Maria at approximately

6  9:30 p.m."

7    Q.   Correct.

8    A.   So I would assume that I was not told

9  that.

10   Q.   Did detectives ever tell you there's

11 that earlier incident out there, but we're not

12 going to get the videotape from it?  Anything

13 like that?

14   A.   They never had that conversation, no.

15   Q.   Obviously, if it showed an earlier

16 confrontation at the same location involving the

17 same people who were shot, that would have been

18 a video that you would have wanted to see,

19 correct?

20   A.   Yes.  An ASA would want to see before

21 making any charges, yes.

22   Q.   When I say you, I'm not saying just --

23   A.   Yes.  If I had everything, I would

24 review the whole case in its totality, yes.

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

218

1    Q.   You are aware that it was -- I may have

2  asked you this.  I'm sorry if I did.

3    A.   That's okay.

4    Q.   You are aware that it was raining that

5  night, correct?

6    A.   Again, I don't recall.  I feel like I

7  kind of remember that, but I don't recall

8  100 percent.

9    Q.   Okay.  From your understanding, did

10 you -- the area of the confrontation at 9:30 was

11 closer to the porch, correct?

12   A.   From what I remember -- like, my

13 understanding of what the detectives told me, it

14 was definitely not across the street where the

15 shooting happened, but, like, definitely by the

16 porch of Maria or near there.

17   Q.   And the person looking out from the

18 vantage point that you actually looked out from,

19 you would have been able to see the 9:30

20 incident much more clearly and the person

21 involved in that better than across the street;

22 fair so say?

23   MR. KOWALCZYK:  Object to form and

24 foundation.

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

219

1    THE WITNESS:  Where is that group?

2        In all honestly, I don't know that you

3  would be able to see it because it was closer to

4  the building.  Do you know what I'm saying?  If

5  you were out front -- out of this group --

6  again, I'm assuming.  You know, if you were at

7  the second floor looking out the window, I don't

8  know that you would see it necessarily on your

9  Exhibit No. 9.

10 BY MR. ROBERTSON:

11   Q.   Did the detectives ever tell you

12 that -- you know, we've talked about the

13 difference in how to potentially recognize

14 different people at those two critical points in

15 the video.  Do you remember that?

16   A.   Yes.

17   Q.   Did the detectives ever tell you that

18 the video showed that the person who was the

19 shooter appeared to be younger than the person

20 identified as Ramiro Bahena involved in the 9:30

21 incident?

22   MR. KOWALCZYK:  Object to form and

23 foundation.

24        But go ahead.

Wadlington Reporting Service, Inc.
(312) 372-5561

---

ASA Jacqueline Griffin
September 18, 2018

220

1    THE WITNESS:  I don't recall that.

2  BY MR. ROBERTSON:

3    Q.   Did detectives ever tell you that the

4  person shown as the shooter in the video

5  appeared to be taller than the Ramiro Bahena who

6  was involved in that earlier 9:30 incident?

7    MR. KOWALCZYK:  The same objection.

8    THE WITNESS:  I don't recall that.

9  BY MR. ROBERTSON:

10   Q.   Did detectives ever tell you that the

11 individual who was the shooter was stockier than

12 Ramiro Bahena who was identified in the 9:30

13 video?

14   MR. KOWALCZYK:  The same objection.

15   THE WITNESS:  I don't recall that.

16 BY MR. ROBERTSON:

17   Q.   Did the detectives tell you that the

18 shooter had shorter hair than the person Ramiro

19 Bahena who was identified in that 9:30 incident?

20   MR. KOWALCZYK:  The same objection.

21   THE WITNESS:  I don't recall that.

22 BY MR. ROBERTSON:

23   Q.   Is it fair to say that all those

24 different factors, though, if they were present,

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

221

```
1   those were all factors you would have wanted to
2   know --
3       MR. KOWALCZYK:  The same objections.
4   BY MR. ROBERTSON:
5       Q.  -- individually and, particularly,
6   collectively?
7       MR. KOWALCZYK:  The same objections.
8       THE WITNESS:  Yes.
9   BY MR. ROBERTSON:
10      Q.  Let's go back to the CI real quick.
11          "Interview Santiago Delgado," correct?
12      A.  Yes.
13      Q.  And he had not been interviewed at any
14  point in time, correct?
15      A.  By me, no.  I don't know -- after I
16  reviewed the case, I don't know what happened.
17  But I did not interview him, no.
18      Q.  And he passed shortly after, correct?
19      A.  According to this, yes.
20      Q.  GSR, the gunshot residue, we talked a
21  little bit about, correct?
22      A.  Yes.
23      Q.  And that was one of the things that
24  detectives and you discussed about having done
```

ASA Jacqueline Griffin
September 18, 2018

222

```
1   the continued investigation, correct?
2       A.  Correct.
3       Q.  And that came back as -- are you aware
4   that that came back as negative?
5       A.  I am not.  If it says that somewhere,
6   then -- does it say it somewhere that I'm
7   missing?
8       Q.  It doesn't say anything about it.  I'm
9   just asking if you're aware?
10      A.  No.
11      Q.  A negative GSR would have given you --
12  would certainly not have added to the evidence
13  against Mr. Bahena, correct?
14      A.  Correct.
15      Q.  And it may have given you pause to go
16  forward with the prosecution?
17      MR. KOWALCZYK:  Object to form.
18      THE WITNESS:  I would say it definitely does
19  not corroborate the account as the witness said.
20  BY MR. ROBERTSON:
21      Q.  The polygraph, that's something that's
22  not admissible in court generally, correct?
23      A.  Correct.
24      Q.  And that's an investigative tool used
```

