**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAMIRO BAHENA,** | ) | **NO. 17 cv 8532** |
| | ) | |
| **Plaintiff,** | ) | **The Honorable** |
| | ) | **Joan Humphrey Lefkow** |
| **vs.** | ) | **Judge Presiding** |
| | ) | |
| **CITY OF CHICAGO, et al.** | ) | **Magistrate Judge** |
| | ) | **Jeffrey T. Gilbert** |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, RAMIRO BAHENA, by and through his attorneys, LAW OFFICES OF JEFFREY J. NESLUND and ROBERTSON DURIC to file his Memorandum of Law in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.

**INTRODUCTION**

Plaintiff Ramiro Bahena was charged with a double murder in 2012 based on the alleged identification of a single witness, Arturo DeLaCruz. All charges were dismissed in 2014 when it came to light that DeLaCruz never saw the actual shooting and, further, had neither the eyesight nor vantage point to make any identification. Plaintiff has alleged Defendant Detectives fabricated the alleged identifications that provided the probable cause for Plaintiff's pre-trial detention. Plaintiff further asserts Defendants pressured and forced DeLaCruz to give a statement they knew was false and repeat the same false story to a Grand Jury.

Defendants' motion for summary judgment ignores the factual chasm at the center of this case: did the Defendants fabricate evidence and pressure and threaten Arturo DeLaCruz into making statements they knew were false to establish probable cause for Plaintiff's detention.

1

Although Defendants cavalierly portray the identification as immediate, certain, and unwavering, Defendants completely ignore all contradictory evidence, including Arturo DeLaCruz's affidavit (Pltf. Ex. A) and deposition testimony that paints a picture of a young man who never even saw the shooting being pressured and threatened in a room for hours until the Defendant Detectives ran a sham photo array and line-up to fabricate the identifications they desperately wanted.

Defendants' motion also ignores the contents of the detailed Dismissal Memorandum by prosecutor ASA Galassini, which provides a roadmap of the obvious factual issues that preclude summary judgment. (Pltf. Ex. B). The memo outlines nine (9) specific problems with the alleged identification by DeLaCruz, including the fact DeLaCruz claims he was pressured by police (SOAF No. 66) and only has 20/100 vision, meaning he could not make a facial recognition past 20 feet (SOAF No. 5, 64), let alone across the street from a 2nd floor window blocked by a canopy of trees on a dark, rainy night as the suspect fled. (SOAF No. 65). In taking the rare action of dismissing a double murder, prosecutors also relied on a security video of the shooting recovered by the Defendants which was never shown to DeLaCruz (SOAF No. 40-42, 67) and concealed from the Felony Review ASA. (SOAF No. 38-39). Plaintiff asserts this video conclusively established Plaintiff was not the shooter. (SOAF No. 41). Unsurprisingly, Defendants steadfastly maintain that same video was of poor quality, inconclusive as to the shooter's identity, and circumstantially supportive of their probable cause to detain Plaintiff.

Only a trier of fact can resolve the factual chasm between these two irreconcilable versions of events, making summary judgment inappropriate. Either the Defendants fabricated the results of the identification procedures and forced and pressured Arturo DeLaCruz into making statements they knew were false or they did not. After serving 657 days in pre-trial detention in the Cook County Department of Corrections while facing natural life in prison, Ramiro Bahena deserves his

day in court to expose the misconduct of the Defendants.

## STANDARD

Summary judgment is appropriate only if Defendants show that there is no genuine issue as to any material fact. *Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 573 (7th Cir. 2003). At this stage, a court does not weigh the evidence, judge credibility, determine the truth of the matter, decide swearing contests or decide which inferences should be drawn. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S. Ct. 2505 (1986). "Where the parties present two vastly different stories ... it is almost certain that there are genuine issues of material fact in dispute." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Any doubt as to the existence of a genuine issue should be resolved against Defendants as they are the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–159, 90 S. Ct. 1598 (1970).

## ARGUMENT

### I. Whether Defendants Fabricated The Identification of Plaintiff To Establish Probable Cause Is A Question of Fact That Precludes Summary Judgment

Defendants painstakingly craft a specious narrative devoid of all discrepancies and invite this Court to grant summary judgment in a factual vacuum. Defendants repeatedly state that DeLaCruz's "credible and repeated identification" supplies "probable cause" as if that magically mandates summary judgment. (Def. Memo. p. 3). Defendants' motion, however, merits little consideration as it simply ignores all evidence that Defendants fabricated the identification by DeLaCruz, who the Defendants knew did not see the actual shooting and could not identify the suspect fleeing the scene. *Fox v. Hayes*, 600 F.3d 819, 832–37 (7th Cir. 2010) (lenient probable cause standard does not allow party to avoid disputed facts). The determination of whether the sole eyewitness' identification established probable cause cannot be ripped from its factual moorings to conceal the myriad of questions that surround the circumstances of that identification and the

role Defendants' conduct played in fabricating and maintaining it.

