IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **RAMIRO BAHENA,** | ) | NO. 17 cv 8532 |
| | ) | |
| Plaintiff, | ) | The Honorable |
| | ) | Joan Humphrey Lefkow |
| vs. | ) | Judge Presiding |
| | ) | |
| **CITY OF CHICAGO, et al.** | ) | Magistrate Judge |
| | ) | Jeffrey T. Gilbert |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PURSUANT TO LOCAL RULE 56.1(B)(3)(c) THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT**

NOW COMES Plaintiff, RAMIRO BAHENA, by and through his attorneys THE LAW OFFICES OF JEFFREY NESLUND and ROBERTSON DURIC pursuant to Local Rule 56.1(B)(3)(c) to set out this Statement of Additional Facts that require the denial of summary judgment; Plaintiff states as follows:

**A. Background**

1. Plaintiff Ramiro Bahena was charged with a double homicide and attempt murder in Cook County criminal case number 12 CR-14983 for the shooting deaths of Jaime Ocampo and Santiago Delgado, which occurred at 2338 N. Laramie on June 12, 2012. (Def. Ex. M, deposition of ASA Kwilos, pp. 83:1-3; 119:10-15; Pltf. Ex. D, Affidavit of Robert W. Johnson, ¶ 2).

2. There was no physical or forensic evidence linking Bahena to the crime and only one eyewitness, Arturo DeLaCruz, who purportedly identified Bahena as the shooter. (Pltf. Ex. D, ¶ 3; Def. Ex. M, p. 119:10-15; Def. Ex. C, Deposition of Detective Moreth, pp. 118:23-24; 119:1:24; 120:1-2; 141:9-19; Pltf. Ex. C, Deposition of Detective Ross Takaki, pp. 50:13-24; 51:1-

1

24; 52:1-21; Pltf. Ex. C Part II, p. 88:13-16; Def. Ex. A, Deposition of Detective Kennedy, p. 196:3-19.

3. Arturo DeLaCruz's identification of Ramiro Bahena, a man he had known for years, was the "pillar of the prosecution" and provided the probable cause for Plaintiff's arrest. (Def. Ex. M, p. 119:10-15; Def. Ex. C, pp. 118:23-24; 119:1:24; 120:1-2; 141:9-19; Pltf. Ex. C Part II, p. 88:13-16; Def. Ex. A. pp. 194:22-24; 195:1-2; 197:1-10; 347:11-19).

**A. Arturo DeLaCruz Did Not See the Shooting and Could Not Identify the Shooter**

4. Arturo DeLaCruz did not see the actual shooting; he heard gunshots, then ran to look out his 2nd floor living room window and saw an unknown male Hispanic across the street running southbound on Laramie. (Pltf. Ex. A, Affidavit of Arturo DeLaCruz, ¶ 4; Pltf. Ex. E, Original Incident Case Report; Pltf. Ex. D, ¶ 4; Def. Ex. I, deposition of Arturo DeLaCruz, pp. 99:2-19; 121:6-16; 128:4-7; 170:15-19).

5. Arturo DeLaCruz has 20/100 vision, which means he cannot make a facial identification past 20 feet. (Pltf. Ex. B, A.S.A. Dismissal Memorandum, p. 1 at #3; Pltf. Ex. D, ¶ 15; Def. Ex. I, pp. 121:6-16; 123:10-12).

6. The shooting happened after midnight on a rainy night and Arturo DeLaCruz could not identify the shooter across the street from a 2nd floor window that had a view obstructed by a canopy of trees. (Pltf. Ex. A, ¶ 4; Pltf. Ex. B, p. 1 at #2; Def. Ex. I, pp. 99:6-19; 121:6-16;

123:10-12; 128:4-7; 163:1-8; Pltf. Ex. D, ¶17; Def. Ex. B, Deposition of Officer Rene Duran, p. 157:5-12).

