# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RAMIRO BAHENA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17 C 8532 |
| ) | |
| CITY OF CHICAGO, et al., ) | Judge Joan H. Lefkow |
| ) | |
| Defendants. ) | |

## **OPINION AND ORDER**

Ramiro Bahena has sued the City of Chicago, Chicago Police Sergeant Michael Kennedy, and Detectives Hipolito Velazquez, Juan Morales, and John Hillman for false arrest under 42 U.S.C. § 1983 and malicious prosecution under state law after he was detained for double homicide charges that were later dismissed. Defendants move for summary judgment. (Dkt. 50.) For the reasons below, the motion is denied.[1]

## **BACKGROUND**[2]

### **I. Shooting and Witness Statements**

Just after midnight on June 17, 2012 in Chicago, someone shot several people on Maria Rabadan's porch, killing Jaime Ocampo and Santiago Delgado and wounding Margarita

---

[1] This court has jurisdiction under 28 U.S.C. § 1331, 1343, and 1367. Venue is appropriate under 28 U.S.C. § 1391(b).

[2] The court takes the facts in this section from the parties' Local Rule 56.1 statements and supporting documents and construes them in the light most favorable to Bahena. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Following its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. The court disregards rather than strikes unsupported statements.

Martinez. (Dkt. 69 ¶ 3.) None of the survivors on the porch saw the shooter. (*Id.* ¶ 41.) Rabadan's 10-year-old daughter, who was on the porch but was not injured, told a responding officer that earlier in the night, Rabadan's boyfriend—plaintiff Ramiro Bahena—had fought with Rabadan and Ocampo at the house, retrieved a gun from his car, and threatened to come back and kill Rabadan and Ocampo. (*Id.* ¶ 6; dkt. 52-50 at 15–17.)[3] Another officer learned that Rabadan's adult son Arturo De La Cruz was in his second-floor apartment when he heard the gunshots and had seen at least some of the shooting. (Dkt. 78 ¶ 11.) De La Cruz told the officer that he went to the window and saw the shooter across the street from Rabadan's porch, still shooting while running southbound. (*Id.*) Officers concluded that the pattern of shell casings left on the street supported that claim. (Dkt. 69 ¶ 67.) De La Cruz did not identify the shooter, and the officer recorded the shooter's identity as an unknown Hispanic male. (Dkt. 78 ¶¶ 11–12.)

Detectives began to arrive on the scene, including defendants Hillman and Velazquez. (Dkt. 69 ¶¶ 5, 7.) De La Cruz repeated to Hillman and Velazquez what he had told the first officer: he saw the shooter through his second-floor window. (Dkt. 69 ¶¶ 9–10; dkt. 52-10 at 92:14–15 ("I told them that I saw a guy that was shooting . . . ."); dkt. 52-10 at 99:2–5 ("I just told them . . . I saw the person coming from the alley that was shooting.").) He led them upstairs and showed Hillman his vantage point from the window. (Dkt. 69 ¶¶ 9–10; dkt. 52-10 at 97:20–100:4.)

The parties' accounts of what De La Cruz told the detectives at the scene materially diverge at this point. According to the defendants, De La Cruz told Hillman that Bahena was the shooter, whom he knew well not only as his mother's long-term boyfriend but also as the father

---

[3] A neighbor had called 911 after that incident, and officers discovered that Bahena did not, in fact, possess a gun. (Dkt. 78 ¶ 70.)

of De La Cruz's ex-girlfriend. (Dkt. 69 ¶¶ 14, 24.) Bahena, however, denies that De La Cruz identified the shooter to Hillman and Velazquez. (*Id.* ¶¶ 12–17, 24; dkt. 52-10 at 98–102.)

## II.     De La Cruz's Statements at the Station

Sometime between 1:15 and 1:45 a.m., De La Cruz voluntarily went to the police station. (Dkt. 69 ¶ 20; dkt. 78 ¶ 17; dkt. 52-10 ¶ 102:12–15.) De La Cruz was placed in an interview room with several detectives, and at 7:20 a.m. he selected Bahena's photo from a photo array. (Dkt. 69 ¶ 32.) The parties dispute what happened during the intervening hours, and both accounts find some support in the record.