ASA Jacqueline Griffin
September 18, 2018

223

```
1   by the police, correct?
2       A.  Correct.
3       Q.  The 911 calls, is that something you
4   CI'd before?
5       A.  I wrote down to obtain those, yes.  I
6   made a box, which I do standard pretty much
7   every case almost.
8       Q.  Now, was there anything -- any other
9   reason why you CI'd this case?
10      A.  I wrote down here in those boxes in
11  evidence the ME report, video from neighbor, GSR
12  reports.  There were seven .40 caliber shell
13  casings with the box.  Make sure that those were
14  all evidence we had obtained prior to any
15  decisionmaking -- or that needed to be obtained,
16  I guess.  That is all I indicated on here.
17      Q.  Okay.  Now, you realize that -- strike
18  that.
19          Did you talk to Jim Byrne about CI'ing
20  this case?
21      A.  I would guess I should have at some
22  point or talked to a trial sup.  But, like I
23  said, in the box it says N with the Byrne CI.  I
24  think that is my possible writing.  I usually
```

ASA Jacqueline Griffin
September 18, 2018

224

```
1   write an N with the circle.
2       Q.  Any memory of what you told Jim or your
3   trial sup?
4       A.  No.
5       Q.  Would you have told them all the
6   information you learned from the detectives?
7       A.  I would hope so, yes.
8       Q.  If there were any problems and issues
9   that were raised with the potential
10  identification of Ramiro Bahena as the shooter
11  in this case, those are certainly things -- if
12  the detectives raised those with you, those are
13  certainly things you would have pointed out to
14  your supervisor or the deputy sup, correct?
15      A.  Yes.
16      Q.  There was never any way you would
17  ignore any such information just for the sake of
18  charging someone, correct?
19      A.  No.
20      Q.  You would agree that would be a
21  horrific thing to do?
22      A.  Yes.
23      Q.  I think I'm almost done.  Give me a
24  second, please.
```

```
 1        A.   Sure.
 2        Q.   Let me finish a couple other things.
 3        There's a number of different
 4   detectives that have been named as defendants in
 5   this lawsuit.
 6        A.   Okay.
 7        Q.   And are you familiar with any of the
 8   detectives?
 9        A.   I don't know who's been named.  Do you
10   want to read them to me and then I can tell you?
11        Q.   Sure.
12        Detective M. Kennedy?
13        A.   No.
14        Q.   Detective W. Fiedler?
15        A.   No.
16        Q.   Detective J. Haniacek?
17        A.   No.
18        Q.   Detective R. Rodriguez?
19        A.   No.
20        Q.   Detective Ross Takaki?
21        A.   No.
22        Q.   Did M. Moreth?
23        A.   No.
24        Q.   Detective D. Jensen?
```

```
 1        A.   No.
 2        Q.   Detective Velazquez?
 3        A.   No.
 4        Q.   Detective Hillman?
 5        A.   No.
 6        Q.   Detective Alvarez?
 7        A.   No.
 8        Q.   Detective Healey?
 9        A.   No.
10        Q.   You might recognize these guys by
11   sight, correct?
12        A.   Possibly, yes.
13        Q.   But no name that jumps out to you that
14   says, "Oh, I know this guy"?
15        A.   Right.
16        Q.   And you think when you left the police
17   station shortly after -- shortly at 5:45 or
18   shortly thereafter you either went to
19   26th Street or went home?
20        A.   Yes.
21        Q.   Do you know if Arturo De La Cruz was
22   still present at the police station?
23        A.   I don't recall.
24        Q.   Do you know if Ramiro -- if Arturo
```

```
 1   De La Cruz was taken to the Grand Jury?
 2        A.   I honestly didn't know until we were
 3   just sitting here when we took a break.  It was
 4   indicated he did go.  I didn't find that out
 5   until today.
 6        Q.   It's not something you recommended that
 7   be done, correct?
 8        A.   I did not write it down as part of my
 9   CI.
10        Q.   And you didn't circle the box, "Send
11   him to the Grand Jury," correct?
12        A.   You know, I only would circle that box
13   if it had been done.  If I came in on a CI case
14   and someone had been sworn to the Grand Jury,
15   then it would be circled.  I don't recall making
16   a representation one way or the other.
17        Q.   And you know when you go -- we talked
18   about you working the Grand Jury, correct?
19        A.   Yes.
20        Q.   And working Branch 66, correct?
21        A.   Yes.
22        Q.   When a case comes in, detectives will
23   usually bring the individual down, correct?
24        A.   Yes.
```

```
 1        Q.   And will have the Grand Jury -- park in
 2   the lot and walk in with the guy, correct?
 3        A.   Yes.
 4        Q.   And bring the guy up to the 4th floor
 5   at 26th and Cal, correct?
 6        A.   Yes.
 7        Q.   And then the state's attorney will
 8   interview him, correct?
 9        A.   Yes.
10        Q.   Usually after talking to detectives,
11   correct, to kind of get a feel for the case?
12        A.   After the state's attorney did?
13        Q.   The state's attorney usually talks to
14   the detectives to get a feel of it while you're
15   working in Branch 66?
16        A.   Yeah, at least read reports or have
17   some knowledge.  I don't know if I necessarily
18   would always talk to them.  Sometimes.
19        Q.   Certainly, if the detectives had
20   provided the video, you would have watched the
21   video, right?
22        A.   Yes.
23        Q.   And then you got the situation where
24   you talked to the witness, correct?
```

ASA Jacqueline Griffin
September 18, 2018

229

1   A.   Yes.
2   Q.   And one of the primary tools when
3  you're talking to such a witness is the
4  statement the witness initially gave to the
5  Felony Review assistant, correct?
6   A.   Yes.
7   Q.   It really forms the template or the
8  framework for the Grand Jury investigation,
9  correct?
10   A.   Yes.
11   Q.   It's another way of kind of reinforcing
12  what was there, correct?
13   A.   Memorializing, yes, what was said.
14   Q.   Generally, it would go briefly over the
15  facts of the case in the Grand Jury question and
16  answer form, correct?
17   A.   Yes.
18   Q.   And then the statement would be used as
19  an exhibit in front of the Grand Jury, correct?
20   A.   Yes.
21   Q.   And, again, the same type of treatment
22  questions that the line ASA Felony Review asked
23  would be asked by the Grand Jury by the state's
24  attorney, correct?