The Fourth Amendment prohibits detaining a person without probable cause, which can occur when the legal process itself goes wrong and a judge's probable cause decision is predicated on false information. *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019). Fabricated evidence and witness identifications that are the product of coercion or manipulation cannot serve as the basis for probable cause. *Hart v. Mannina*, 798 F.3d 578, 587–88 (7th Cir. 2015); *Alexander v. United States,* 721 F.3d 418, 423 (7th Cir. 2013). When probable cause involves factual disputes and/or differences of opinion, the jury is the proper arbiter of this issue. *Chelios v. Heavener,* 520 F.3d 678, 689 (7th Cir. 2008); *Fox*, 600 F.3d at 832–37. The forgiving probable cause standard does not allow Defendants to rely on facts without regard to the full context of the circumstances known to them. *Guzell v. Hiller,* 223 F.3d 518, 520 (7th Cir. 2000) (police "can't close their eyes" to information that undercuts probable cause).

Defendants make their case here by simply closing their eyes to DeLaCruz's affidavit and deposition testimony that establish: a.) he repeatedly told detectives for hours that he did not see the shooting (SOAF No. 7); b.) he repeatedly told them he could not identify the suspect because of his vision problems and obstructed vantage point (SOAF No. 8); and c.) he was pressured and threatened for hours to say it was Bahena. (SOAF No. 9, 10, 17, 56). DeLaCruz also told Detectives in both the photo array and line up procedures that Plaintiff was the person he has known for years and ***not*** the shooter. (Pltf. SOAF No. 29, 33). Yet, Defendants continued to pressure and threaten DeLaCruz to repeat a narrative they knew was false; testimony that is corroborated by the affidavit of Bahena's criminal attorney Robert W. Johnson (SOAF No. 56) as well as the ASA Dismissal Memorandum. (SOAF No. 66).

Defendants' claim that DeLaCruz came forward and immediately identified Ramiro

Bahena by name on the scene is flawed from its inception. DeLaCruz told the first officer on the scene that he did not see the shooting, but rather ran into his living room after hearing shots to see an unknown male Hispanic fleeing southbound on Laramie. (SOAF No. 11). DeLaCruz's initial version was documented in the Official Incident Report by the preliminary investigator, Officer Rene Duran, and was available to every detective working on the case. (SOAF No. 12). This initial recounting magically transformed, without explanation, into the antiseptic version developed by Defendants in which DeLaCruz just happened to be looking out the 2nd floor living room window after midnight only to witness Plaintiff commit the fatal shooting. How DeLaCruz's initial version of an unknown suspect fleeing the scene morphed into a positive ID of Plaintiff firing the fatal shots adds yet another layer of factual questions that require the denial of Defendants' motion. Such red flags cannot simply be ignored or swept under the investigative rug by the Defendants in hopes of molding unblemished probable cause and obtaining felony charges. *Hebron v. Touhy*, 18 F.3d 421, 422–23 (7th Cir. 1994); *Anderson v. Landrum,* 2015 WL 1538243, at *7 (N.D. Ill. 2015) (citing *Guzell v. Hiller,* 223 F.3d 518, 520 (7th Cir. 2000)).

Defendants' scrubbed narrative also fails to account for the litany of factual issues that are inherent in their own testimony and that of their fellow officers. *Cooper v. City of Chicago*, No. 12 C 5104, 2014 WL 626793, at *1–2 (N.D. Ill. Feb. 18, 2014). There are factual discrepancies regarding basic information such as when, where, and by whom DeLaCruz was interviewed and under what circumstances he "identified" Ramiro Bahena. (SOAF 14-16). The three Defendants involved in that initial interview and photo array (Hillman, Velasquez and Morales) all tell a different tale as to what was going on during the crucial six plus hours at the station before and during the photo array. (SOAF No. 18-20). They cannot agree who was present during these interviews, where the questioning took place, who presented DeLaCruz with the photo advisory

form, who explained/read it to him, or what language was spoken. (SOAF No. 24-27). These Defendants cannot even agree on how DeLaCruz purportedly "identified" Bahena in the photo array. (SOAF No. 28). *Tucker v. Lally*, No. 17 C 2331, 2020 WL 60205, at \*4–6 (N.D. Ill. Jan. 6, 2020). There is simply no agreement between these three Defendants on these basic foundational facts. The tributaries of such discrepancies flow directly into the river that is the main issue in this case – whether Defendants fabricated the identification of Bahena to establish probable cause for his detention. *Lewis,* 914 F.3d at 477; *Tucker,* at \*4–6; *see also Chelios,* 520 F.3d at 689; *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir. 2005); *Morfin v. City of East Chicago,* 349 F.3d 989, 1004 (7th Cir. 2003).