### C. Detectives Threaten and Pressure Arturo DeLaCruz into Identifying Ramiro Bahena As the Shooter

7. Arturo DeLaCruz repeatedly told investigating police officers and detectives that he did not see the actual shooting and did not know the identity of the shooter. (Pltf. Ex. A, ¶ 6; Def. Ex. I, pp. 99; 170:5-19; Pltf. Ex. D, ¶ 9; Pltf. Ex. E, p. 4).

8. Arturo DeLaCruz repeatedly told the detectives at the station that he had vision problems and could not see the shooter. (Def's Ex. I, pp. 56:12-14; 99; 100:11-16; 121:6-16; 123:10-12; 128:4-7, 19-22; 185:13-20).

9. When DeLaCruz told the detectives he could not identify the shooter, they kept pressuring him to say it was Ramiro Bahena, or else Bahena would get released and kill his mother. (Pltf. Ex. D, ¶ 10; Pltf. Ex. A, ¶ 7; Def. Ex. I, pp. 170:3-9; 171:4-24).

10. Arturo DeLaCruz was forced and pressured by detectives to identify Ramiro Bahena as the shooter and was told he could not leave the station until he did so. (Pltf. Ex. A, ¶ 7; Def. Ex. I, pp. 170:3-9; 171:4-24; Pltf. Ex. D, ¶ 11). DeLaCruz told this to Bahena's criminal attorney, Robert W. Johnson, as well as the prosecutor, ASA Nancy Galassini. (Pltf. Ex. B, p. 2 at #8; Pltf. Ex. D, ¶ 11).

**D. Officer Duran Interviewed Arturo DeLaCruz Minutes After Shooting and Documents That DeLaCruz Did Not See the Shooting and Only Saw An Unknown Male Hispanic Running Away**

11. During a 15-minute interview with Officer Rene Duran before detectives arrived on the scene, DeLaCruz told Officer Duran that he was inside the 2nd floor apartment when he heard shots fired and then went into his living room and looked out the window where he saw an unknown male Hispanic in a blue sweatshirt across the street running southbound on Laramie. DeLaCruz never said he witnessed the actual shooting. (Def. Ex. B, pp. 37:4-15; 40:19-22). DeLaCruz also never told Duran that he saw Ramiro Bahena, a man he knew well, fire any shots. (Def. Ex. B, pp. 40:23-24; 41:1; Pltf. Ex. A, ¶ 8; Def. Ex. H, pp. 9:13-14; 10:3-5).

12. The General Offense Case Report prepared by Officer Duran and submitted for approval on June 17, 2012 at 3:46 a.m. did not identify Ramiro Bahena as the shooter; nor did it indicate that Arturo DeLaCruz saw any of the shooting. (Pltf. Ex. E; Def. Ex. B, p. 58:9-13; Def. Ex. E, Deposition of Detective David Healy, pp. 81:11-16; 82:14-18). In this report, Duran listed the suspect as "unknown" and not Ramiro Bahena. (Pltf. Ex. E, p. 1; Def. Ex. B, p. 122:9-17).

**E. Detectives Arrive On Scene**

13. Detective Ross Takaki and Detective Jensen were assigned to the case at 12:50 a.m. and arrived on the scene between 1:20 a.m. and 1:30 a.m. Detective Takaki was assigned to the case as the primary detective; Takaki coordinated the investigation and expected that all the information developed by other detectives would be brought to him in a timely fashion. (Pltf. Ex. C, pp. 38:12-24; 39:11-19, 52:1-7; 64:7-24; 65:1-5).

4

14. Detective Takaki, the primary detective assigned to the case, denies he told Detective Hillman there was a witness who saw everything and that he pointed out Arturo DeLaCruz to Detective Hillman. (Pltf. Ex. C, Takaki dep. Part II, p. 25:1-6).

15. According to Detective Takaki, Detective Hillman did not come up to him on scene and ask to go into the second floor of the residence with DeLaCruz. (Pltf. Ex. C, p. 120:3-6, 15-22).

16. Detective Healy, who left the scene at about 4:30 a.m. after checking in with Detectives Takaki and Jensen, did not receive any information that Ramiro Bahena had been identified as the shooter. (Def. Ex. E, pp. 58:24, 59:1-9; 60:1-12; 62:19-24; 63:1-19).