The defendants testified as follows: Between De La Cruz's arrival and the time he viewed the photo array, Hillman and Morales, the latter acting only as a Spanish translator, questioned De La Cruz, who reiterated that Bahena was the shooter. (Dkt. 69 ¶¶ 22–24.) De La Cruz told the detectives that he believed Bahena was jealous that Rabadan had been sitting on the porch with other men, including Ocampo. (*Id.* ¶ 25.) De La Cruz further told the detectives that the shooter was wearing a blue shirt like what he had seen Bahena wearing earlier that day. (*Id.* ¶ 27.) After Hillman and Morales completed their interview, Velazquez generated a photo array. (*Id.* ¶ 28.) Velazquez explained to De La Cruz, in English, that the subject may or may not be in the array, and that De La Cruz did not have to make an identification. (*Id.* ¶ 30.) De La Cruz then signed an advisory form giving the same advice in Spanish. (*Id.* ¶ 31.) Velazquez asked De La Cruz whether the photo array contained a photo of anyone involved in the shooting, and De La Cruz identified Bahena as the shooter. (*Id.* ¶ 32.) On the defendants' telling, throughout this process, the detectives neither threatened De La Cruz nor promised him anything in return for his cooperation. (*Id.* ¶ 26.) In fact, De La Cruz was free to leave at his leisure but never asked to.

(Dkt. 78 ¶ 17.) Nor did De La Cruz ever tell detectives that he had vision problems. (Dkt. 69 ¶ 62.)

Bahena, on the other hand, claims based on De La Cruz's deposition and affidavit that in the first six hours after De La Cruz arrived at the station, Hillman, Morales, and Velazquez badgered De La Cruz into identifying Bahena. (*Id.* ¶¶ 23–27; dkt. 78 ¶¶ 9–10.) According to De La Cruz's statements in this litigation, De La Cruz steadfastly denied knowing the shooter's identity, just as he had done at the scene. (*Id.* ¶ 7; dkt. 69 24.) He explained to them that it was dark, his eyesight was poor, and he could not tell who the shooter was. (Dkt. 70 ¶¶ 4–6; dkt. 78 ¶¶ 7–8.) But the detectives insisted that he identify Bahena as the shooter and refused to let him leave until he did. (Dkt. 78 ¶¶ 17, 56; dkt. 70 ¶ 7.) Once De La Cruz succumbed to the pressure, Hillman, Morales, and Velazquez used a photo array, which is not standard procedure when the witness knows the suspect well. (Dkt. 78 ¶¶ 21–24.) And instead of asking De La Cruz to pick the shooter from the array, they asked him to point to Bahena, which he did. (*Id.* ¶ 29.)

Around 8:00 a.m., Kennedy and other non-defendant detectives arrested Bahena at his home. (Dkt. 69 ¶ 34.) Bahena was taken to the station, Kennedy asked De La Cruz whether he would be willing to view an in-person lineup, and De La Cruz agreed. (*Id.* ¶ 37.) De La Cruz signed an English-language lineup advisory form and then picked Bahena out of a lineup. (*Id.* ¶¶ 37–40; dkt. 68-9.) The parties have essentially the same dispute about the lineup as they do about the photo array. Kennedy testified that De La Cruz, with full understanding of the process, including that he did not have to select anyone, identified Bahena as the shooter. (*Id.* ¶¶ 37–40.) De La Cruz testified that he did not understand the lineup identification process, in part because Kennedy spoke and furnished an advisory form in English, which De La Cruz neither spoke nor

4

read as well as Spanish. (*Id.*; dkt. 78 ¶ 31.) De La Cruz said that he was asked to select Bahena, rather than the shooter, out of the lineup. (Dkt. 69 ¶ 39; dkt. 78 ¶ 33.)