ASA Jacqueline Griffin
September 18, 2018

230

1   A.   Yes.
2   MR. ROBERTSON:  Do you guys want to take a
3  brief break?
4   MR. NESLUND:  Yeah.  I think we're almost
5  there.
6            (WHEREUPON, a short recess
7            was had.)
8  BY MR. ROBERTSON:
9   Q.   Could you go back to your Felony Review
10  folder.
11   A.   Yes.
12   Q.   Go to that page with all the CI stuff.
13   A.   Yes.
14   Q.   Could you read and tell me -- I know
15  we've been over this.  We're unsure as to
16  whether everything came out.
17        Could you read and tell me every single
18  reason that a CI was done in this matter?
19   A.   By me or by the next ASA?  It looks
20  like there is a CI for another ASA following me,
21  I would assume.  This is additional handwriting,
22  so there were additional things that either came
23  up by the time they went out that were -- do you
24  know what I'm saying?  Do you want me to read

ASA Jacqueline Griffin
September 18, 2018

231

1  all the CI's or just the ones I wrote?
2   Q.   Tell me the ones you did.
3   A.   Okay.
4   Q.   Then I'll ask you the follow-up.
5   A.   I definitely wrote a box for polygraph
6  defendant.  I wrote a box for interview Santiago
7  Delgado, if possible, a box for GSR, a box for
8  911 calls, and then a box over here by the
9  evidence ME report, a box video from neighbor, a
10  box GSR results, and a box seven .40 caliber
11  casings.
12   Q.   Any other reason why?
13   A.   That I wrote down at this juncture, no.
14  I did not write anything else down.
15   Q.   Whose decision would it have been to CI
16  the case?
17   A.   Ultimately, I would be deciding if
18  there was -- well, not deciding, but getting the
19  information if there was still stuff that the
20  police were doing that needed to be done before
21  a decision was going to be made.  Then I would
22  relay that information to whoever I notified,
23  which I believe was Byrne.  I would have told
24  him what we have, what the police are talking

ASA Jacqueline Griffin
September 18, 2018

232

1  about doing next, you know, what still is kind
2  of out there before a decision to approve or
3  reject it be made.
4   Q.   Fair to say, pursuant to policy, that
5  decision for the CI, just like approval and
6  rejection, had to be done by a deputy sup or
7  above?
8   A.   A higher-up, yes.
9   Q.   Again, this is something that we may
10  have covered, but I -- remember when I was first
11  talking about the differences between the video
12  showing Ramiro Bahena at 9:30 and the video
13  showing the shooter?
14   A.   Yes.
15   Q.   Did the detectives ever tell you that
16  the shooter did not appear to have a withered
17  arm, unlike Ramiro Bahena, who's identified at
18  9:30 p.m. as having a withered arm?
19   A.   I don't recall that being related to
20  me, no.
21   Q.   Something like that would have been a
22  critical fact that you would have wanted to know
23  if this matter, correct?
24   MR. KOWALCZYK:  Object to form.  Assumes

233

1   facts not in evidence.
2           But go ahead.
3       THE WITNESS:  I would want to know if that
4   were the case, if he shot with that arm or if it
5   was the arm that the shooter was shooting with,
6   if there was other information about it, you
7   know, that needed -- if it was the arm that he
8   didn't use, I don't know how critical it would
9   be.  I guess -- I would want to explore more to
10  find out if there's some reason we should know
11  that, I guess.
12  BY MR. ROBERTSON:
13      Q.  And that's the reason why you want as
14  much information as possible from detectives?
15      A.  Right.
16      Q.  Also, the withered arm could also
17  appear -- even beyond the shooting, it could
18  also go to ID if you could tell whether it was
19  withered or not?
20      A.  **If the video shows that someone has a**
21  **withered arm, yes, or it doesn't.  I would**
22  **assume that would be, yes, something.**
23      Q.  Now, Ramiro Bahena was released.  Do
24  you know if anyone on your end or the police end

234

1   notified, like, Arturo or anyone else that
2   Ramiro Bahena was going to be released?
3       A.  **That I don't know.  I know I didn't**
4   **notify anyone of that.**
5       Q.  Was there ever any concern that Ramiro
6   Bahena would basically -- after having been
7   arrested and held for 48 hours, would just take
8   off upon being released?
9       A.  **I don't recall in this case that being**
10  **discussed.  Hypothetically, in any case,**
11  **obviously, if you think someone committed this**
12  **crime, there's always that concern.**
13      Q.  Oftentimes, you'll have detectives who
14  don't like cases being CI'd; fair to say?
15      A.  **Yes.**
16      Q.  Fair to say probably the angriest the
17  detectives get at you in Felony Review is
18  probably a CI?
19      A.  **Maybe.  Maybe.  Sometimes a rejection.**
20      Q.  It's the idea of, "Hey, go do more"?
21      A.  **Go do more work, yes.**
22      Q.  They'd rather have the case approved,
23  correct?
24      A.  **Or rejected, yes.  Possibly.**