In a similar vein, the critical photo array identification raises several additional factual questions, beginning with why one was even necessary if DeLaCruz knew Ramiro Bahena for years and immediately identified him by name as the shooter on scene. (SOAF No. 22). And if it was necessary, why did it take over 6 hours of "interviews" with DeLaCruz to administer a photo array that would take all of 2 minutes to assemble without detectives putting out a flash message to fellow officers to be on the lookout for this armed and dangerous murderer, purportedly identified by name at the scene. (SOAF 21). The presence of these commonsense issues is only magnified by the concern that the detective handwritten general progress report notes (GPRs) of the DeLaCruz interviews were never produced during the criminal prosecution (SOAF No. 61), but were instead manufactured after this civil suit was filed. *Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014); *Tucker,* at \*4–6.

*Questions of fact regarding additional identification statements by DeLaCruz*

Again, presenting all the roses and ignoring the thorns, Defendants place controlling weight on both the statement created by ASA Kwilos at the station and the Grand Jury

testimony, as if these statements somehow fortify the house of cards built upon their earlier fabrications. (Def. Mem 11-12). Fabricated evidence cannot simply be buffed out with additional false identification statements, all built upon the same foundation of pressure, threats and coercion. *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988).

Here, there is evidence that Velasquez, Hillman, and Morales – and only those three - were involved in the interrogation of DeLaCruz prior to and during the photo array and that DeLaCruz was pressured and coerced, including threats that the Plaintiff would kill his mother, if DeLaCruz did not implicate Plaintiff in the shooting. (SOAF No. 9-10, 17, 56). As for the line-up, it was Defendant Kennedy – and only Defendant Kennedy – who was with Arturo DeLaCruz during the line-up procedure, singlehandedly presenting him with the English advisory form despite the Spanish version of the same form being used just hours earlier during the photo array. (SOAF No. 31). Like the photo array, DeLaCruz told Kennedy he recognized Bahena as the man he has known for years, but did ***not*** say Bahena was the shooter. (SOAF No. 33).  Kennedy was again present with ASA Kwilos during the scene visit with DeLaCruz – leaving the Spanish interpreter in the street to act as a demonstrative aid. (SOAF No. 37). Kennedy was also present as a party to the signed statement subsequently prepared by ASA Kwilos, who does not speak Spanish, and was even present during the "treatment by police" portion that was done in a formalistic, one question manner. (SOAF No. 44-46). This statement also contains multiple details, purportedly from DeLaCruz, that are demonstrably false as outlined in the ASA Dismissal Memorandum. (SOAF No. 47). Whether DeLaCruz was pressured, threatened and coerced into making this false statement by Kennedy (SOAF No. 43), who saw the obstructed view from the 2nd floor window when he left the Spanish interpreter outside, is a question for the jury.

Likewise, it was lead Detective Kennedy who pushed for murder charges a month after

Plaintiff's release without any additional admissible evidence. (SOAF No. 53). Kennedy picked up DeLaCruz, took him to the Grand Jury ASA, and waited until DeLaCruz was finished with his testimony. (SOAF No. 54). DeLaCruz indicated that he was coerced and pressured into repeating the same false story to the Grand Jury. (SOAF No. 55). In short, garbage in, garbage out. Summary judgment is not appropriate here because viewing this evidence and all reasonable inferences in Plaintiff's favor, a trier of fact could find the Defendants fabricated the initial identification at the scene and the sham identification procedures at the station, while pressuring and threatening DeLaCruz for hours in police custody into making additional statements they knew were false.

### Defendants' Case Law Distinguished

Defendants set forth as "helpful" *Hill v. City of Chicago,* 2016 U.S. LEXIS 161266 (N.D. IL Nov. 21, 2016), (Def. Memo. p. 8). Defendants' reliance, however, is misplaced as *Hill* is factually distinguishable and actually supports Plaintiff's position. In *Hill*, an eyewitness identified murder suspects in photo arrays and physical lineups. During a videotaped interview with the Felony Review ASA and detectives, the witness acknowledged his markings on the photo array as identifying the suspects involved in the shooting. *Id*. at 6. At the criminal trial, the witness "flipped" prosecutors and claimed he was just pointing out people that he knew rather than pointing out people who committed the crime. *Id*. at p. 9. The witness further testified that he lied to the ASA and detectives because he was concerned about a warrant and wanted to get out of the police station quickly. *Id.* at p. 10.