F. **Arturo DeLaCruz Taken to Area North**

17. Arturo DeLaCruz was taken to Area North at Belmont and Western between 1:15 a.m. and 1:45 a.m., separated from his mother and placed alone into a room where he was forced and pressured for 8 to 10 hours by three or four officers into identifying Ramiro Bahena as the shooter. (Def. Ex. F, pp. 55; Def. Ex. I, p. 105:10-18; 180:6-24; 181:1-5; Def. Ex. G, pp. 42:23-24, 43:20-24; 44:1-13; Pltf. Ex. A, ¶ 7; Pltf. Ex. D, ¶¶ 10, 11). The interview rooms at Area North are small (10 x 10 or 10 x 12), with stone walls, metal benches, metal doors, and most have no windows. (Pltf. Ex. C, pp. 103:8-24; 104:1, 11-18; 105:3-5). They are equipped with electronic audio and video recording equipment activated at the detective's discretion. (Pltf. Ex. C, pp. 103:8-24; 104:1, 11-18; 105:3-5; Def. Ex. M, pp. 178:-14-24; 179:1-11; Def. Ex. L, p. 37:1-9; Def. Ex. E, p. 139:8-11).

18. According to the primary investigator Detective Takaki, Detective Morales' role was not exclusively that of an interpreter. (Pltf. Ex. C, p. 163:1-11).

19. Detective Morales could not remember whether Detective Hillman and Detective Kennedy pressured DeLaCruz into making an identification or a statement. (Def. Ex. J, pp. 165:21:24; 166:1-4).

20. Detective Hillman testified that when they arrived back at the station, he and Detective Velasquez went into the aggravated battery office with Arturo DeLaCruz, a room with six desks that offered privacy, that is on the main floor in Area North to interview DeLaCruz. (Def. Ex. F, pp. 56:19-24; 57:1-8). According to Detective Velasquez, DeLaCruz was interviewed only by Detectives Morales and Hillman and this was done on the second floor of Area North lasting until 6:00 or 7:00 a.m. without Velasquez ever entering that interview room. (Def. Ex. G, pp. 47:9-18; 51:10-22).

*Photo Array Used With DeLaCruz Even Though He Has Known Bahena For Years*

21. Photo arrays, which can be assembled in a couple of minutes using the CLEAR system, are normally not used when the witness knows the suspect by name and has known the suspect for a period of years. (Def. Ex. J, pp. 55:20-24; 56:1-17; Def. Ex. E, pp. 95:20-24; 96:1-14; pp. 97:15-24; 98:1-2; 99:8-22; Pltf. Ex. C. pp. 37:6-8; 92:1-13; Def. Ex. M, p. 197:14-17).

22. Detective Takaki, the primary investigator, could not name a single case where a photo array was used when the witness knew suspect for a period of years and agreed that there would be no reason to delay the investigation 5 to 7 hours to do a photo array if DeLaCruz knew Bahena for a period of years. (Pltf. Ex. C Part II, pp. 24:7-14; 85:7-14).

23. By the time DeLaCruz was shown the photo array, he had been questioned by the police for over six (6) hours. (Def. Ex. I, pp. 180, 183).

24. According to Detective Hillman, the photo array was administered on the desk in the aggravated battery office on the first floor of Area North with himself, Morales, and Velasquez present. (Def. Ex. F, p. 76:3-4, 13-15). The aggravated battery office is on the first floor of Area North, not the second floor; there is no aggravated battery office on the second floor. (Def. Ex. J, pp. 138:15-24; 139:1).

25. Detective Morales testified he was never in the aggravated battery office on the first floor at Area North station with Arturo DeLaCruz and denied he was ever in a room with DeLaCruz and Hillman for a period of 5 hours or so, or from 1:45 a.m. until 6:00 or 7:00 a.m. (Def. Ex. J, pp. 138:15-22; 139:8-20).