De La Cruz returned to the station the next night. (Dkt. 69 ¶ 47.) He spoke with Assistant State's Attorney Jacqueline Kwilos. (*Id.* ¶ 48.) Their conversation resulted in De La Cruz's signing a statement, in English, that from his second-floor window he saw Bahena shoot at Rabadan's porch on June 17. (Dkt. 52-15.)[4] Kennedy and a non-defendant interpreter were present for this statement and testified that De La Cruz made it voluntarily. (Dkt. 69 ¶ 53.) Bahena, however, claims that De La Cruz was told he could not leave until he signed the statement. (Dkt. 78 ¶ 43.) Because he felt pressure to sign, he signed it, even though it was untrue. (*Id.*)

Bahena remained in custody until June 19. In interviews with non-defendant detectives, Bahena repeatedly denied any involvement in the shooting. (Dkt. 69 ¶ 42.) As the deadline to charge or release Bahena approached, Kwilos decided that she would prefer to continue the investigation before charging Bahena, and Bahena was released. (*Id.* ¶¶ 69–70.)

## III. Bahena's Arrest and Prosecution

On July 17, although there was no new evidence, Kennedy and another detective arrested Bahena. (Dkt. 69 ¶ 74; dkt. 78 ¶ 49.) On July 27, De La Cruz testified before a grand jury. (Dkt. 52-9 at 1.) He reiterated, now under oath, that he saw from his second-floor window that Bahena was the shooter on June 12. (Dkt. 69 ¶¶ 89–90.) He also testified that he told detectives and Kwilos the same thing during his interviews in the immediate aftermath of the shooting and identified Bahena as the shooter in the photo array and lineup. (*Id.* ¶ 91.) He further testified that he was treated well and was not coerced. (*Id.* ¶ 92.) At his deposition in this case, however, De

---

[4] The parties refer to this typed document as De La Cruz's "handwritten" statement.

La Cruz claimed that he lied to the grand jury, inculpating Bahena because he thought that was what Kennedy—who was not present but who drove De La Cruz to and from the grand jury—wanted to hear. (Dkt. 78 ¶ 55; dkt. 52-10 at 192–93; dkt. 52-2 at 66–67.) Rabadan and her daughter also testified to the grand jury, consistent with earlier statements, that Bahena had come to Rabadan's house earlier the night of the shooting and threatened to come back and kill Rabadan. (Dkt. 69 ¶ 93.) Because the case continued for many months after the grand jury heard this testimony, the court assumes that the grand jury returned a true bill of indictment, though neither side includes that fact in the Rule 56.1 statements.

As the prosecution progressed, Bahena's defense counsel identified substantial exculpatory evidence. (Dkt. 78 ¶¶ 41–42, 56–61.) They reviewed surveillance footage of the shooter that detectives had obtained on the day of the shooting. (*Id.* ¶ 41.) Though the shooter's face was not identifiable in the footage, defense counsel concluded that he was clearly not Bahena. (*Id.*) Bahena had a ponytail; the shooter did not. (*Id.*) The shooter was tall and stocky; Bahena was shorter and leaner. (*Id.*) And the shooter fully extended his arm, which Bahena could not do because of an old injury. (*Id.*)[5]

Defense counsel then interviewed De La Cruz and showed him the surveillance footage, which he had never seen. (*Id.* ¶¶ 40–41, 56–57.) De La Cruz concluded immediately from the video that Bahena was not, in fact, the shooter. (Dkt. 78 ¶ 57; dkt. 68-4 ¶¶ 12–13.) Defense counsel also noticed that De La Cruz squinted at the screen while watching the video and took him for an eye exam. (Dkt. 78 ¶ 58.) The eye exam confirmed that De La Cruz had 20/100

---

[5] The court has reviewed the security footage and finds that it is subject to interpretation. A reasonable jury could find it supports either party's contention. *Hurt* v. *Wise*, 880 F.3d 831, (7th Cir. 2018) (finding video evidence is not necessarily dispositive on summary judgment where it does not "blatantly contradict" either party's version of events).

vision, which meant he could not identify a face more than twenty feet away from himself. (*Id.* ¶¶ 5, 58.) The shooting occurred at night and in the rain, and De La Cruz saw the shooter across the street from a second-floor window with a canopy of trees obstructing his view. (*Id.* ¶ 6.) De La Cruz claims he told the detectives about these vision problems on the night of the shooting. (*Id.* ¶ 8.)