235

1       Q.  But they're usually calling a case in
2   for it to be approved, correct?
3       A.  **Yes, I guess that would be fair to say.**
4   **They're looking for felony charges, yes.**
5       Q.  If a GPR were written on June 17, 2012,
6   if -- just before 1:00 a.m. or just before
7   2:00 a.m., depending on which time you go with,
8   that GPR would have obviously been in existence
9   at the time you came out and reviewed the case,
10  correct?
11      A.  Yes.
12      Q.  And if it was signed off on July 18,
13  that would have been -- an official version
14  would have been available when Dave Herrera
15  finished off the case at 12:45 a.m. on July 19,
16  correct?
17      A.  Yes.
18      Q.  And there have been times when --
19  especially if they've been signed off on, where
20  GPRs are copied and put in the file and sent to
21  the Grand Jury?
22      A.  Yeah.  Sometimes it happens, yes.
23      Q.  So the ASA has those GPRs from the
24  inception of the case, correct?

236

1       A.  Yes.
2       Q.  Do you remember -- we talked a little
3   bit about what Rob Holland said about this.
4           Is there any other ASA who you've
5   encountered that has mentioned this case to you
6   in any way?
7       A.  **Besides Steve?**
8       Q.  I don't want to know anything that
9   Steve said to you.
10      A.  **No.**
11      Q.  Every one of the reasons you laid out
12  that the case was CI'd were communicated to
13  detectives who were working the case, correct?
14      A.  **Yes, I would assume so.**
15      Q.  Obviously, for you to give a CI and
16  keep it a secret would defeat the purpose?
17      A.  **Right.  We discussed it.  I don't know**
18  **if I told them or they told me they were doing**
19  **it.  I don't know if I told them, "Hey, you guys**
20  **need to do this," or if they were saying we're**
21  **going to do X, Y, and Z and these were reasons**
22  **we were waiting back for further information.**
23
24

1    EXAMINATION
2    BY MR. NESLUND:
3        Q.   Can you tell from your Felony Review
4    folder what the other reasons were that
5    subsequent ASA's CI'd the case?
6        A.   In all honestly, I see the boxes in,
7    like, X's, but I can't read the handwriting.
8    Like, the first one it says something like
9    "polygraph" something.  I can't really read or
10   make out what those other words are.  They're
11   kind of small.
12       Q.   And then on page -- State's Attorney
13   Bates Stamp 187 -- Rob might have already
14   covered this.  In the bottom, it says "GSR" and
15   then there's some other handwriting.  I know
16   that's not your handwriting.  Can you make out
17   what that says?
18       A.   The GSR -- I think this is what it
19   says, "ISP machine."  And then I don't know what
20   the next two or three words are.  "To process as
21   of."  Then it looks like that's some type of
22   date, but I can't make out what the date is.
23       MR. KOWALCZYK:  Could I suggest it says, "Not
24   able to process"?

1        THE WITNESS:  Oh, yes.
2        MR. NESLUND:  Good job, detective.
3    BY MR. NESLUND:
4        Q.   And then does it say detective
5    somebody?
6        A.   Detective something following up.
7    "Detective is following up," I think, maybe.
8    I'm guessing again.  Just my handwriting
9    interpretation.
10       Q.   Just let me ask you about some of the
11   CI boxes.
12       You wanted the detectives to take
13   Mr. Bahena to take a polygraph examination?
14       A.   We discussed it.  I don't know if I
15   wanted it or if they wanted it, but it would
16   have been discussed.  Hence, I put the box with
17   the, "Polygraph defendant."
18       Q.   Okay.  The reason for the 911 calls,
19   can you just kind of flesh that out?  What were
20   you looking for with the 911 calls?
21       A.   Well, in every case you want to try and
22   obtain the calls for various reasons.  Usually
23   down the road you can't get the actual audio, so
24   you want to try and get them preserved

1    immediately.  Also, you want to see if there
2    were any other possible witnesses that, you
3    know, didn't necessarily talk to the reporting
4    officers.
5        Q.   And then the seven .40 caliber shell
6    casings, just walk me through what was your
7    thinking?  What were you looking for there?
8        A.   Just to make sure that they were
9    collected and that -- it would have been
10   mentioned as, you know, evidence.  I don't know
11   if it was to corroborate possibly, you know, how
12   many shots someone heard or just to make sure
13   that the evidence was collected.
14       MR. NESLUND:  I think that's all I've got.
15   BY MR. NESLUND:
16       Q.   And just to kind of -- that same page
17   with the GSR where the stuff is Bates stamped
18   SAO 187 --
19       A.   Yes.
20       Q.   -- for Mr. Delgado -- you might have
21   covered it already -- it says, "Now dead."  Can
22   you make out what that writing is to the right
23   of that?
24       A.   Yeah, I can't.  I don't know if that --

1    I can't tell one way or the other if it is my
2    writing or not.  Under, "Now dead," it says,
3    "GSW one."  I think that is my writing.  But the
4    stuff to the right of that, I don't know if that
5    is.  I don't know if I wrote it.
6        Q.   I'm sure Rob covered this because I've
7    been in and out.
8        I think you already said you don't know
9    how long Mr. De La Cruz was at the station
10   before you arrived?
11       A.   Right.  Except that before I arrived I
12   had spoke to him at the apartment.
13       Q.   Let me try a better question.
14       You don't know how long he was at the
15   police station before you got involved in this
16   case?
17       A.   Correct.
18       Q.   Obviously, you don't know what
19   detectives said to him prior to your
20   involvement?
21       A.   Correct.
22       MR. NESLUND:  Anything else?
23       MR. ROBERTSON:  That's good.
24       MR. NESLUND:  Okay.  Larry, you're up.