Following a not guilty verdict in the criminal case, the witness testified at his deposition in the subsequent civil lawsuit that he did not give accurate testimony because he was "nervous and afraid." *Id.* at 10. The witness further testified that ***nobody told him who to identify***. *Id.* (emphasis added). Further, the witness admitted it was him, and not the detectives, that first said the plaintiffs

were involved in the shooting. *Id* at 11. In granting summary judgment for the defendants, Judge Zagel found there was no witness coaching or coercion alleged by the witness. However, Judge Zagel noted, "if indeed the detectives provided answers to Rolle [the witness], then the detectives subsequent reliance on those initial identifications would be unreasonable." *Id.* at p. 21.

That is precisely the issue presented here. Unlike *Hill*, there is evidence that Defendants fabricated the identifications and threatened, pressured and coerced DeLaCruz into making statements the Defendants knew were false. Also, unlike the witness in *Hill*, who admitted he injected the plaintiff's name into the criminal case, DeLaCruz claims that he repeatedly told the Defendants he did ***not*** see the shooting and could ***not*** identify the shooter. (SOAF No. 7, 8). Further, the Defendant Detectives here chose not to video Mr. DeLaCruz's interviews and identifications despite the ability to do so. (SOAF No. 17). A reasonable trier of fact could infer that the Defendants did not want anyone to see the 6 hours of interrogation that took place before the photo array as well as the alleged photo identification itself. *See Hart*, 798 F.3d at 588 ("Turning on the tape recorder only after the witnesses said they recognized someone in the photo array presents an incomplete picture of the witnesses' interaction with the police."). Finally, in contradistinction to *Hill*, prosecutors made the affirmative decision to dismiss all the criminal charges against Plaintiff and outlined: 1.) the specific problems with the statements of identifications obtained by the Defendants from DeLaCruz, (SOAF No. 47, 62-66); and 2.) the video evidence which further established Plaintiff was not the shooter. (SOAF No. 42, 67).

## II. Defendants Concealed The Security Video That Shows Plaintiff Was Not the Shooter From The Felony Review ASA and Witnesses

Apparently trying to create a silk purse from a pig's ear, Defendants maintain that the security video actually corroborates the alleged identification by DeLaCruz and "strengthened

DeLaCruz's credibility because it established that he had definitely witnessed the shooting." (Def. Mem p. 9). This argument speeds by specious and into the absurd.

Defendants completely ignore that this is the very same video that established Plaintiff was *not* the shooter as outlined in the prosecutor's Dismissal Memorandum. (Pltf. Ex. B). A.S.A. Galassini outlined nine (9) specific ways the video points to the Plaintiff's innocence, including the fact the shooter was "younger, taller, stockier male, with possibly shorter hair" than Mr. Bahena. Any negligible corroborative bump that a general direction of flight could provide pales in comparison to how the movements of the shooter, as well as his height, weight, and physical dimensions clearly establish that the shooter and Bahena were two different people. (SOAF No. 42). This is a fact confirmed by 100% of ASA Galassini's colleagues who viewed the video. (SOAF No. 67).

Given this powerful video evidence, an obvious question of fact is why the Defendants never showed it to DeLaCruz or his mother, Maria Rabadan (SOAF No. 40), who both immediately could tell the shooter was *not* Bahena when they finally saw the video over a year later. (SOAF No. 57). A related question is why Detective Kennedy concealed the video from Felony Review ASA Kwilos. (SOAF No. 38-39). A jury may reasonably conclude the Defendants did not want any video evidence to contradict or interfere with their scheme to frame Plaintiff with false and fabricated identifications.

Defendants cite the self-serving irrelevant opinions of A.S.A. Galassini that she "had no concerns with how the detectives or officers conducted their investigation." (Def. Mem. p. 17). A.S.A. Galassini's uninformed opinions regarding Defendants' conduct here are completely irrelevant. *Myvett v. Heerdt*, 232 F. Supp. 3d 1005, 1026-27 (ASA opinion regarding merits of case is irrelevant and will not shield officer from liability in civil case). Regardless of any possible

attempt to cover for fellow law enforcement, ASA Galassini took the unique step of recommending the dismissal of a double murder case and documented her specific reasons for doing so. *See Simon v. Northwestern Univ.,* No. 15-CV-1433, 2017 WL 55076, at *3–5 (N.D. Ill. Jan. 3, 2017). In addition to the video proof that Plaintiff was not the shooter, ASA Galassini noted Arturo DeLaCruz's statement he was pressured by the police (SOAF No. 66) and his inability to make any identification due to his poor vision (SOAF No. 64) and obstructed view. (SOAF No. 60, 65). All of this was known to the Defendants. (SOAF No. 7, 8). Contrary to the Defendants' characterization that they "acted in good faith," a jury may just as likely conclude the Defendant Detectives fabricated the identifications by Arturo DeLaCruz, half-blind without corrective glasses, and pressured and threatened DeLaCruz into making statements they knew were false in order to quickly clear a double murder case.