26. According to Detective Hillman, Detective Morales was at the initiation of the photo array and Detective Morales conducted it because that portion was done in Spanish (Def. Ex. F, p. 76:16-23); but Detective Morales' name does not appear on the photo array advisory form, only

7

that of Detective Hillman and Detective Velasquez. (Pltf. Ex. F, Spanish Line-up/Photo Advisory Form; Def. Ex. J, pp. 78:20-24; 79:1).

27. Detective Morales testified in contrast to Detective Velasquez (See DSOF # 30-31) that he read the photo advisory form to DeLaCruz in Spanish and that his signed sworn answers to interrogatories were incorrect when they stated that Morales was only present during the photo array in case a translator was needed. (Def. Ex. J, pp. 76:4-6; 174:11-24; 175:11-18; Plaintiff's Exhibit G, Interrogatories Responses of Defendant Juan Carlos Morales).

28. All three Defendant Detectives described the purported photo array in a different manner: Det. Velasquez testified DeLaCruz said this is the person that I saw shoot from the east side of Laramie to the west wide of Laramie. (Def. Ex. G, pp. 54:15-24; 55:1-12); Det. Morales said that Arturo circled one of the photos and said that is the person that shot, but did **not** say the shooter's name (Def. Ex. J, pp. 86:13-19; 113:23-24; 114:1); and Det. Hillman testified DeLaCruz pointed to a photo and said, "this is Ramiro" and that "Ramiro shot people at his house on his porch that night." (Def. Ex. F, p. 77:5-24).

29. According to Arturo DeLaCruz, the detectives asked him to point out which photograph showed Ramiro Bahena, so DeLaCruz pointed out Bahena's photo because he has known him for years, but never said he did the shooting. (Pltf. Ex. A, ¶ 8; Def. Ex I, p. 182:7-16).

30. The arrest of Ramiro Bahena on June 17, 2012 was based on the photo array identification allegedly made by Arturo DeLaCruz. (Pltf. Ex. C Part II, pp. 87:11-16; Pltf. Ex. H,

8

Bahena June 17, 2012 Arrest Report, p. 8). Without the alleged photo array identification by DeLaCruz, there would have been no probable cause to arrest Ramiro Bahena for the shooting. (Def. Ex. C., pp. 118:23-24; 119:1:24; 120:1-2; 141:9-19; Part II Ex. C, pp. 87:11-16; p. 88:13-18).

*Line Up Used With DeLaCruz Even Though He Has Known Bahena For Years*

31. The lineup advisory form presented to Arturo DeLaCruz by Defendant Detective Kennedy at 10:50 a.m. on June 17, 2012 was in English, even though the Spanish version of the same form was used with the photo array hours earlier. (Pltf. Ex. I, Line-up Advisory Form English version). Kennedy was the only person with Arturo DeLaCruz when this form was presented and during the line-up identification process itself. (Def. Ex. A, p. 160:7-12, 23-24; 161:1-9).

32. When Ramiro Bahena was brought in for a lineup, Arturo DeLaCruz had been questioned by the police for over nine (9) hours. (Def. Ex. I, p. 180, 183).

33. According to Arturo DeLaCruz, a detective asked him to point to Ramiro Bahena in the line-up. DeLaCruz identified Bahena in the line-up as he has known him for years and repeatedly told Detectives he was not sure who did the shooting. (Def. Ex. I, p. 99; 170:5-19; 184, 185:1-15; Pltf. Ex. A, ¶ 6; Pltf. Ex. D, ¶ 9).

34. The use of a line-up in this instance was against normal police protocol considering that: 1.) DeLaCruz knew Bahena for a number of years and 2.) had a quasi-familial relationship with him. (Def. Ex. E, pp. 114:12-24; 115:1-7, 16-21). In fact, there would be no reason to do a

9

line-up if DeLaCruz knew Ramiro Bahena and identified him by name. (Def. Ex. M, pp. 170:22-24; 171:1-24; 172:1-9).