Defense counsel presented this evidence to one of the assistant state's attorneys handling the prosecution. (Dkt. 78 ¶ 60.) These developments prompted the assistant to prepare a memorandum to her supervisors explaining that she did not believe that Bahena's guilt could be proven beyond a reasonable doubt. (Dkt. 68-2.) She dismissed the case against Bahena *nolle prosequi*. (Dkt. 69 ¶ 96.) In April 2014, Bahena was released after spending 657 days in jail. (Dkt. 78 ¶ 71.) This suit followed.

## **LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must look beyond the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91

L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on their pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S. Ct. 2548; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24, 106 S. Ct. 2548.

## ANALYSIS

### I. Constitutional Violation

#### A. Probable Cause

The Fourth Amendment, effective against the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. U.S. Const. amd. IV, XIV. Ordinarily, a seizure, such as an arrest, is "'reasonable' only if based on probable cause to believe the individual has committed a crime." *Manuel* v. *City of Joliet*, 137 S. Ct. 911, 917, 197 L. Ed. 2d 312 (2017). The Fourth Amendment continues to govern pretrial detentions, which similarly must be supported by probable cause. *Lewis* v. *City of Chicago*, 914 F.3d 472, 476–47 (7th Cir. 2019).

Probable cause exists "if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez* v. *City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan* v. *DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627 (1979)). "To make this determination, [the court] must step[] into the shoes of a reasonable person in the position of the officer[,] considering the facts known to the officer at the time." *Williams* v. *City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (citations omitted). "In deciding this question of law as part of a motion for summary judgment, however, [the court] must give the non-moving party the benefit of conflicts in the evidence about what the officers

8

actually knew at the time." *Id.* "The fact that criminal charges are eventually dropped or the complaining witness later recants has no consideration in the determination of arguable probable cause at the time of arrest." *Burritt* v. *Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).

If De La Cruz voluntarily identified Bahena as the shooter, the defendants would have had probable cause to believe that Bahena committed the shooting. "Probable cause can be based on a single identification from a credible eyewitness." *Hart* v. *Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). Here, De La Cruz identified Bahena from a photo array and an in-person lineup, signed a written statement confirming his identification, and repeated his identification under oath to the grand jury. The defendants all believed that surveillance footage and the placement of shell casings corroborated De La Cruz's statement that the shooter ran southbound, suggesting that De La Cruz indeed saw the shooter. The defendants also had been told that that Bahena had threatened to kill Rabadan earlier in the day, giving them further reason to believe De La Cruz's identification. Any reasonable jury would find that that collection of facts amounted to probable cause that Bahena had committed a crime. *Hart*, 798 F.3d at 587.

If, on the other hand, De La Cruz did not voluntarily identify Bahena as the shooter, but, rather, the defendants pressured him to do so, they would have lacked probable cause. "A police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth." *Hart*, 798 F.3d at 591. But "[t]o supply probable cause, witness identifications cannot be the product of coercion or manipulation." *Id.* at 588. Moreover, an officer who uses forbidden tactics "to trick a person into making an unreliable identification" may be liable for false arrest under § 1983. *Phillips* v. *Allen*, 668 F.3d 912, 917 (7th Cir. 2012).

9

On this record, there is a genuine dispute about whether De La Cruz volunteered his identification of Bahena or whether the officers drew it out of him without regard to its truth. Kennedy, Velazquez, Morales, Hillman, Kwilos, and a few non-defendant detectives will testify that it was the former. De La Cruz will testify that it was the latter. Because a reasonable jury could credit either side of the dispute, summary judgment must be denied. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment . . . .").

### B. Qualified Immunity

The factual disputes also preclude qualified immunity. "An officer is entitled to qualified immunity if 'a reasonable officer could have mistakenly believed that probable cause existed.'" *Burritt*, 807 F.3d 239 at 250 (quoting *Fleming* v. *Livingston Cty., Ill.*, 647 F.3d 874, 880 (7th Cir. 2012)). If the jury credits Bahena's version of events, it would mean that the officers pressured De La Cruz to falsely identify Bahena as the shooter. No reasonable officer at the time would have mistakenly believed that pressuring a witness to falsely identify a suspect is consistent with the Fourth Amendment. *Lewis*, 914 F.3d at 477 ("It has been clear since at least *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674 . . . (1978), that falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment.")