241

```
 1              EXAMINATION
 2    BY MR. KOWALCZYK:
 3         Q.   Ms. Griffin, I will bounce around a
 4    little bit.  If you need me to repeat or
 5    rephrase a question, just let me know.  I'll try
 6    to be as efficient as I can.
 7              In the very beginning, you were asked
 8    by counsel about information that you would rely
 9    on in terms of your role as an ASA in the Felony
10    Review role?
11         A.   Yes.
12         Q.   In addition to what the detectives
13    would tell you, you also do rely on information
14    directly given to you by witnesses?
15         A.   Yes.
16         Q.   And, in fact, in this particular case
17    you took an oral statement of Maria Rabada and
18    Margarita Martinez?
19         A.   Yes.
20         Q.   And neither of those two individuals
21    said they saw the shooting?
22         A.   That's correct.
23         Q.   So neither of those -- was there a
24    handwritten statement taken of either of those?
```

242

```
 1         A.   That's correct.
 2         Q.   Now, Mr. Arturo De La Cruz, you, in
 3    fact, talked with him at the location of where
 4    he claims he saw the shooting?
 5         A.   That's correct.
 6         Q.   And that evening he, in fact,
 7    identified Ramiro Bahena as the shooter?
 8         A.   Correct.
 9         Q.   At any point during your involvement,
10    did Arturo De La Cruz ever waver on his
11    identification of Ramiro Bahena as the shooter?
12         A.   Not that I could tell.
13         Q.   And did he appear confident in his
14    identification of Mr. Bahena?
15         A.   From what I could see, yes.  It was in
16    Spanish, like I said.  From his physical
17    appearance, yes.
18         Q.   Along those lines, in terms of
19    everything that was being interpreted to you by
20    whichever detective was at a particular
21    location, was it ever relayed to you that
22    Mr. Arturo De La Cruz was having difficulties
23    understanding the way things were being
24    translated to him?
```

243

```
 1         A.   It did not appear that way.
 2         Q.   Have you had other witnesses who have
 3    had issues and they've raised it via the
 4    interpreter that, "I don't know exactly what
 5    you're saying," or "Could you repeat that or
 6    rephrase that"?
 7         A.   I've had other instances in my career
 8    where a witness would stop the interpreter and
 9    it would appear they would have a conversation
10    and then come back and clarify.
11         Q.   Okay.  And there were no issues in
12    terms of the translations by the various
13    detectives who assisted during that?
14         A.   I don't recall any, no.
15         Q.   And, in fact, on a couple of occasions
16    you indicated that you asked the question and
17    Mr. De La Cruz, in fact, answered in English?
18         A.   Yes.
19         Q.   All right.  In terms of
20    Mr. De La Cruz's identification of Ramiro Bahena
21    as the shooter, did he ever indicate to you that
22    he had been pressured, in any way, to say that?
23         A.   I don't recall that.
24         Q.   All right.  And is that the kind of
```

244

```
 1    thing that would stand out in your mind?
 2         A.   If someone had reported that to me,
 3    then I -- or I had concerns, I probably would
 4    have taken the statement and wouldn't have went
 5    forward with the case necessarily.
 6         Q.   And the fact that you did take a
 7    statement indicates that there were no such
 8    concerns raised by Mr. De La Cruz about being
 9    pressured or coerced and told he couldn't leave,
10    for example, and giving this identification?
11         A.   Correct.
12         Q.   In the entire time that you were
13    talking with Mr. De La Cruz either at the
14    location where the shooting occurred or back at
15    the station ultimately taking, you know, what we
16    call the handwritten statement, did
17    Mr. De La Cruz ever claim any vision problems or
18    issues in the entire time that you were dealing
19    with him?
20         A.   I don't recall that.
21         Q.   Again, is that the kind of information
22    that you would record somewhere if
23    Mr. De La Cruz had, in fact, made such a claim?
24         A.   If he had told me that he had problems
```

1  seeing or something, then it probably would have
2  been in the statement.  If he had problems, I
3  don't know that I would have necessarily
4  considered him to have seen it.
5      Q.  Right.
6          So the fact that he indicates he saw
7  Mr. Bahena and did not make presumably any
8  indications of difficulties with his vision, you
9  moved forward with taking his handwritten
10 statement?
11     A.  Yes, that's fair to say.
12     Q.  And had, in fact, such a concern been
13 raised, that would have been important
14 information obviously for you to consider and to
15 know about?
16     A.  Yes.
17     Q.  All right.  And do you recall either of
18 the detectives making any statement that
19 Mr. De La Cruz had some problems with vision or
20 had indicated any problems with vision?
21     A.  I don't recall that.
22     Q.  Now, it's preferable to have the
23 firsthand testimony of the eyewitness who saw
24 the event, true?