*Defendants' Use Of Additional Information Cannot Establish Probable Cause*

Defendants spill much ink raising several ancillary factors that they contend add to the probable cause analysis. (Def. Mem 9-11). Defendants argue that an earlier verbal altercation and that deception was indicated on the polygraph exam establish probable cause when coupled with DeLaCruz's identification. Defendants' attempt to inflate the probable cause balloon with these peripheral issues does nothing to alter that the sole basis for Plaintiff's detention – and for the criminal prosecution – was the DeLaCruz identification which is hotly contested and chock-full with factual issues precluding summary judgment. *Fox*, 600 F.3d at 832–37; *Tucker,* at *4–6; *see also Miller*, 761 F.3d at 828.

Defendants, their fellow officers, and the Assistant State's Attorneys all recognized the load-bearing nature of DeLaCruz's identification for probable cause. (SOAF No. 3, 30, 49, 53). No matter how they are packaged, these "additional factors" are irrelevant and do not establish

probable cause independent of the DeLaCruz identification. *Fox*, 600 F.3d at 832–37 (rejecting three pages of bullet points in brief allegedly establishing probable cause; most facts were disputed or unreasonable when viewed in context). Even Defendants recognize this by stating that these factors establish probable cause when "*coupled with Arturo's statement and identification of Plaintiff.*" (Def. Memo. p.11).

Without the tainted DeLaCruz identification, these additional factors support nothing more than bare suspicion, and the Court has emphasized that probable cause requires more than that. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) (probable cause "mean[s] more than bare suspicion"); *Henry v. United States,* 361 U.S. 98, 104 (1959) ("Under our system suspicion is not enough for an officer to lay hands on a citizen."); *see also Ebert v. Gaetz*, 610 F.3d 404, 413 (7th Circ. 1020) ("The officers must have more than a bare suspicion that they have the right guy… ."). While probable cause is a lower hurdle, the bare evidence of prior threats by Plaintiff during an earlier verbal argument does not clear it without the alleged identification by DeLaCruz. *See, e.g.*, *Truesdale v. Klich,* No. 03C8209, 2006 WL 1460043 at *5 (N.D. Ill May 23, 2006). Nor can the fact that a 10-year-old thought Plaintiff may have had a gun reasonably contribute to probable cause, especially when officers who responded earlier that night found Plaintiff to be unarmed and were not informed of any threats. (SOAF No. 70). *Fox*, 600 at 832–37.

Defendants' superficial use of the secondhand hearsay regarding the alleged results of the polygraph fair no better. *Halsey v. Pfeiffer*, 750 F.3d 273, 299–303 (3d Cir. 2014). The polygraph played no role in the probable cause analysis. (SOAF No. 51). Further, any reference to polygraph should be stricken as it is all based on inadmissible hearsay. *Schliske v. Albany Police Dep't*, 617 F. Supp. 2d 1106, 1113 (D. Or. 2009). Nor is there a sufficient foundation to establish its scientific reliability to satisfy the dictates of Federal Rule of Evidence 702 so this Court could weigh this

information in the probable cause analysis. *Tittle v. Raines*, 231 F. Supp. 2d 537, 551–53 (N.D. Tex. 2002). Even if there were, there is no indication in the record as to what "deception indicated" means or whether that result is reliable. *United States v. Scheffer,* 523 U.S. 303, 309–10, 118 S. Ct. 1261 (1998) (polygraph accuracy is "little better than could be obtained by the toss of a coin." There is not even any indication as to what questions Plaintiff was asked or on which one deception was indicated. (SOAF No. 52). Finally, this polygraph came well after both of Plaintiff's arrest and its results are inadmissible in criminal cases, thereby further negating whatever negligible relevance may exist. *Fox*, 600 F.3d at 832–37.

### III.     Defendants Are Not Entitled to Qualified Immunity For Intentional Misconduct In Fabricating Witness Identification

Defendants next contend that they are entitled to qualified immunity because probable cause existed and there is no indication they violated a clearly established constitutional right. (Def. Memo. p. 12-13). This Court should summarily reject Defendants' recycled arguments, which are set forth without benefit of factual context. This is not a case where an officer acted reasonably and made a mistake, but one involving the intentional violation of constitutional rights by fabricating a witness identification to establish probable cause. *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007).