*Felony Review ASA Does Not Speak Spanish and Did Not Understand Anything Said Between Detectives and Arturo DeLaCruz*

35. ASA Kwilos speaks only English, so she needed a Spanish speaking detective to interpret all conversations with Arturo DeLaCruz and his mother, Maria Rabadan. (Def. Ex. M, pp. 59:17-24; 60:1-3, 7-9; 61:6-12; 71:8-24; 72:1; 74:18-24; 75:1).

36. ASA Kwilos did not have contact with Arturo DeLaCruz until 36 hours after the shooting and did not know who interviewed DeLaCruz or what was said during those interviews. (Def. Ex. M, pp. 83:7-24; 84:1-11; 85:10-18). Arturo did not graduate from elementary school and attended high school for only six months. (Def. Ex. I, pp. 9:6-14; 8:12-13; 7:7-17). He does not read a lot of English and can only write a little bit. (Def. Ex. I, pp. 9:24, 10:1-6).

37. During the visit to the scene, Detective Alvarez, the Spanish interpreter, was across the street in the general area where the shell casings were recovered, never entered the apartment and did not know what was said between Arturo DeLaCruz, ASA Kwilos and Detective Kennedy inside the apartment. (Def. Ex. M, p. 58:4-9; Def. Ex. L, pp. 59:5-15; 71:1-10).

*ASA and Witnesses Not Shown the Surveillance Video To Watch*

38. When ASA Kwilos was at the scene with DeLaCruz and Det. Kennedy, she was not informed there was a video that captured the shooting that had been recovered by Kennedy's partner from the next door neighbor. (Def. Ex. M, pp. 77:18-24; 78:1-9, 17-24; 79:1-4; 81:3-9; Def. Ex. C., pp. 86:4-21; 112:9-12; 113:5-9).

10

39. The surveillance video should have been available for viewing, but ASA Kwilos does not think she watched the video and that the police told her that it was not accessible, even though Detective Kennedy was the detective primarily dealing with her and he was responsible for holding that video until it was inventoried by him 11 days later. (Def. Ex. C., p. 103:6-10; Def. Ex. M, pp. 77:18-24; 78:1-9, 17-24; 79:1-4; 81:3-9; 88:18-24; 89:1-10; Pltf. Ex. J, Inventory of Surveillance Video; Def. Ex. A, p. 7:18-24).

40. The Detectives never showed the surveillance video to Arturo DeLaCruz or his mother, Maria Rabadan, who both immediately recognized that the shooter in the video was **not** Ramiro Bahena when they finally saw it in 2013. (Pltf. Ex. D, ¶¶ 12, 13, 18, and 19).

41. The surveillance video recovered by Kennedy's partner and inventoried by Det. Kennedy, shows that the shooter had different physical characteristics than Ramiro Bahena, including the fact that Mr. Bahena had a pony-tail, as well as an old injury that prevented him from fully extending one of his arms. The shooter was a younger, taller, stockier male and **not** Ramiro Bahena. (Pltf. Ex. B, p. 2 at #5; Def. Ex. Q, pp. 21-24; 28:5-13; 29:1-4; Pltf. Ex. D, ¶ 13; Pltf. Ex. J).

42. Nancy Galassini, the ASA assigned to prosecute Ramiro Bahena, outlined the reasons the video evidence did not support the criminal prosecution of Bahena in a detailed memo to her supervisors recommending dismissal of the case, including the fact that 100% of her colleagues who watched video agreed Ramiro Bahena was not the shooter. (Pltf. Ex. B, p. 2 at # 9).

43. Arturo DeLaCruz signed the handwritten statement created by A.S.A. Kwilos because he was pressured and threatened by the Detectives to say Ramiro Bahena did the shooting, including that Bahena would kill his mother. (Def. Ex. L, p. 191:10-22; Pltf. Ex. D, ¶¶ 7, 11). DeLaCruz was also told by detectives he could only go home after the statement was complete and he identified Bahena as the shooter. (Def. Ex. L, p. 191:10-22; Pltf. Ex. D, ¶¶ 7, 11).