## II. Malicious Prosecution

To prove malicious prosecution, Bahena must show "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez* v. *City of Chicago*, 900 F.3d 838, 849 (7th Cir.

10

2018) (quoting *Sneed* v. *Rybicki*, 146 F.3d 478, 480–81 (7th Cir. 1998)). The first and fifth elements are not at issue. As discussed above, there are triable facts about whether the defendants had probable cause, satisfying the second element. For the same reason, the court rejects the defendants' argument that they could not have had malice because they had probable cause. The defendants thus contest only the third and fourth elements, arguing that some detectives did not "commence or continue" the proceedings against Bahena and that those proceedings did not end in Bahena's favor.

Although the court finds that Bahena has enough evidence to satisfy these elements, Bahena should consider whether this claim can be voluntarily dismissed as duplicative of the § 1983 claim.

### A. Commence or Continue

Hillman, Velazquez, and Morales claim that they were not personally responsible for initiating the charges against Bahena and therefore are not liable for malicious prosecution. Kennedy, who personally arrested Bahena and advocated for the charges against him, does not join this argument. "[A] person can be liable for commencing or continuing a malicious prosecution even if that person does not ultimately wield prosecutorial power or actively deceive prosecutors." *Beaman* v. *Freesmeyer*, 131 N.E.3d 488, 499, 2019 IL 122654 (Ill. 2019). "[T]he relevant inquiry is whether the officer proximately caused the commencement or continuance of the criminal proceeding." *Id.* at 496. Here, Bahena's theory, if successful, would show that Hillman, Velazquez, and Morales proximately caused the commencement of criminal proceedings by manipulating or falsifying key evidence. According to this theory, Hillman and Morales (and possibly Velazquez) pressured De La Cruz to identify Bahena as the shooter without regard to whether it was true. They refused to accept De La Cruz's repeated statement

11

that he could not identify the shooter and refused to let him leave until he inculpated Bahena. Then, Velazquez personally told De La Cruz to select Bahena out of a photo array and later claimed falsely that De La Cruz identified Bahena as the shooter. All three therefore personally manipulated or fabricated the key evidence against Bahena, proximately causing his prosecution. *See, e.g.*, *Johnson* v. *Winstead*, — F. Supp. 3d —, 2019 WL 6527954, at *5 (N.D. Ill. 2019) (finding all officers who were aware of witness's false statement potentially liable for malicious prosecution).

      **B.**      **Termination in Bahena's Favor**

The defendants argue that the dismissal of charges against Bahena *nolle prosequi* was not a termination in his favor. "The Illinois Supreme Court has held that 'a *nolle prosequi* dismissal terminates a proceeding in favor of the accused 'unless the abandonment is for reasons not indicative of the innocence of the accused.'" *Gardunio* v. *Town of Cicero*, 674 F. Supp. 2d 976, 987 (N.D. Ill. 2009) (quoting *Logan* v. *Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001)). "[T]he particular circumstances of each case must be considered to determine whether the dismissal following suppression of evidence should be considered indicative of innocence." *Dobiecki* v. *Palacios*, 829 F. Supp. 229, 235 (N.D. Ill. 1993). Here, the assistant state's attorney's memorandum reveals the rationale behind the dismissal *nolle prosequi*: she did not believe that she could prove Bahena's guilt beyond a reasonable doubt. (Dkt. 68-2.) The prosecutor did not dismiss the charges as an act of mercy or to preserve scarce prosecutorial resources—she did not believe that she could demonstrate Bahena's guilt. Because that dismissal is "indicative of innocence," the proceedings were terminated in Bahena's favor.

## **ORDER**

The motion for summary judgment (dkt. 50) is denied.

Date: August 26, 2020

_____
U.S. District Judge Joan H. Lefkow