1      A.  Yes.
2      Q.  All right.  And on a video, for
3  example, a grainy typical building surveillance
4  video where you can't make out a face, the
5  testimony of the eyewitness is important?
6      A.  Yes.
7      Q.  All right.  And did you know, even as
8  of that point, if the detectives were even able
9  to download the video or move it to the location
10 of where the statement was being taken?
11     A.  I don't know one way or the other.
12     Q.  Is that typically a different
13 department that goes there to download
14 video-type evidence, to your knowledge?
15     A.  I've had it both ways where the
16 detective working the case has gotten the video
17 from the surveillance location from the owner or
18 whatever and I've also, I think, had them had to
19 send out a specialized person if they had
20 trouble getting the video.  They have a special
21 guy that has to go all over the city and try and
22 get the video downloaded.  Sometimes, I think,
23 the owners themselves make a disk for the police
24 and give it to them.  There's been different

1  ways.
2      Q.  Depending on the type of format it's
3  saved in?
4      A.  Yes.  And the video equipment,
5  recording equipment.
6      Q.  With respect to the video -- I know you
7  have it documented that it doesn't -- it's not
8  clear on the face of the defendant?
9      A.  Yes.
10     Q.  And do you recall, one way or the
11 other, of the video being told -- or it was
12 relayed to you that the video, in fact,
13 corroborated Mr. De La Cruz's statement in terms
14 of direction of travel of the shooter and the
15 number of shoots that were fired?
16     A.  I believe that -- from what I wrote, it
17 says that -- it showed the earlier incident of
18 the argument and shows defendant shooting in
19 direction of porch.  So I believe it showed -- I
20 mean, I would be assuming that it corroborated
21 it since it sounds like it shows the defendant
22 shooting in the direction of the porch and
23 that's what Arturo told me happened.  It doesn't
24 appear that I got very specific details about

1  direction of travel or anything like that.
2      Q.  Okay.  At the station when you were
3  preparing the handwritten statement that was
4  then approved by Mr. De La Cruz, did you ever
5  tell Mr. De La Cruz that he wasn't free to
6  leave?
7      A.  No.
8      Q.  Did you ever feel that you pressured or
9  coerced Mr. De La Cruz into saying something
10 that he didn't want to or mean to say?
11     A.  No.
12     Q.  During the statement, he made
13 it crystal clear that Ramiro Bahena was, in
14 fact, the shooter that he observed that evening?
15     A.  Yes.
16     Q.  Are you aware -- I think you indicated
17 just today that you learned that Mr. De La Cruz,
18 in fact, went before a Grand Jury.  Are you
19 aware that he, in fact, testified under oath
20 with the use of an official interpreter?
21     A.  I was made aware of that today.
22     Q.  Would it surprise you to learn that
23 Mr. De La Cruz, in fact, confirmed 100 percent
24 everything that he had stated to you that you

249

```
 1   recorded in the handwritten statement?
 2       A.   No, it would not surprise me.
 3       Q.   In the Grand Jury testimony, he had
 4   absolutely no problems with the official
 5   interpreter translating what he was saying and
 6   what was being said to him?
 7       A.   Correct.
 8       Q.   Would it also not surprise you that
 9   Mr. De La Cruz raised no concern whatsoever
10   about any vision issues or problems seeing that
11   evening?
12       A.   That does not surprise me.
13       Q.   And that he didn't raise any issues of
14   being forced, coerced, pressured, or told not to
15   leave while he was doing the handwritten
16   statement?
17       A.   That does not surprise me.
18       Q.   Was it your impression that the
19   detectives on this case that you dealt with were
20   seeking justice?
21       A.   Yes.
22       Q.   And that they weren't trying to
23   maliciously prosecute or violate the
24   constitutional rights of Mr. Bahena?
```

250

```
 1       A.   No.
 2       Q.   And the CI that we discussed, which
 3   means continued investigation, did you learn
 4   that, in fact, Mr. Bahena -- well, first off,
 5   that a polygraph test examiner was not available
 6   that day?
 7       A.   I just sort of maybe learned that just
 8   by you guys having me interpret the notes.  I
 9   didn't know if they ever got one.  But just from
10   reading it, it looks like the ISP machine does
11   not process or something.  So I really have no
12   knowledge one way or the other.
13       Q.   And that takes some time to conduct the
14   polygraph exam?
15       A.   Yes.
16       Q.   If he's getting close to the 48 hours,
17   they may have released him if no polygraph, or
18   whatever the term is, is available at that
19   point?
20       A.   Yes.
21       Q.   And would you be surprised to learn in
22   the polygraph that was given later to Mr. Bahena
23   that deceptive intent was, in fact, found?
24       A.   I wouldn't be surprised.
```

251

```
 1       Q.   The GSR, the gunshot residue, is
 2   there -- in your knowledge, is there a time
 3   period by which you have to obtain this evidence
 4   in order to process it?
 5       A.   If you don't obtain it immediately, it
 6   tends to -- it could be washed off or shaken
 7   off.  It's very crucial to get it off of the
 8   person immediately.
 9       Q.   In addition to the polygraph, the GSR,
10   the video we discussed, the witness Mr. Delgado,
11   who had also been shot, at that point he was
12   still alive?
13       A.   Yes.
14       Q.   So he's indicated here's another
15   witness and let's see if he saw anything and
16   what his testimony might be?
17       A.   Yes.
18       Q.   And that witness ended up passing away,
19   though?
20       A.   Yes.
21       Q.   At the time you were encountered and
22   presented with the evidence that you saw, you
23   didn't reject the charges?
24       A.   No, I didn't.
```

252

```
 1       Q.   I want to reference very briefly the
 2   report that was marked as Exhibit 3.  It's the
 3   Case Incident Report that you were shown.
 4       A.   Okay.
 5       Q.   And the narrative portion of that,
 6   which is the last page, I believe.
 7       A.   Yes.
 8       Q.   The phrase "UNK male HISP," unknown
 9   male Hispanic -- again, you didn't draft this
10   particular report?  It was Officer Duran who
11   drafted it?
12       A.   Yes.
13       Q.   Did you ever speak to Officer Duran as
14   to what he meant -- or what he typically refers
15   to when he uses "unknown male" with perhaps a
16   race attached to it in his report writing?
17       A.   No, I never spoke to him or her.
18       Q.   In other words, if he talked with a
19   witness who just didn't relay a name and
20   indicated other information, his use of the word
21   "unknown male Hispanic," you know -- again, you
22   don't know what significance he attaches to
23   that?
24       A.   No, I don't.
```