Initially, this Court cannot conclude the Defendant is entitled to qualified immunity because there are material facts in dispute.  *Apostol v. Landau*, 957 F.2d 339, 342-43 (7th Cir. 1992). "If the parties were disputing who did what and when, any questions of qualified immunity would have to wait until those fact issues were resolved."  *Meyer v. Robinson*, 992 F.2d 734, 737 (7th Cir. 1993). When facts are in "hot dispute," officers cannot seek refuge behind a claim of qualified immunity. *Dufour-Dowell v. Cogger*, 152 F.3d 678 (7th Cir. 1998). Viewing the evidence

in the light most favorable to Plaintiff, Defendants fabricated the photo and line up identifications and pressured and threatened DeLaCruz into making statements they knew were false. As such, they are not entitled to qualified immunity. *Lewis,* 914 F.3d at 477.

Defendants' conclusory claim of qualified immunity is also contrary to well established law. Qualified "immunity does not extend to misconduct '[w]here the probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth.' *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985). The hypothetical officer in the qualified immunity analysis is one who acts in *good faith. Harlow v. Fitzgerald,* 457 U.S. 800, 815-19 (1982). The qualified immunity defense does not, and should not, provide protection for those who knowingly violate the law or engage in misconduct such as the fabrication of evidence by pressuring and a witness into false identifications. *Lewis,* 914 F.3d at 477; *Tucker*, at *6–7; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006).

Defendants' *pro forma* claim that Plaintiff cannot establish that the conduct at issue violates an established constitutional right is specious. Any competent officer would not even entertain whether it was lawful for him to knowingly fabricate, or coerce and pressure a witness into a false identification. *Rainsberger v. Benner,* 913 F.3d 640 (7th Cir. 2019). Regardless, the type of conduct at issue here has long been established as constitutionally protected. *See, e.g., Dominguez v Hendley*, 545 F.3d 585, 589 (7th Cir. 2008); *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978). A material question of fact exists as to whether Defendants' conduct was an intentional violation of the Plaintiff's constitutional rights that precludes summary judgment. *See e.g., Lewis,* 914 F.3d at 477; *Good v. Curtis*, 601 F.3d 393, 398–99 (5th Cir. 2010) ("we conclude that a police officer's knowing efforts to secure a false identification by fabricating evidence or otherwise unlawfully influencing witnesses is not entitled to qualified immunity.").

### IV. Questions of Fact Preclude Summary Judgment on Plaintiff's Malicious Prosecution Claim

Defendants' attack on Plaintiff's malicious prosecution claim likewise ignores the same questions of fact concerning whether Defendants fabricated the identifications that were the "pillar of the prosecution." (Pltf. SOAF No. 3). The alleged identifications of Plaintiff by DeLaCruz provided the probable cause for Plaintiff's arrest and subsequent detention. (Pltf. SOAF No. 3, 30, 49). ASA Galassini's Dismissal Memorandum specifically states, "Our approval of charges was based on the eyewitness testimony of Arturo DeLaCruz." (Pltf. Ex. B).  As such, all Defendants who played a significant role in fabricating this evidence are liable for Plaintiff's malicious prosecution. *Allen v. Berger,* 336 Ill. App. 3d 675, 784 N.E.2d 367 (1st Dist. 2002).

### *All Defendants Played A Significant Role In The Prosecution*

Defendants Hillman, Velasquez, and Morales first employ a divide and conquer strategy, each minimizing their role and claiming they cannot be held responsible for commencing or continuing the criminal prosecution against Plaintiff. Despite Defendant Morales' claim that he was "just the interpreter," Velazquez's denial of being involved in any interviews, and the collective claim of merely administering a single photo array, contrary facts tell a different story. During the critical time of DeLaCruz's pre-photo array interrogation, various testimony places these three Defendants – and only these three Defendants - in a room with DeLaCruz.  It was during these six hours that DeLaCruz was pressured and threatened to move from not seeing the shooting and an unknown suspect fleeing the scene into implicating Ramiro Bahena. Regardless, all three were present by their own admissions during the alleged positive photo identification which DeLaCruz specifically denies making. (Pltf. SOAF No. 29). *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 794–95 (N.D. Ill. 2013) (triable issue regarding whether officer commenced

criminal prosecution based on conduct in improper photo array, getting witness to change story, and fabricating statements); *see also Keri v. Folino,* 2019 WL 4201567, at *14 (N.D. Ill. Sept. 5, 2019); *Tucker*, at *4–6.