44. Statements created by the Felony Review Unit follow the same general pattern and detectives know parts of the statement are boilerplate and that the Assistant State's Attorney works off a template, including the advisement section, the treatment section and the review section. (Def. Ex. M, pp. 130:3-16; 134:9-24; 135:6-12, 22-24, 136:1-4, 17-24; 137:1; Def. Ex. L, pp. 141:23-24; 142:1-6; Def. Ex. A, pp. 189:19-22; 190:1-23).

45. It is the detective's choice as to who sits in on the statement and both Detectives Kennedy and Alvarez were present for the entirety of the statement of Arturo DeLaCruz. (Def. Ex. L, p. 73:10-23; Def. Ex. M, pp. 128:22-24, 129:1-2).

46. The treatment paragraph that DeLaCruz was not threatened or promised anything was done in Detective Kennedy's presence, in a formalistic way, with a single question. (Def. Ex. L, p. 196:3-20; Def. Ex. M, pp. 145:2-24; 146:1-13).

47. ASA Galassini outlined the factual discrepancies in the statement created by ASA Kwilos in the detailed memo to her supervisors recommending dismissal of the case, including the

fact that the statements says DeLaCruz saw Bahena earlier in the evening at 7:30 p.m. and 9:30 p.m. on the night of the shooting, when phone records and other witnesses established Bahena was not at the residence at 7:30 p.m. and DeLaCruz was not present for the 9:30 p.m. incident. (Pltf. Ex. B, p. 2 at # 5).

### G. Ramiro Bahena Released Despite Alleged Identifications Only To Be Re-arrested a Month Later Without Any New Evidence.

48. Ramiro Bahena was released without charges on June 19, 2012, which was very unusual after an identification by a witness who knowns the suspect. (Def. Ex. D, pp. 65:16-23; 66:2-4; Pltf. Ex. D, ¶ 26; Def. Ex. K, p. 60:12-16).

49. Ramiro Bahena was re-arrested a month later on July 17, 2012, without any new additional evidence and with the same probable cause as the first arrest – the purported photo array identification made by Arturo DeLaCruz. (Pltf. Ex. K, July 17, 2012 Arrest Report, p. 9; Def. Ex. C, pp.105:2-9; 208:4-22; Def. Ex. A, pp. 185:9-24; 186:1-8; 235:21-24; 236:1-8).

50. Ramiro Bahena, who had no criminal convictions, was fully cooperative with the investigation, consistently denied shooting anyone, never invoked his right to counsel and even agreed to a polygraph examination. (Def. Ex. E, pp. 102:13-24; 103:1-24; 104:1-8; Def. Ex. K, pp. 21:20:24; 22:1-3; 29:11-16; 30:9:16; 35:12-13; 49:11-16; Def. Ex. C., p. 136:1-16). The substance of Bahena's statements were similar from his first statement following arrest through 5 subsequent interviews. (Def. Ex. L, pp. 120:8-12; 132:12-24; 133:1).

51. Polygraph evidence is not admissible as evidence and is not used when determining probable cause. (Def. Ex. C, pp. 134:1-7; 208:16-22; 213:23-24; 214:1-11; Def. Ex. L, pg. 133:14-16; Def. Ex. A., p. 13:4-13).

52. Detectives questioning Bahena post-polygraph did not know on which question Bahena was allegedly deceptive as this was never told to the detectives or contained in any report. (Def. Ex. L, pg. 118:1-15; Def. Ex. C., p. 132:5-24; 133:1; Def. Ex. A, p. 233:11-16).

53. Charges for double murder and attempt murder against Ramiro Bahena were sought by Detective Kennedy, who took over as the primary investigator from Detective Takaki. (Def. Ex. A, pp. 6:2-4; 8:5-8; 8:13-17; 22:5-8; 112:5-7; 228:21-22; 262:22-24; 263:9-19). Felony charges were approved over the phone following this second arrest, not due to any additional admissible evidence, but based on the original alleged identification obtained from Arturo DeLaCruz. (Pltf. Ex. B, p. 1; Pltf. Ex. C, pp. 43-45; Def. Ex. A, pp. 235:21-24; 236:1-8; 262:22-24; 263:9-19).