ASA Jacqueline Griffin
September 18, 2018

253

```
 1        Q.   Or how long he even spoke with the
 2   witness?
 3        A.   No.  He didn't indicate in the report.
 4        Q.   Officer Duran's not a detective?
 5        A.   No.  A reporting officer, it says.
 6        Q.   When you spoke with Maria Rabada, she
 7   would have been Mr. Bahena's girlfriend?
 8        A.   The defendant's girlfriend?
 9        Q.   The defendant's.
10        A.   Yes.
11        Q.   Do you recall during your oral
12   statement of her -- of Ms. Rabada indicating
13   that in the earlier altercation that Mr. Bahena
14   told them that he was going to come back and
15   kill them?
16        A.   I do remember her saying something
17   about him threatening them.
18        Q.   And you lead me to my next question.
19        I have another copy of SAO 186.
20   Frankly, it's a group exhibit.  I think it was
21   Group Exhibit 1.
22        To the extent the word that you
23   couldn't tell if it said "threatened" or not,
24   does a slightly darkened 186 help with that?
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

254

```
 1        A.   It does appear to look like the word
 2   "threatened."
 3        Q.   In other words, would that be
 4   consistent -- would that note on that page be
 5   consistent with your memory of the conversation
 6   with Ms. Rabada?
 7        A.   Yes.
 8        MR. KOWALCZYK:  Go ahead.  I think I might be
 9   done.
10        Thank you, Ms. Griffin.
11        FURTHER EXAMINATION
12   BY MR. ROBERTSON:
13        Q.   Mr. Kowalczyk asked you some questions
14   about the Grand Jury.  Okay?
15        A.   Yes.
16        Q.   And about Arturo De La Cruz raised any
17   certain concerns in there, correct?
18        A.   Yes.
19        Q.   The Grand Jury works with one -- as a
20   Grand Jury assistant, you kind of go through the
21   questions ahead of time with the witness kind of
22   giving him an idea of what's going to occur in
23   there, right?
24        A.   Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

255

```
 1        Q.   You never tell the witness what to say
 2   or anything like that, but you do kind of a
 3   preview with them, correct?
 4        A.   Yes.
 5        Q.   When you get in there, it's a
 6   question-and-answer format, correct?
 7        A.   Yes.
 8        Q.   It's not kind of like, "Hey, here's
 9   Arturo De La Cruz.  Tell these people whatever
10   you want," right?
11        A.   No.
12        Q.   The witness has to answer the question
13   that's being put to them, correct?
14        A.   They answer the question usually.
15   Sometimes they continue on with their answer,
16   and then the questioner will clarify
17   if something's -- you know, ask another
18   question.  It's a question, answer.  It's not,
19   like, just one summary by a person.
20        Q.   And there's generally one prosecutor in
21   there, correct?
22        A.   Yes.
23        Q.   And grand jurors, correct?
24        A.   Yes.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

ASA Jacqueline Griffin
September 18, 2018

256

```
 1        Q.   And it's the prosecutor's show in terms
 2   of asking the questions initially, correct?
 3        A.   The prosecutor asks the first
 4   questions, yes.
 5        Q.   And it goes through everything they've
 6   got, and then if the Grand Jury wants to ask a
 7   question they're allowed to do that?
 8        A.   Correct.
 9        Q.   Mr. Kowalczyk asked you a number of
10   questions about your interpretation of Arturo
11   De La Cruz and what he was saying to detectives
12   back and forth.  Do you remember those
13   questions?
14        A.   Could you be more specific?  A
15   particular question?
16        Q.   Just that they were having a
17   conversation, and at one point I think you said
18   something like, "As far as I could tell, it was
19   all in Spanish"?
20        A.   Yes.
21        Q.   And that's something that the entire --
22   whether it be at the house or at the police
23   station and/or during the handwritten statement,
24   all you were getting was two guys speaking the
```

Wadlington Reporting Service, Inc.
(312) 372-5561

257

1 language? You had no clue what they were

2 saying?

3 **A. Right. Except when they were English**

4 **answers, but yes.**

5 Q. We've talked about those were always

6 short and they were rare, I think you said?

7 **A. Yes.**

8 Q. In terms of -- you have no clue as to

9 what was -- whether -- what Arturo De La Cruz

10 was saying was being reported to you accurately;

11 fair to say?

12 **A. That's fair to say. In Spanish, yes.**

13 Q. Right. That's what I meant.

14 **A. Yes.**

15 Q. And Mr. Kowalczyk asked you whether

16 Arturo De La Cruz ever raised vision issues with

17 you, correct?

18 **A. Correct.**

19 Q. And that's also something the

20 detectives never raised with you, right?

21 **A. I don't recall that, right.**

22 Q. If Arturo De La Cruz had serious vision

23 problems, that's something that would have

24 caused you significant concern, correct?

258

1 **A. In a general sense as to his being an**

2 **eyewitness?**

3 Q. Yeah.

4 **A. Yes.**

5 Q. Especially as a solo eyewitness,

6 correct?

7 **A. If he had vision problems, that would**

8 **be concerning, yes.**

9 Q. Especially since the shooting had

10 occurred on a dark night, rainy, through a bunch

11 of trees, and across the street, right?

12 **A. Yes.**

13 Q. Mr. Kowalczyk asked you you didn't

14 reject charges, correct?

15 **A. I didn't.**

16 Q. That wouldn't have been your call

17 anyway, right?

18 **A. If I thought it was appropriate, I**

19 **would have had to notify a supervisor.**

20 Q. Either way, you had to notify a

21 supervisor of that, correct?

22 **A. Yes.**

23 Q. The instances where you said there's

24 been issues where an interpreter and a person

259

1 who's being interpreted for and they've kind of

2 worked it out, those have happened in court,

3 correct?

4 **A. In court. It occurred to me actually a**

5 **couple of weeks ago outside of court while**

6 **talking to a witness with the interpreter.**

7 Q. Okay.

8 **A. So not, like, actually under testimony,**

9 **but, like, in our office with an interpreter.**

10 Q. Was that with the victim witness

11 interpreter?

12 **A. With victim witness interpreter and**

13 **then later on with the -- maybe it wasn't with**

14 **that guy. It was only with our victim witness**

15 **interpreter, yeah.**

16 Q. And that's someone who works with the

17 State's Attorney's Office, correct?

18 **A. Yes.**

19 Q. Mr. Kowalczyk asked you some questions

20 about what you relied upon. Would it be fair to

21 say that every piece of information in this case

22 that indicated that Arturo ---that Ramiro Bahena

23 was the shooter came from Arturo De La Cruz via

24 a Chicago Police Department detective?

260

1 MR. KOWALCZYK: Object to form.

2 THE WITNESS: Yes. If you're saying, like,

3 the fact that I knew that -- or that Arturo was

4 saying that Ramiro was the shooter was through

5 translation, yes.

6 BY MR. ROBERTSON:

7 Q. And the rest of the information that

8 you got was all from the detectives, correct?

9 **A. Between me and Arturo?**

10 Q. All the other information you got.

11 **A. General information, yes.**

12 MR. ROBERTSON: I've got nothing else.

13 MR. KOWALCZYK: I have nothing else.

14 MR. ROBERTSON: Do you want to explain

15 signature?

16 MR. GARCIA: Reserved.

17 MR. ROBERTSON: Signature is reserved.

18 FURTHER DEPONENT SAITH NOT.

19

20

21

22

23

24