All three Defendants also play down the importance of the array in the criminal prosecution of Ramiro Bahena. The fabricated identification obtained from DeLaCruz by Defendants Hillman, Morales, and Velasquez, and locked in with the photo array, served as the probable cause of Plaintiff's arrests and the foundation of the entire criminal case against Plaintiff. *Mosley v. Pendarvis*, No. 13 C 5333, 2015 WL 2375253, at *4 (N.D. Ill. May 15, 2015) (Defendant officer who helped fabricate statements given to prosecutor could be considered to have commenced or continued prosecution despite no post-arrest involvement). Without these fabricated and coerced identifications, Plaintiff would never have been charged. *See Jones*, 856 F.2d at 993; *see also* Pltf. Ex. B, ASA Dismissal Memorandum ("Our approval of charges was based on the eyewitness testimony of Arturo DeLaCruz").

Defendant Kennedy's role as the subsequent lead detective, with his own fabrication involving the line-up, played a major role in pursuing and obtaining charges. However, this does not let the other Defendants off the hook for malicious prosecution. The fact that the fabrication train changed conductors is irrelevant. But for their significant role in fabricating that critical initial false identification from DeLaCruz and locking it in with the sham photo array, Plaintiff would not have been arrested let alone prosecuted. *Rodgers v. People Gas Light and Coke,* 315 Ill. App. 3d 340, 733 N.E.2d 835 (1st Dist. 2000); *Allen*, 336 Ill. App. 3d at 678–79.

**_The Prosecutor's Dismissal Memorandum Establishes Termination in Plaintiff's Favor_**

Defendants next make the untenable argument that the dismissal of all charges did not constitute a termination in Plaintiff's favor. (Def. Memo. p.16). For malicious prosecution cases,

"a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding with a *nolle prosequi,* unless the abandonment is for reasons not indicative of the innocence of the accused." *Swick v. Liautaud,* 169 Ill. 2d 504, 662 N.E.2d 1238, 1242–43 (1996). Miscasting this case as one that was logistically impossible to take to trial, Defendants again refuse to accept that this double murder case was *nolled* after the SAO interviewed DeLaCruz, who not only said he did not see the shooting and could not identify the person fleeing the scene (SOAF No. 59, 63), but also that he had been pressured into identifying the Plaintiff. (SOAF No. 56, 60, 66). This dismissal occurred after the SAO confirmed that DeLaCruz's 20/100 vision and obstructed view at night in the rain made any alleged identification impossible. (SOAF No. 64, 65). Contrary to Defendants' argument that the "poor quality" of the video played a role in the dismissal, the SAO determined that the security video established that it was someone other than Ramiro Bahena that committed this double murder. (SOAF No. 41, 42, 67). This dismissal cannot be credibly cast as anything other than one in Plaintiff's favor.

Defendants stubbornly refuse to accept that abandonment of a prosecution by means of a *nolle prosequi* is a favorable termination unless there is some indication to the contrary, such as an agreement or compromise with the accused,  misconduct on the part of the accused, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticality of bringing the accused to trial. *Swick*. 169 Ill. 2d at 513. None of these factors are at play and there is no evidence that Plaintiff did anything untoward to procure the dismissal. The suggestion that Plaintiff may have had his son do the shooting and then flee to Mexico (Def. SOF No. 98) is nothing more than desperate, unsupported speculation. *See United States v. Cellitti,* 387 F.3d 618, 624 (7th Cir. 2004). ASA Galassini admitted she heard this

neighborhood rumor from a victim's family member, had no idea if it was true, and that it played **no role** in the decision to dismiss the charges.[1] (Pltf. SOAF No. 69).

Defendants attempt to recast this dismissal into one of inability to go to trial because DeLaCruz "flipped" is without merit. ASA Galassini admitted "flippers" are common in criminal cases and the government routinely proceeds with the prosecution. (SOAF No. 68). Here, there was no impossibility or even difficulty in bringing Plaintiff to trial – the State had in its possession a signed statement of identification, a photo array identification, a line-up identification, and Grand Jury testimony, all admissible as substantive evidence and all courtesy of Defendants. Culled statements from ASA Galassini that she did not know if Plaintiff was the shooter or had some involvement in the shooting do not undercut the plain wording of the dismissal memo or her actions in outright dismissing a double murder prosecution and setting Plaintiff free. *Simon,* No. 15-CV-1433, 2017 WL 55076, at *3–5 (genuine issue of fact on favorable termination even though prosecutor made some statements consistent with plaintiff's guilt); *Morrow v. May,* 2010 WL 4008173, at *4-5 (N.D. Ill. Oct. 13, 2010).

Here, there is a substantial amount of evidence, most of which is outlined in ASA Galassini's own Dismissal Memo, that proves Bahena was **not** the shooter and DeLaCruz's purported identifications were impossible. (SOAF No. 62-67). *Garcia v. City of Chicago*, No. 09 C 5598, 2012 WL 601844, at *10 (N.D. Ill. Feb. 23, 2012). Considering the evidence that Defendants fabricated the sole identification that provided the probable cause for Plaintiff's arrests and served as the centerpiece of the criminal prosecution, the dismissal was undoubtedly a favorable determination for Plaintiff.