54. Detectives Kennedy and his partner Detective Moreth picked up DeLaCruz and his mother to take them to testify before the Grand Jury. (Def. Ex. C., pp. 152:2-4; 156:6-24; 157:1-7). They drove them to 26th and California, walked them up to Branch 66, and handed him off to an ASA. Defendant Kennedy and Detective Moreth then waited and gave him a ride home. (Def. Ex. C., p. 152:2-4; 156:6-24; 157:1-7).

55. DeLaCruz testified before the Grand Jury that it was Ramiro Bahena because he had been threatened, coerced and pressured by Detectives to identify Bahena as the shooter while held at the station and was driven to the Grand Jury by detectives. (Def. Ex. I, pp. 192:19-23; 193:5-9; Ex. D ¶¶ 9-11).

56. Attorney Robert W. Johnson interviewed Arturo DeLaCruz in December of 2013 at which time DeLaCruz told Johnson that he repeatedly told the police and detectives he could not identify the shooter. (Pltf. Ex. D, ¶ 9). DeLaCruz told Johnson that when he told the detectives he could not identify the shooter, they kept pressuring him to say it was Ramiro Bahena or else Bahena would get released and Mr. Bahena would kill his mother. (Pltf. Ex. D, ¶ 10). DeLaCruz further explained to Attorney Johnson that detectives pressured him for hours to say Ramiro Bahena was the shooter and that Arturo would not be allowed to leave the police station until he identified Mr. Bahena as the shooter. (Pltf. Ex. D, ¶ 11).

57. Attorney Robert W. Johnson showed the surveillance video to Arturo DeLaCruz and his mother, Maria Rabadan, who both recognized immediately that the shooter was obviously not Ramiro Bahena. (Pltf. Ex. D ¶¶ 13, 18, 19; Def. Ex. I, pp. 148, 149:1).

58. Attorney Robert L. Johnson could tell that DeLaCruz had problems with his vision by the way he kept squinting, so he took DeLaCruz for an eye exam which confirmed DeLaCruz's 20/100 vision. (Pltf. Ex. D, ¶¶ 14, 15).

59. DeLaCruz also told Attorney Johnson that he was interviewed by an Assistant State's Attorney around the second week of December of 2013 and told that person he could not see who fired the shots. (Pltf. Ex. D, ¶ 20).

60. Attorney Robert W. Johnson informed the prosecuting attorney, ASA Nancy Galassini, of his conversations with Arturo DeLaCruz and provided her with a copy of the eye exam as well as photographs of DeLaCruz's view from the 2nd floor window that showed the view was obstructed by a canopy of trees. (Pltf. Ex. D, ¶¶ 17, 21).

61. The detective hand-written notes, known as General Progress Reports or "GPRs," for the interviews with Arturo DeLaCruz were never produced in the criminal case. Attorney Robert W. Johnson subpoenaed the documents in the criminal case and was told by the prosecutors that the hand-written notes of the detective interviews of Arturo DeLaCruz – the sole eyewitness - did not exist. (Pltf. Ex. D, ¶ 6).

H.  **State's Attorneys Dismisses All Charges**

62. On March 21, 2014, ASA Nancy Galassini outlined in a detailed memorandum to her supervisors all the reasons why the criminal charges should be dismissed against Ramiro Bahena. The only evidence against Ramiro Bahena was the alleged identification by Arturo DeLaCruz and the surveillance video inventoried by Det. Kennedy. (Pltf. Ex. B; Pltf. Ex. J, Inventory Report of Surveillance Video).

63. ASA Galassini had multiple conversations with Arturo DeLaCruz with a Spanish speaking interpreter during which Arturo was consistently stated that he could not see the face of the shooter and he did not know whether it was Bahena. (Def. Ex. Q, pp. 24:6-21; 29:14-22; 49:6-22; 50:7-18).