```
 1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3   RAMIRO BAHENA,              )
                                 )
 4            Plaintiff,         )
                                 )
 5        vs.                    ) No. 17 CV 8532
                                 )
 6   CITY OF CHICAGO, et al.,    )
                                 )
 7            Defendants.        )
 8
 9        I hereby certify that I have read the
10   foregoing transcript of my deposition given at
11   the time and place aforesaid, consisting of
12   pages 1 to 260 inclusive, and I do again
13   subscribe and make oath that the same is a true,
14   correct, and complete transcript of my
15   deposition so given as aforesaid and includes
16   changes, if any, so made by me.
17
18   _____
19                  JACQUELINE GRIFFIN
20
21   SUBSCRIBED AND SWORN TO
22   before me this _____ day
     of _____, A.D. 2019.
23
24   _____
          Notary Public
```

```
 1             ERRATA SHEET
 2   Examination of:  JACQUELINE GRIFFIN
 3   Date taken:  September 18, 2018
 4   Page Line
 5   ____ ____   Change: _____
 6             Reason: _____
 7   ____ ____   Change: _____
 8             Reason: _____
 9   ____ ____   Change: _____
10             Reason: _____
11   ____ ____   Change: _____
12             Reason: _____
13   ____ ____   Change: _____
14             Reason: _____
15   ____ ____   Change: _____
16             Reason: _____
17   ____ ____   Change: _____
18             Reason: _____
19   ____ ____   Change: _____
20             Reason: _____
21   ____ ____   Change: _____
22             Reason: _____
23   Deponent's
24   Signature_____ Date _____
```

```
 1             ERRATA SHEET
 2   Examination of:  Jacqueline Griffin
 3   Date taken:  September 18, 2018
 4   Page Line
 5   ____ ____   Change: _____
 6             Reason: _____
 7   ____ ____   Change: _____
 8             Reason: _____
 9   ____ ____   Change: _____
10             Reason: _____
11   ____ ____   Change: _____
12             Reason: _____
13   ____ ____   Change: _____
14             Reason: _____
15   ____ ____   Change: _____
16             Reason: _____
17   ____ ____   Change: _____
18             Reason: _____
19   ____ ____   Change: _____
20             Reason: _____
21   ____ ____   Change: _____
22             Reason: _____
23   Deponent's
24   Signature_____ Date _____
```

```
 1   STATE OF ILLINOIS )
 2                     )  SS:
 3   COUNTY OF K A N E )
 4        I, MARGARET R. BEDDARD, a Notary Public
 5   within and for the County of Kane, State of
 6   Illinois, and a Certified Shorthand Reporter of
 7   said state, do hereby certify:
 8        That previous to the commencement of the
 9   examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12        That the foregoing deposition was
13   reported stenographically by me, was thereafter
14   reduced to a printed transcript by me, and
15   constitutes a true record of the testimony given
16   and the proceedings had;
17        That the said deposition was taken before
18   me at the time and place specified;
19        That the reading and signing by the
20   witness of the deposition transcript was agreed
21   upon as stated herein;
22        That I am not a relative or employee or
23   attorney or counsel, nor a relative or employee
24   of such attorney or counsel for any of the
```

265

1  parties hereto, nor interested directly or

2  indirectly in the outcome of this action.

3     IN WITNESS WHEREOF, I do hereunto set my

4  hand and affix my seal of office at Chicago,

5  Illinois, this 7th day of June, 2019.

6

7

8

9  *Margaret R. Beddard*

10     Margaret R. Beddard

11     Certified Shorthand Reporter

12     CSR Certificate No. 84-3565

13

14

15

16

17

18

19

20

21

22

23

24