---

[1] In addition, any information that Bahena's only son was involved in the shooting and fled that night to Mexico is directly contradicted by Defendants' own investigation which included interviews with David Bahena and access to Plaintiff's phone. (SOAF No. 50).

### *There Are Questions Of Fact On The Issue Of Probable Cause*

Defendants next challenge the probable cause element of Plaintiff's malicious prosecution claim. Once again, Defendants scour the record and throw the kitchen sink into the probable cause determination even though it is evident that the DeLaCruz identification was the pillar of the prosecution and the sole basis for probable cause. (SOAF No. 3, 30, 49). As outlined above, there are questions of fact regarding whether Defendants improperly fabricated evidence and pressured and threatened DeLaCruz into making statements the Defendants knew were false. *Grayson v. City of Aurora,* 157 F. Supp. 3d 725, 745–47 (N.D. Ill. 2016). Where there are such disputed facts concerning a witness, the Court will "adopt[s] the plaintiff's version of the disputed facts for which there is some support in the record." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001). The probable cause determination must be submitted to a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. *Chelios*, 520 F.3d at 686. Viewing the evidence in the light most favorable to the Plaintiff, a question of fact exists that precludes summary judgment. *Harris v. United States*, No. 13-CV-8584, 2017 WL 770969, at *5–6 (N.D. Ill. Feb. 28, 2017) (issue of fact on probable cause precluding summary judgment involving officer's actions regarding photo identification).

### *Fabricating Evidence Establishes Defendants' Malice*

Defendants next contend that summary judgment should be granted on Plaintiff's malicious prosecution claim because there is no evidence of malice. Malice does not mean ill-will, spite or hatred toward the person prosecuted. *Turner v. Chicago*, 91 Ill. App. 3d 931, 415 N.E.2d 481 (1st Dist. 1980). Malice may be shown where the defendant proceeded with a prosecution for some improper motive. *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 887 N.E.2d 656, 663 (1st Dist.

2008). The absence of probable cause establishes an inference of malice by Defendants. *Williams v. City of Chicago,* 733 F.3d 749, 760 (7th Cir. 2013); *Aguirre*, 382 Ill. App. 3d at 97.

Here, there is ample evidence of malice. Obviously, fabricating evidence to establish probable cause in order to facilitate felony charges supports the presence of malice. *Aguirre*, 382 Ill. App. 3d at 99 (finding circumstances indicating Defendants coordinated false statements provided circumstantial evidence of malice); *see also Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009). Taking the drastic, unlawful, and unconstitutional action of pressuring and coercing a witness to do so only further supports the presence of the Defendant's malicious intent. *Chagolla v. City of Chicago*, No. 07 C 4557, slip op. N.D. Ill. February 8, 2012) (rejecting summary judgment; jury could conclude Defendants acted with malice by falsifying charges against Plaintiff). There is additional circumstantial evidence supporting the presence of malice, including: 1.) the missing GPRs of the DeLaCruz interviews; 2.) the lack of any explanation as to how DeLaCruz's initial statement that he did not see the shooting inexplicably transformed into an immediate identification at the scene; 3.) withholding the security video from the Felony Review ASA; 4.) refusing to show the security video to DeLaCruz or his mother, Maria Rabadan, who instantly recognized Bahena was not the shooter; and 5.) the discrepancies in the DeLaCruz's signed statement that show he could not have seen Bahena earlier on the night of the shooting. *Grayson*, 157 F. Supp. 3d at 745–47. Defendants conclusory and self-serving statements that they were acting in "good faith" and just wanted to bring "Plaintiff to justice" lack meaningful value and do not support summary judgment as a matter of law. *Sidney v. Alejo*, No. 16 C 2041, 2018 WL 3659352, at *6–7 (N.D. Ill. Aug. 2, 2018). In fact, any notion of "justice" is completely incompatible with the intentional misconduct alleged here. Justice can only be served by the denial of Defendants' motion.

## **CONCLUSION**

WHEREFORE, for the reasons outlined above, Plaintiff Ramiro Bahena respectfully

request that the Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

Jeffrey J. Neslund
Jeffrey J. Neslund
One of the Attorneys for Plaintiff

JEFFREY J. NESLUND                            ROBERT ROBERTSON
Law Offices of Jeffrey J. Neslund            ROBERTSON DURIC
20 North Wacker Drive, Suite 3710            One North LaSalle Street, Suite 300
Chicago, IL 60606                            Chicago, IL 60602
(312) 223-1100                               (312) 223-8600