64. ASA Galassini observed firsthand DeLaCruz squinting a lot and having trouble seeing. (Def. Ex. Q, p. 70:10-12). She confirmed that DeLaCruz had only 20/100 vision, which means he could not make a facial recognition past 20 feet (Pltf. Ex. B, p. 1 at #3).

65. ASA Galassini also noted in her memo that the view that DeLaCruz had from the second floor window was at night, in the rain, through a canopy of trees (Pltf. Ex. B, p. 1 at #2); and that the Original Case Report stated DeLaCruz did not see the actual shooting and only saw an unknown male Hispanic running southbound. (Def. Ex. Q, p. 24:22-24; 25:1-14; Pltf. Ex. E; Pltf. Ex. B, p. 1 at #1).

66. DeLaCruz also told ASA Galassini that he felt pressured by the police to say that the shooter was Ramiro Bahena. (Pltf. Ex. B, p. 2 at #8).

67. ASA Galassini's memo also outlined concerns regarding the identification due to the surveillance video, including how the shooter did not appear to be dressed the same as Bahena or be the same age, height, or weight as Bahena. Specifically, the shooter appeared taller, younger, and stockier than Bahena. (Def. Ex. Q, pp. 25:15-24; 26:1-6; Pltf. Ex. B, p. 2 at #2-4). The shooter did not move or walk like Mr. Bahena and did not have a physical defect in one of his arms like

17

Mr. Bahena that prevented him from raising or extending his arms smoothly. (Def. Ex. Q, pp. 28:5-13, 21-24; 29:1-4; Pltf. Ex. B, p. 2 at #5). ASA Nancy Galassini showed the video to a group of colleagues who all agreed "100%" that the shooter in the video was **not** Ramiro Bahena. (Pltf. Ex. B, p. 2 at # 9).

68. ASA Galassini recommended dismissal of all charges even though witnesses often "flip" or recant in criminal prosecutions and the government can proceed to trial with evidence such as photo and line-up identifications and Grand Jury testimony. (Def. Ex. Q, p. 34:19-24; 35:1-7; Def. Ex. E, p. 137:2-22; Def. Ex. J, p. 121:9-24).

69. There was no evidence that Ramiro Bahena ordered his son to do the shooting. (Pltf. Ex. D, ¶ 25). Bahena's only son, David, fully cooperated with the investigation and Detectives had no problem with his credibility. (Def. Ex. A, pp. 171:23-24; 172:1-4; 302:16-19; Pltf. Ex. L, Deposition of Ramiro Bahena, p. 11:4-13; Def. Ex. E, pp. 119:18-24; 120:1-7; 141:23-24; 142:1-23). Further, ASA Galassini admitted that she had no idea if the rumor was true, it did not play a role the decision to dismiss the case, and she never followed up on it. (Def. Ex. Q, pp. 62:9-24; 63:1-16).

70. There was no indication of any problems before the day of the shooting between Ramiro Bahena and anyone on that porch. (Def. Ex. A, pp. 25:19-22; 26:6-12). Chicago Police Officers Summer and Daly responded to the earlier call regarding the verbal argument; no one reported any threats by Bahena and they spent 15-20 minutes with Plaintiff, patted him down, and

did not find any weapons. (Def. Ex. A, pp. 26:16-24; 27:1-16; 28:1-24; 34:8-17; 326:4-13; Pltf. Ex. B, p.1).

71. Ramiro Bahena was released from custody on April 1, 2014 after spending 657 days in pre-trial detention in the Cook County Department of Corrections on a case in which he was facing a minimum sentence of natural life prison. (Pltf. Ex. D, ¶ ¶ 2, 23, and 24).

                                                  Respectfully submitted,

                                                  <u>Robert Robertson</u>
                                                  Robert Robertson
                                                  One of the Attorneys for Plaintiff

Jeffrey J. Neslund
Law Offices of Jeffrey J. Neslund
20 N. Wacker Drive, Suite 3710
Chicago, IL 60606
(312) 223-1100

Robert Robertson
Robertson Duric
One North La Salle St.
Chicago, Illinois 60602
(312) 223-8600